## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 08-066 (RWR)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. MATHERON,** | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND
### MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently. The United States also submits this memorandum in aid of sentencing.

## I.    BACKGROUND

The defendant was charged in a one-count information with Possession of Material Involving Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5) and 2256. On May 23, 2008, the defendant pled guilty to the information. At that time the defendant admitted to the following:

At all times relevant to this offense, Michael John Matheron was employed at the Library of Congress (LOC) as a Congressional Research Specialist in the American Law Division. The Library of Congress is located at 101 Independence Avenue, SE, Washington, DC.

On September 19, 2007, the term "twinks" was detected on IP address 140.147.143.82. This IP address was assigned to user profile "MMATHERON" and was assigned to the computer located in Matheron's personal workspace. The term "twinks" is commonly used in the child pornography

industry.  Further investigation showed Matheron routinely used his LOC computer to access child pornography "internet groups" through Yahoo and Google to include "Crazy For Twink Butts," "Endless-Twinks-n-Things" and "Gayscat."  Matheron used his LOC computer to access Google groups and his Yahoo accounts, which he used to save and upload images of child pornography.

Yahoo provides free web based Internet electronic mail access to the general public, and a Yahoo user with a Yahoo account is supplied with storage space that can only be accessed by the user.  Matheron used his Yahoo account and Yahoo storage space to maintain his library of images of child pornography.  A December 10, 2007 search of Matheron's Yahoo account and storage space revealed over 300 images of child pornography, consisting primarily of photographs of naked young boys engaging in sexually explicit conduct.  During a December 10, 2007 search of Matheron's home in Silver Spring, Maryland, investigators seized a Dell desktop computer.  Located on this computer was a video clip of naked pre-pubescent boys engaging in sexually explicit conduct, including oral and anal sex.

On December 10, 2007, Matheron was interviewed by LOC investigators.  During this interview Matheron provided a statement in which he admitted that he has been using the internet to access child pornography for approximately nine years.  He admitted to looking at child pornography using both his home computer and his LOC work computer.  He admitted to viewing over 500 images containing child pornography, and to viewing movie clips.  He also admitted that he sometimes saved the images and movie clips.

The images located on Matheron's computer and Yahoo account were taken to the National Center for Missing and Exploited Children (NCMEC), where they were compared with NCMEC's Child Recognition & Identification System (CRIS). The analysis resulted in one of the images being identified as a known minor, (i.e. under age 18).

Matheron used a computer for the possession of the child pornography he possessed, and the images had been mailed, shipped, or transported through interstate commerce. Furthermore, some of the images of child pornography possessed by Matheron involved prepubescent minors or minors who had not attained the age of 12 years.

## II.    SENTENCING CALCULATION

### A    Statutory Maximum

Pursuant to 18 United States Code § 2252A(b)(2), Possession of Material Involving Child Pornography carries a maximum sentence of 10 years imprisonment.

### B.    Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 27. See PSR ¶ 26. This calculation contemplates a three level downward adjustment for acceptance of responsibility, and the following enhancements: two levels pursuant to U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor, four levels pursuant to U.S.S.G. § 2G2.2(b)(4) because the material involved portrays sadistic or masochistic conduct or other depictions of violence, two levels pursuant to U.S.S.G. § 2G2.2(b)(6) because a computer was used to facilitate this offense, and four levels pursuant to U.S.S.G. § 2G2.2(b)(7)(D) because of the number of images involved. The PSR calculates the defendant's criminal history as Category I. See PSR ¶ 29. Therefore, the PSR calculates the guideline range for the defendant at

70 to 87 months.    See PSR ¶ 66.    However, the government is not seeking the four level enhancement for sadistic or masochistic conduct or other depictions of violence, despite the fact that the images possessed by the defendant portray young children being sexually penetrated by other children.  As such, the defendant's offense level is a 23, which provides for a guideline range of 46 to 57 months.

II.    **GOVERNMENT'S RECOMMENDATIONS**

A.    Acceptance of Responsibility

The government agrees that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines.  He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-sentence investigation. Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

B.    Application of the Federal Guidelines post-Booker and Rita

Pursuant to the plea agreement, it is the government's position that the Court should impose a sentence at the high end of the guidelines range.  In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. Section 3553(b)(1).  Booker, 125 S. Ct. at 756-57.  However, the Court expressly refused to invalidate the Guidelines in their entirety. Id. at 764.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as

to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by the court of appeals for "reasonableness." Booker, 125 S. Ct. at 766.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker at 767 (citing 18 U.S.C. Sections 3553(a)(4), (5) (Supp. 2004)).

In Rita v. United States, 127 S. Ct. 2456 (2007), the Court reiterated its position with respect to the Sentencing Guidelines. The Court stated that the court of appeals may apply a presumption of reasonableness to a within-Guidelines sentence. Id. at 2467. The Court also stated, "[i]n our view, however, the presumption, even if it increases the likelihood that the judge, not the jury, will find sentencing facts, does not violate the Sixth Amendment." Id. (Internal quotation marks omitted). In this light – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – a sentence within the Guidelines, while not required, accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences. Booker, 125 S. Ct. at 766.

5

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing. Such characteristics, which are articulated in 18 U.S.C. Section 3553(a), include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and] . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); Id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); Id. at 789

6

(dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See id. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) -- provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, but Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals for reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the appropriate Federal Guidelines range.

C.    Basis for Government's Sentencing Recommendation

1.    General Considerations

Child pornography is one of the most insidious traps confronting children in this country. Both Congress and the United States Supreme Court have found that the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance because of the psychological and physical effects such abuse has on children and their families.

In response to the growing epidemic of child pornography, Congress enacted the Prosecutorial Remedies and Other Tools to End the Exploitation Children Today Act (the PROTECT Act, Public Law 108-21) in 2003 to enhance the penalties for crimes involving the sexual exploitation of children. Congress also sought to restrict the ability of courts to grant downward departures in cases of sexual exploitation of children. The Commentary to U.S.S.G. § 5K2.0 explains that the standard for a downward departure in crimes against children and sexual offenses differs from the standard for other departures under the policy statement in that it includes a requirement "that any mitigating circumstances that form the basis for such a downward departure be affirmatively and specifically identified as a ground for downward departure." Commentary to § 5K2.0, Scope of Policy Statement 4 (B) (I).

As justification for higher sentences in child pornography offenses, Congress stated:

> (2) The Government has a compelling state interest in protecting children from those who sexually exploit them, including both child molesters and child pornographers. "The prevention of sexual

8

exploitation and abuse of children constitutes a government objective of surpassing importance," New York v. Ferber, 458 U.S. 747, 757 (1982), and this interest extends to stamping out the vice of child pornography at all levels in the distribution chain. Osborne v. Ohio, 495 U.S. 103, 110 (1990).

(3) The Government thus has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective. "The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." Ferber, 458 U.S. at 760.

The Protect Act, Title V. - Obscenity and Pornography, Sec. 501. Findings.

The federal child pornography statutes and penalty provisions are designed to do precisely that. Notably, the Sentencing Commission revised U.S.S.G. § 2G2.2 (2004 edition) so that the base offense level for simply possessing material involving the sexual exploitation of a minor is now 18 instead of 15. This suggests that the trend in Congress has been to do everything possible to increase punishment for crimes involving the sexual exploitation of minors because of its consequential effects on children.

The defendant's actions in amassing an extensive library of child pornography fueled an industry that victimizes children throughout the world. The serious punishment recommended by the United States Sentencing Commission reflects Congressional concerns that consumers of child pornography, such as the defendant, create the market that causes producers of child pornography to kidnap, drug, and otherwise coerce the young children who are subjects of this ugly contraband.

The Ninth Circuit has articulated that "commercial child pornography" (images obtained from the Internet, just like those possessed by this defendant) is the industry targeted by Congress; moreover, the most effective method of eradicating the industry is to punish the ultimate consumer.

United States v. Adams, 343 F.3d 1024, 1034 (9th Cir. 2003).

> Th[e] legislative history leads us to three observations: (1) Congress determined that child pornography is a multi-million dollar industry in which sexually explicit depictions of children are bought, sold, and traded interstate; (2) Congress decided to "stamp out" the market for child pornography by criminalizing the production, distribution, receipt, *and possession* of child pornography; and (3) Congress thought it could strike a blow to the industry by proscribing possession of child pornography "because those who possess and view child pornography encourage its continual production and distribution."

Id. at 1032, citing 136 Cong. Rec. at S4730 (emphasis in original). This Ninth Circuit panel stressed the national interest in punishing consumers, because "possession of commercial child pornography [whether the possession resulted from inter- or intrastate sale, trade, or dissemination] substantially affects the national market for child pornography." Id. at 1034; see also United States v. Rodia, 194 F.3d 465, 477 (3d Cir. 1999) (Polaroid photographs of "naked boys in various sexually explicit poses" does indeed fall within federal reach, because "possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography"). The defendant's pursuit of these materials does indeed victimize children, since throughout the world, real children are forced or tricked into the degradation that is child pornography, for the mere gratification of adults like this defendant. Moreover, because the Internet has become the distribution medium of the photographs, the degradation of these children is permanent, continuous, and impossible to eradicate.

Clearly, the defendant here fueled the national and international market for child pornography. As such, the defendant's punishment should reflect the impact of his actions on the child pornography industry, and on the true victims, the children who were subjected to the illegal

sexual abuse documented in the many photographs and videos in the defendant's collection. And the victims cannot, and should not, be considered simply in the abstract. They are real, flesh and blood victims of terrible crimes. It is the ultimate insult that all of the victims, whether rescued and identified or not, are left with a terrible burden to carry for the rest of their lives: the knowledge that not only were they victimized by the predators who used the victims to create pornographic images, but that these images remain in circulation, and are viewed again and again and again by those who derive pleasure from seeing the images.

Indeed, the child victims of pornography will be forced to live with the horrible and depraved sexual acts they were forced to commit for the rest of their lives:

> The trauma of sexual abuse on a child is different from such childhood traumas as experiencing the divorce of one's parents or even being the victim of physical abuse. . . .  [F]our traumagenic dynamics – traumatic sexualization, betrayal, powerlessness, and stigmatization – form the core of the psychological injury inflicted by abuse.  They alter children's cognitive and emotional orientation to the world, and create trauma by distorting children's self-concept, world view, and affective capacities.

> First, a child who is sexually abused is shaped in a developmentally inappropriate and interpersonally dysfunctional way, emerging with (1) inappropriate repertoires of sexual behavior, (2) confusions and misconceptions about his or her sexual identity and the role of sex in affectionate relationships, and (3) unusual emotional associations with sexual activities.

> Second, a child who is sexually abused by someone on whom he or she was vitally dependent experiences betrayal by (1) the perpetrator and (2) family members who are not sexually abusing the child but are unable or even unwilling to believe the child, thereby ignoring the child's cry for help.  Moreover, child-victims who experience betrayal suffer from an intense need to regain trust and security, manifested in extreme dependency and clinging.  As adults, they suffer from impaired judgment about the trustworthiness of other people or even experience hostility and anger towards personal relationships.

Furthermore, anger stemming from betrayal may lead to aggressive, hostile or delinquent behavior as a way of protecting the self from future harm or as a way of retaliating against the initial abuse.

Third, powerlessness occurs in sexual abuse when a child's territory and body space are repeatedly invaded against the child's will. Force and threat are not necessary for a child to feel powerless – the mere realization that he or she is trapped, combined with the fear of the consequences of disclosing his or her participation in sexual activity, can create a sense of powerlessness. Nightmares, phobias, hypervigilance, clinging behavior, and somatic complaints related to anxiety have been repeatedly documented among sexually abused children. As adults, the effects of powerlessness can include the impairment of a person's sense of efficacy and coping skills. . . .

Fourth, stigmatization occurs when sexually abused children incorporate negative connotations related to their sexual experiences. Child-victims may feel isolated and may gravitate to various stigmatized levels of society, thereby becoming involved in drug or alcohol abuse, criminal activity, prostitution, extreme forms of self-destructive behavior, and suicide attempts.

Lydia W. Lee, Note, Child Pornography Prevention Act of 1996: Confronting the Challenges of Virtual Reality, 8 Southern California Interdisciplinary Law Journal 639, 662-64 (1999) (quotation marks and footnotes omitted) (summarizing findings set forth in David Finkelhor & Angela Browne, The Traumatic Impact of Child Sexual Abuse: A Conceptualization, 55 American Journal of Orthopsychiatry 530, 531-36 (1985)).

The "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" used in the production of the pornographic material. Osborne, 495 U.S. at 109. The Sixth Circuit has likewise held that using children to produce graphic sexual images is a form of sexual abuse which can cause mental and/or physical harm to a child. United States v. Champion, 248 F.2d 502, 506 (6th Cir. 2001). As previously noted, "[t]he 'victimization' of the children involved does not end when the camera is put away." United States

v. Norris, 159 F.3d 926, 929 (5th Cir. 1998).  Additionally, viewing and collecting these images, which depict children involved in sexual acts, contributes indirectly to the harm inflicted on that child by creating a demand for more of the images.  These viewers contribute to the cycle of abuse and are in part responsible for the psychological and physical harm of the children used to produce the images.  United States v. Yeaple, 605 F. Supp. 85, 86 (Pa. D. 1985), see also, Ferber, 458 U.S. at 759.

The consumer of sexual images causes children of pornographic abuse to suffer in various ways: (1) the abuse is perpetuated through dissemination, (2) the existence of the image is an invasion of the child's privacy, and (3) the demand for the creation of more images is created by the consumer.  Norris, 159 F.3d at 929-30.  "Child pornography invariably produces great shame and guilt in the children involved, especially as they get older and more fully comprehend the enormity of their abuse and know that there is a permanent record of the degradation out there, circulating around for people to see – maybe future friends or their own children when they grow up."  Dr. Victor B. Cline, Pornography's Effects on Adults & Children, Morality in Media, 12 (2001).

While it is true that the defendant was not involved in any production of child porn, his crime is still considered to not only promote the production of such materials, but to also continue the harm to the children.  Case law has recognized that even a "'passive' consumer who merely receives or possesses the images directly contributes to this continuing victimization." Sherman, 268 F.2d at 545 (citations omitted).  "Indeed, one of the reasons for criminalizing the 'mere' possession of child pornography is to create an incentive for the possessor to destroy the material, and alleviate some of these harms to the children depicted."  Sherman, 268 F.3d at 547.

2.    Psychiatric Considerations

The defendant has provided two letters  from A. Carl Segal, M.D: one dated April 14, 2008, and one dated July 29, 2008.[1]  While Dr. Segal is a practicing psychiatrist, his experience in treating sex offenders is less clear.  Indeed, he has not published any articles regarding sex offender treatment, nor is he a member of any professional organizations that treat sex offenders.  The only information provided regarding Dr. Segal's experience treating sex offenders is his assertion that he has experience "dealing with a[n unspecified] number of sex offenders in the Howard County Detention System . . . and since then while in private practice."  Nor is there any indication that Dr. Segal conducted any of the tests that are routinely used in the treatment of sexual offenders, including, but not limited to: phallometry, viewing time, or polygraphy.  See The Association for the Treatment of Sexual Abusers Practice Standards and Guidelines for the Evaluation, Treatment, and Management of Adult Male Sexual Abusers.  Many of these tests are also used by the United States Probation office as part of their evaluation and supervision of defendants involved in child pornography cases.

Dr. Segal relies on his "experience" to determine that he does not "believe" that the defendant is attempting to deceive him.   Dr. Segal is willing to accept the defendant's word on *every* issue, despite the facts that 1) Dr. Segal recognizes that the defendant understands that any information he

---

[1]    The government assumes the purpose of these letters is to provide a psychiatric diagnosis, despite Dr. Segal's extensive recitation of his views regarding the purpose of the United States' criminal justice and incarceration systems.  Dr. Segal is certainly entitled to his opinion, but the government is troubled by his opinion's complete disregard for not only the victims of child pornography, but also for Congress' intent in enacting laws against child pornography, and in fashioning the factors to be considered at sentencing under 18 U.S.C. § 3553(a).  The government also can't help but wonder whether Dr. Segal's opinions have swayed his ultimate conclusion that the defendant should not be incarcerated.

shares with Dr. Segal would be reported to the Court and . . . "might" inhibit total truthfulness, and

2) the defendant *failed* to report his use of child pornography to previous therapists, despite being

in therapy for 16 to 17 years.  If, as Dr. Segal opines, the defendant was so desperate to be caught

so he could get help, the government cannot help but wonder why he  never previously reported his

predilection to the mental health professionals who were trying to assist him.

Dr. Segal's "conclusions" are troubling, particularly in light of the defendant's actions.  Dr.

Segal boldly states "[t]here is no indication that [the defendant] has any significant interest in child

pornography."  It is difficult to see how Dr. Segal came to that conclusion, given the over 300 images

of child pornography found in the defendant's possession.[2]  Similarly disturbing is Dr. Segal's

statement that the defendant indicated he "accidentally" found sites dealing with children, and one

type of site was not viewed to the exclusion of others.  This assertion is difficult to reconcile with

the images possessed by the defendant, which are nearly all images involving sexual conduct

between young boys.  Given the breadth and volume of child pornography available over the internet,

defendant's claim that he just happened to end up with a certain type of child pornography, to the

exclusion of the many other types available, is beyond belief.

3.    Medical Considerations

The government is similarly unpersuaded by the defendant's assertion that his medical

conditions warrant a departure pursuant to U.S.S.G. § 5H1.4.  5H1.4 notes that

---

[2]    Again straying from his area of "expertise," Dr. Segal offers the Court his ultimate
opinion that the defendant's incarceration would "serve no constructive purposes to . . . society as
a whole."  While Dr. Segal apparently sees no value in promoting respect for the law, providing just
punishment for the offense, and affording adequate deterrence to criminal conduct, Congress feels
differently, and it is Congress' edicts that this Court is required to enforce.  See 18 U.S.C. § 3553(a).

> Physical condition or appearance, including physique, is not
> ordinarily relevant in determining whether a departure may be
> warranted. However, an extraordinary physical impairment may be
> a reason to depart downward; e.g. in the case of a seriously infirm
> defendant, home detention may be as efficient as, and less costly than,
> imprisonment.

As such, physical impairment is discouraged as a basis for departure at sentencing. United States v. Johnson, 318 F. 3d 821, 824 (8th Cir. 2003). The Supreme Court has held that discouraged factors should only be used in "exceptional cases." Koon v. United States, 518 U.S. 81, 95 (quoting U.S.S.G. § 5H intro comment). Many courts have demonstrated the stringency of this standard. For example, in United States v. Drew, the court held that AIDS did not qualify as an extraordinary physical impairment. 751 F. Supp. 1195, 1199 (E.D. Va. 1990) ("Defendant's AIDS affliction warrants sympathy, but not a departure.") In an opinion that was affirmed by the Fourth Circuit, the court noted that "[e]xcept in extraordinary circumstances . . . terminally ill persons who commit serious crimes may not use their affliction to escape prison. Were this rule otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons." Id. See also United States v. Guajardo, 950 F.2d 203, 208 (5th Cir. 1991) (fact that defendant had cancer in remission, high blood pressure, a fused right ankle, an amputated left leg, and a drug dependency not grounds for departure); United States v. Waters, 105 F.3d 200, 208 (5th Cir. 1997) (defendant's sarcoidosis, a chronic inflammation of multiple organs, did not warrant departure); United States v. Carey, 895 F.2d 318 (7th Cir. 1990) (fact that defendant had had several serious operations as a result of brain tumor did not justify downward departure); United States v. Hilton, 946 F.2d 955 (1st Cir. 1991) (defendant's severe skin disorder that had required surgery on approximately thirty occasions in the three years prior to sentencing not grounds for departure);

United States v. Tolson, 760 F. Supp. 1322, 1331 (N.D. Ind. 1991) (defendant's extensive physical problems, including arthritis and emphysema, not grounds for departure). But see United States v. Greenwood, 928 F. 2d 645, 646 (4th Cir. 1991) (defendant's severe medical impairment caused by loss of both legs before the knee in the Korean War, requiring treatment at the V.A. hospital, warranted downward departure).

The defendant asserts that his chronic renal failure, hypertension, and hyperlipidemia justify a downward departure. It appears that these medical conditions were present at the time of his criminal conduct - a consideration that weighs against his requested departure. In United Sates v. Sjolie, no. 05-4011, 2007 WL 1597920 (8th Cir. 2007), the court upheld the denial of a downward departure, noting "[a]n appropriate sentence should afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. The record shows that [the defendant] continued to distribute drugs despite his medical problems."

Furthermore, renal failure does not qualify as an "extraordinary physical impairment" warranting a downward departure. See United States v. Henry, 71 F. Appx. 493, 505 (6th Cir. 2003) (defendant who had been diagnosed with diabetes and had suffered renal failure approximately four years earlier not entitled to downward departure). Nor does diabetes provide the defendant with the "get out of jail free card" that he seeks. See United States v. Likens, 464 F.3d 823, 825 (8th Cir. 2006) (defendant's heart disease, diabetes, and drug addition not a ground for departure); United States v. Anderson, 260 F. Supp.2d 310 (D. Mass. 2003) (defendant's diabetes not a ground for downward departure, as Bureau of Prisons could adequately treat defendant's medical needs); United States v. Seward, No. 97 CR 851, 2002 WL 31103488 at *3 (N.D. Ill. 2002) (defendant with diabetes, high blood pressure, ulcers, and a shrunken prostrate did not demonstrate "extraordinary" physical

17

impairment); United States v. Hernandez, 89 F. Supp.2d 612, 616 (E.D. Pa. 2000) (defendant's diabetes, asthma, and high blood pressure "did not render his health so extraordinarily poor" as to warrant a departure).

As the above cited cases show, the defendant's various medical conditions do not qualify as "extraordinary physical impairment" sufficient to warrant a downward departure, nor has the defendant shown that the Bureau of Prisons could not adequately treat his medical conditions. As such, there is no basis for a downward departure pursuant to U.S.S.G. § 5H1.4.

4.      Benefits Already Afforded to the Defendant

The defendant  has received a number of significant benefits from this plea, and all the leniency he should receive is encompassed in the concessions already made by the government. The defendant received a three point decrease in his offense level as a result of his acceptance of responsibility, and the United States Attorney's Office for the District of Columbia has agreed to decline to prosecute the defendant for receipt of child pornography, in violation of 18 United States Code §§ 2252A(a)(2) and 2256.[3]  Moreover,  the United States Attorney's Office for the District of Maryland also agreed not to prosecute the defendant for receipt of child pornography, in violation of 18 United States Code §§ 2252A(a)(2) and 2256.  Had the defendant been convicted of this charge, the defendant would have faced an additional sentence in a different jurisdiction, which may well have been imposed consecutively to whatever sentence this Court imposes.

---

[3]         This offense has a mandatory five year minimum sentence.

## V.    <u>CONCLUSION</u>

Wherefore, the government respectfully requests that the Court sentence the defendant to 57 months of incarceration, to be followed by a lifetime of supervised release, with the following special conditions:

1)      Lifetime registration as a sex offender.

2)      The defendant shall not possess or use a computer that has access to any on-line computer service at any location, including his place of employment, without the prior written approval of the probation office. "On-line computer service" includes, but is not limited to, any Internet service provider, bulletin board system, or other public or private computer network.

3)      The defendant shall submit to periodic unannounced examinations of defendant's computer by the probation office.

4)      The defendant shall not possess or use any data encryption technique or program.

5)      The defendant shall maintain a daily log of all addresses accessed by way of any computer, other than those authorized for employment, and shall make the log available to the probation office for review.

6)      The defendant shall consent to third party disclosure regarding computer related restrictions to any employer or potential employer.

7)      The defendant shall not engage in employment, consulting, or associate in any way with children as a profession for the duration of his supervision.

8)      The defendant shall not participate in any volunteer activity that involves contact with minors.

9)      The defendant shall participate in mental health treatment specifically related to sexual offender therapy.

10)      The defendant shall not associate with any known sex offender.

11)    The defendant shall not reside with a child under the age of 18 without the express
       written approval of the minor's legal guardian and the written permission of the
       Court.

                        Respectfully submitted,

                        JEFFREY TAYLOR
                        United States Attorney

                        Catherine K. Connelly
                        _____
                        Assistant United States Attorney
                        Major Crimes Section, Mass.  Bar No. 649430
                        555 4th Street, N.W.  #4844
                        Washington, DC 20001
                        Phone: 616-3384
                        Fax: 353-9414

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  08-066 (RWR)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. MATHERON,** | : | |
| **Defendant.** | : | |

## <u>ORDER</u>

WHEREUPON, having considered the Government's Motion for Guidelines Credit, and the record before the court, it is hereby

**ORDERED**, that the Government's motion is hereby GRANTED.

_____
Richard W. Roberts
United States District Judge

cc:

Catherine K. Connelly
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530

David W. Lease
11 North Washington Street
Suite 520
Rockville, MD 20850