# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

        Plaintiff            :

                           :

v.                          :        Docket No.: 1:08cr066-01

                           :

MICHAEL J. MATHERON       :

                           :

        Defendant         :

## DEFENDANT'S 18 U.S.C. § 3553 SENTENCING MEMORANDUM

Defendant, Michael J. Matheron, by and through his counsel, David W. Lease and Smith, Lease & Goldstein, LLC, pursuant to 18 U.S.C. § 3553, hereby submits this Sentencing Memorandum, and various attachments in aid of sentencing, in the above referenced case.

### I.    INTRODUCTION.

On May 23, 2008, Mr. Matheron entered a guilty plea to one count of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(b) and 2256.  At the plea hearing, this Court directed counsel to submit any sentencing memorandum on or before August 25, 2008, and scheduled a sentencing hearing for September 3, 2008.

As more fully set forth below, the Government's request for a 4 point enhancement to Mr. Matheron's offense score, based on the allegation that some images retrieved from Mr. Matheron's computer depicted sadistic or masochistic conduct is without merit.  The images do not depict any conduct that falls within the guideline's definition and, thus, do not support a 4 point enhancement.  More importantly, the Court should not give the sentencing guideline at issue in this case any significant weight because it was not developed through the Sentencing Commission's empirical analysis but, rather, was the product of Congressional directives and Department of Justice manipulation.  Upon consideration of all the factors contained in 18

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST
SUITE 520
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/838-8950

U.S.C. 3553(a), this Court should consider a probationary sentence with home detention as a sentence to be sufficient but not greater than necessary to satisfy the purposes of sentencing.

II.  PROCEDURE TO BE APPLIED IN SENTENCING UNDER 18 U.S.C. § 3553(a).

In imposing a sentence, a district court must first correctly calculate the advisory United States Sentencing Guideline ("Guideline") range and then select an appropriate sentence by applying the factors set forth in 18 U.S.C § 3553(a).  See Gall v. United States, 128 S. Ct. 586, 596 (2007).  The factors set forth in 18 U.S.C § 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>     (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (b) to afford adequate deterrence to criminal conduct;
>     (c) to protect the public from further crimes of the defendant; and
>     (d) to provide the defendant with needed educational, vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kind of sentences available;
> (4) the advisory guideline range
> (5) any pertinent policy statements issued by the sentencing commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.

After considering these factors, the court must impose a sentence that is "sufficient but not greater than necessary," to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public and rehabilitation of the defendant.  18 U.S.C. § 3553(a)(2).  This so-called "parsimony provision" represents the "overreaching" command of the statute.  Kimbrough v. United States, 128 S. Ct. 558, 570 (2007).

While the district court must generally give respectful consideration to the Guidelines in determining a sufficient sentence, Gall v. United States, 128 S. Ct. at 594, it may not presume that the Guideline sentence is the correct one. Rita v. United States, 127 S. Ct. 2456, 2465

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

(2007).  Moreover, the court is free to consider whether the Guideline sentence itself "fails to properly reflect §3553(a)'s considerations in the case at hand," <u>Rita</u>, 127 S. Ct. at 2465, and whether "the guideline at issue exemplifies the sentencing commission's "exercise of its characteristic institutional role." <u>Kimbrough</u>, 128 S. Ct. at 575.

III. THE GOVERNMENT'S ASSERTION THAT A 4 POINT ENHANCEMENT FOR IMAGES THAT CONTAIN SADISTIC OR MASOCHISTIC CONDUCT[1] IS WITHOUT MERIT.

During the plea negotiations, the Government contended that a deleted video recovered from Mr. Matheron's home computer, contained images which met the definition of sadistic or masochistic conduct or other depictions of violence under USSG § 2G2.2(b)(4).    The Government argues that because there was a depiction of two prepubescent boys engaging in anal sex on the video, it thus depicted sadistic or masochistic conduct.  The Government's contention is based upon other circuit court rulings that have held that *adult* penetration of a prepubescent child, whether anally or vaginally, necessarily would inflict pain, meeting the requirements of USSG § 2G2.2(b)(4).  <u>See</u> <u>e.g.</u>  <u>United States v. Hoey</u>, 508 F.3d 687, 691 (1st Cir. 2007) (The Court determined that an image of "a young boy with an expression of pain and disgust who is being anally penetrated by the penis of a much older man," meets the requirements under USSG § 2G2.2 ("§ 2G2.2").  "The relative sizes of the man's penis and the small boy in addition to the boy's expression all suggest the likelihood of ongoing pain").

This blanket presumption has not been adopted in any District of Columbia circuit case, and this Court should review each case individually to determine if the conduct actually depicted meets the heightened level of "sadistic or masochistic conduct."  Moreover, the reasoning set

SMITH, LEASE & GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[1] The Presentence Investigation Report ("PSR") includes this enhancement merely because the Government is seeking it.  There is no factual basis set forth in the PSR which otherwise supports this enhancement.

forth by the other circuits simply does not apply in this case. Rather than being a depiction of an adult penetrating a prepubescent child, the conduct at issue in this case involves interaction between two children of approximately the same age, and thus the inference of ongoing physical pain due to the difference in size between an adult and child does not apply. Moreover, there is nothing depicted in the video which remotely suggests that children are in any physical pain, nor is there any other indication of sadistic or masochistic conduct.

Consequently, the Government failed to meet its burden by a preponderance of evidence that this 4 level enhancement applies in this case. Without the 4 level enhancement, Mr. Matheron's total offense level under the calculation of the Guidelines would be a 23 with a criminal history category of I. Consequently, Mr. Matheron's Guideline range would be forty-six to fifty-seven months.[2]

IV. THIS COURT SHOULD NOT GIVE ANY SIGNIFICANT WEIGHT OR REGARD TO § 2G2.2 OR ITS PROPOSED SENTENCE BECAUSE THIS GUIDELINE WAS NOT THE RESULT OF THE SENTENCING COMMISSION'S EMPIRICAL ANALYSIS OR EXPERTISE.

In United States v. Rita, 128 S. Ct. at 594, the Supreme Court noted that some sections of the Guidelines are "the product of careful study based upon extensive empirical evidence derived from review of thousands of individual sentencing decisions." The Supreme Court, however, recognized that "not all of the guidelines are tied to this empirical evidence." Id. at 594, n.2. The current Guideline at issue in this case, § 2G2.2, is the perfect example of a non-empirically based guideline. This Guideline is the product of Congressional directives to the Sentencing Commission and the manipulation by the Department of Justice, which has resulted in a

SMITH, LEASE & GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[2] If this Court applies the 4 level enhancement pursuant to § 2G2.2.(b)(4), Mr. Matheron's offense level would increase to a 27 and his Guideline range would be seventy to eighty-seven months.

distortion of the Guideline beyond recognition from the one originally crafted by the Sentencing Commission.

Because Mr. Matheron's proposed Guideline sentence is not a product of reason or objective empirical evidence, this Court is justified in subjecting the Guideline's "advice to greater scrutiny."  In fact, the Supreme Court in <u>Kimbrough v. United States</u>, 128 S. Ct. 558, 575 (2008), held that a sentencing court's rejection of the Guideline based on its disagreement with Congressional policy is particularly well-grounded when the Guideline in question is not the result of the Sentencing Commission's empirical analysis or expertise, but is instead a result of ever increasing statutory mandatory minimum sentences or other Congressional directives. <u>United States v. Kimbrough</u>, 128 S. Ct. at 575.

As more fully set forth below, and as was the case in <u>Kimbrough</u> when addressing drug trafficking guidelines, the Guideline at issue here (§ 2G2.2) was not developed under the empirical approach, but rather was created by way of Congressional directives and responses to increases in statutory mandatory minimum sentences.  See <u>United States v. Baird</u>, 2008 WL 151258, at *7 (D. Neb. Jan. 11, 2008) ("Because… the Guidelines for child [pornography] offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but… response to statutory directives… the court affords them less deference than it would to empirically-grounded guidelines.").  More recently, Judge Griesbach stated in <u>United States v. Ontiveros</u>, 2008 WL 2937539 at *8 (E.D. Wis. July 24, 2008):

> For the reasons set forth by Judge Adleman in his recent decision in <u>United States v. Hanson</u>, [____ F.Supp.2d ___], 2008 WL 2486336, [E.D. Wis. June 20, 2008] *4-6, I conclude that the guideline provisions relating to child pornography offenses of this nature do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role.  The review of the development of those provisions and the history of child pornography legislation

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

described in a recent published paper cited by Judge Adleman, indicates that the guidelines for these offenses have been repeatedly raised despite evidence and recommendations by the Commission to the contrary so now that less than 5% of the defendants affected by the charges fall within the classes of mass producers, repeat abusers and mass distributors that Congress intended to target for the lengthiest sentences. See Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* at 27, available at http://www.fd.org/pdf-lib/deconstructingthechildpornography guidelines 06.10.08.pdf (June 10, 2008).

In order to understand why and how the current version of § 2G2.2 reflects an unsound judgment and does not properly reflect the 18 U.S.C. § 3553(a) factors in Mr. Matheron's case, this Court must understand the history and development of the current Guideline. Attached hereto is a recent article which has already been cited with approval by two United States District Court Judges[3] and details a complete history of §§ 2G2.2 and 2G2.4. See Attachment B[4] (*Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of Child Pornography Guidelines*). The article examines how the Guidelines have been altered to produce vastly enhanced penalties, creating policy problems which ran counter to the intent of the Sentencing Commission and Congress.

First, guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary. *Second*, repeated congressional directives were targeted to deter mass producers, repeat abusers and mass distributors, but this group makes up less than 5% of the defendants affected by the changes. *Third*, the two point enhancement for use of computer is applied to nearly every defendant but the rationale for creating and continuing the enhancement is rarely present. *Fourth*, the latest and most dramatic changes to the guidelines result not from study by the Commission nor debate in Congress, but instead by the action of two unknown authors within the Department of Justice.

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[3] See United States v. Hanson, __ F.Supp.2d ____, 2008 WL 2486336 (E.D. Wis. June 30, 2008); United States v. Ontiveras, 2008 WL 2937538 (E.D. Wis. July 24, 2008).

[4] Attachment A is an index of the various attachments.

Attachment B at 26-27. (emphasis added). The net effect of these factors is especially relevant to Mr. Matheron's case. The advisory Guideline sentence calculated in this case is a result of five factors – the base offense level plus four enhancements. Four of these five factors were added or impacted by a Congressional mandate and not as a result of the Sentencing Commission's empirical analysis or expertise.[5]

> A. § 2G2.2's Base Offense Level of 18 is the Product of Congressional Mandates Which Specifically Overrode the Sentencing Commission's Reasoned Judgments.

When Congress passed legislation criminalizing the possession of child pornography in November 1990, the Sentencing Commission needed to develop a new offense Guideline. It created a new Guideline section, § 2G2.4 (1991). See USSG Appendix C, Amendment 372. The Sentencing Commission believed that possessing, receiving and transporting child pornography, "which were considered offenses that are logical predicates of each other," should appropriately be sentenced under this new Guideline. All offenses related to distribution of and possession with intent to sell child pornography should be dealt with under the already existing, harsher § 2G2.2. See Attachment B at 4-5.

The base offense level of this newly created § 2G2.4 was set at 10, see § 2G2.4(a) (1991), which was the highest alternative offense level considered by the Sentencing Commission in their decision-making process. See Attachment B at Appendix B. This "carefully studied plan," however, was rejected by Congress in October 1991 without any study, analysis or debate. See Attachment B at 5-6; see also Pub. L. 102-141, § 632 (1991). Through a mischaracterization of

---

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

[5] The only factor affecting Mr. Matheron's advisory Guideline sentence that was not impacted by Congressional directive or a Congressional amendment to the Guidelines (none of which were empirically based, expert studied, nor appropriately limited in scope) is § 2G2.2(b)(2)'s 2 level enhancement for materials depicting a prepubescent minor.

what the Sentencing Commission had done, certain Senators were able to advance a bill directing that receipt and transportation of child pornography be dealt with under the harsher § 2G2.2, and expanded the enhancements to both §§ 2G2.2 and 2G2.4.  Id.

Over the strenuous objection of the Sentencing Commission, the bill was passed with little accurate discussion and no debate at all.  Id. at 5-7.  Thus, this Congressional action, "was nothing less than a rejection of the empirical, studied approach to child pornography sentencing." Id. at 7.  As a result of the passage of this legislation, the Sentencing Commission was required to alter the base offense level of § 2G2.2, from 13 to 15, while also including the crimes of receiving and transporting child pornography.   Additionally, under § 2G2.4, which now addressed only the crime of simple possession of child pornography, the Sentencing Commission was forced to increase the base offense level from 10 to 13.  See USSG Appendix C, Amendments 435, 436.

In March 1995, Congress again directed the Sentencing Commission on the child pornography Guidelines.  The House of Representatives passed a bill that was intended to increase the sentences for those who create or traffic child pornography, especially for profit. Though discussion on the House floor was limited to the creators and traffickers, the Senate later expanded the bill's reach to include all child pornography offenses.  Attachment B at 10 (citing 141 Con. Rec. H14319-02).  Pursuant to this legislation, the Sentencing Commission was forced, again, to respond by increasing the base offense level in both §§ 2G2.2 and 2G2.4.  The base offense level for possession of child pornography (§2G2.4) was increased from 13 to 15.  See USSG Appendix C, Amendment 537.

The final increase to the base offense level for possession of child pornography was a reaction to the PROTECT Act, which drastically restricted federal sentencing discretion and

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

adjusted the mandatory minimum and statutory maximum sentences for certain child-related offenses. See e.g. Pub. L. 108-21, Title IV. It is now well known that the sentencing guideline section of the PROTECT Act was authored by two Department of Justice officials: the sponsor of these provisions, a freshman Congressman named Feeney was, as he later put it, "just the messenger." Attachment B at 17-18. Much like other Congressional sentencing provisions relating to child pornography, this section of the PROTECT Act received virtually no attention or debate. Id. at 18.[6]

The passage of the PROTECT Act caused the Sentencing Commission to merge § 2G2.4 into § 2G2.2. This merger was accomplished despite the fact that in a 1996 Report to Congress, the Sentencing Commission recommended against consolidation of these two Guidelines since doing so would result in the sentencing enhancements from § 2G2.2 applying to cases of simple possession. See Report to Congress, Sex Offenses Against Children 1996 at 13. The report fails to address whether the resulting higher sentences for possession would be necessary to promote the statutory purposes of sentencing. Ultimately, in completing the consolidation, the base offense level for possession was increased from 15 to 18, again in response to Congress' mandated action. See USSG Appendix C, Amendment 664.

Starting with a base offense level of 10, a number based upon the Sentencing Commission's empirical study and reasoned judgment, the base offense level for this Guideline applicable to Mr. Matheron today begins at 18. This increase of 8 levels is unsupported by any empirical study or expert analysis. This is the precise example of a sentencing Guideline directed through Congressional and Department of Justice authored policies which deserve no deference from this Court.

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[6] For a summary and discussion of the PROTECT Act's impact on federal sentencing guidelines, see United States v. Detwiler, 338 F.Supp.2d 1166, 1170-72 (D. Or. 2004).

B.  § 2G2.2(b)(7) Enhancement for the Number of Images.

Similar to § 2G2.2's base offense level, § 2G2.2(b)(7) is a prime example of a "specific offense characteristic" that is divorced from any empirical or expert justification.  The first enhancement based upon the number of pornographic images, occurred in November 1991, again due to Congressional instruction to the Commission.  See USSG Appendix C, Amendment 436.[7] In response, the Commission added a 2 level enhancement for possessing more than ten images, but if more than fifty "books, magazines, periodicals, films, videotapes or other items" were possessed, the Commission also suggested that "an upward departure may be warranted."  Id. This is how the guideline remained until the PROTECT Act was passed.

With the passage of the PROTECT Act:

> Congress directly amended [for the first time] the Federal Sentencing Guidelines by drafting guideline text.  In the past, Congress often… issue[d] directions to and requests for study from the Commission but left it to the Commission to craft specific guideline text.  This time, Congress completely ignored the expert role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications.

See Stephen L. Chanenson, *Hoist With Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 and nn.54-57 (2004) (emphasis in original); See also United States v. Detwiler, 338 F.Supp.2d at 1171.  This fact becomes even more important when it was revealed by Representative Feeney that he was provided this precise language by two Department of Justice lawyers.  Neither the Judicial Conference nor the Sentencing Commission had any input on the Amendment.  See Chanenson, 17 Fed. Sent'g Rep. at n.56 (citing Letter from the Judicial Conference of the United

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[7] This is the same Congressional directive and guideline amendment that increased § 2G2.4's base offense level from 10 to 13.

<u>States to Senator Orrin G. Hatch</u>, (April 3, 2003), reprinted at 15 Fed. Sent'g Rep. 341, 343 (2003)).

One of these direct Amendments to the Guidelines was the inclusion of §§ 2G2.2(b)(6) and 2G2.4(b)(5), which is the present day § 2G2.2(b)(7).  <u>See</u> USSG Appendix C, Amendment 649.  "No research, study, body of experience, or rationale was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the 2 to 5 point enhancement relating to the number of images of child pornography.  Attachment B at 18. Thus, the enhancement set forth in § 2G2.2(b)(7) has no studied relationship to the statutory purposes of sentencing.

C.  <u>The Alleged Purpose for the Enhancement for Use of Computer is Overbroad and Outdated</u>.

The current Guideline § 2G2.2(b)(6), which provides for a two-level enhancement for "use of a computer," is another example of an outdated, overly broad offense characteristic that was a result of Congressional interference with the Sentencing Commission's mandate. Attachment B provides an excellent discussion of the "use of computer" enhancement and illustrates why the enhancement is not appropriate in modern day offenses.  <u>See</u> Attachment B at 13-15.  In 1995, Congress enacted a law directing the Sentencing Commission to amend the child pornography guideline.  Pub. L. No. 104-71.[8]  As directed, the Sentencing Commission inserted into §§ 2G2.2 and 2G2.4 a new sentencing enhancement for use of a computer.  <u>See</u> USSG Appendix C, Amendment 537.  The enhancement for using a computer was designed for four purposes: (1) to fight widespread distribution of child pornography; (2) to combat increased difficulty of investigation and prosecution; (3) to prevent the viewing of child pornography by

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[8] This is the same Congressional directive that increased § 2G2.2's base offense level from 15 to 17 and § 2G2.4's base offense level from 13 to 15.

minors; and (4) to limit the potential for pedophiles to lure children into sexual relations through the computer. <u>See</u> Attachment B at 13.

First, assuming computer use once made it difficult for investigators to detect a crime, that is not the case today. The vast majority, some estimates approaching 95%, of all child pornography defendants use computers. Detection of those computers is now facilitated by modern day forensic computer technology and subpoena power to track Internet Provider addresses to subscribers. There may be some cases in which finding the subscriber is thwarted through the use of a borrowed or proxy IP address, however, that was not the case with Mr. Matheron. In fact, the use of his computer led the investigation directly to him.

Second, if a person "used a computer, but did not widely disseminate the images, did not use them to entice or coerce a child, and did not show them to a child, then their conduct is completely outside the scope" of what Congress sought to prevent. <u>Id.</u> at 14. Here, Mr. Matheron collected images of pornography, some of which included child pornography, and kept them on a Yahoo photo account. Mr. Matheron did not engage in any conduct for which this enhancement was created.

  D. <u>The Enhancement for Sadistic or Masochistic Images was Also Enacted Through Congressional Mandate</u>.

When the Sentencing Commission created § 2G2.4 in 1991 (due to Congress making it a federal offense to possess child pornography), it did not include a 4 level enhancement for "material that portrays sadistic or masochistic conduct." This was no mistake or oversight. In 1990, the Sentencing Commission added a similar enhancement to § 2G2.2. <u>See</u> USSG Appendix C, Amendment 325. However, in drafting and promulgating § 2G2.4 for possession, no such enhancement was included. <u>Compare</u> § 2G2.2 (1991) with § 2G2.4 (1991). This exclusion should be presumed to be intentional. <u>See</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 173

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

(2001) (If language is included in one section of a statute but excluded in another section of the same statute, it is presumed that the exclusion was done "intentionally and purposely").

Therefore, it must be concluded that the empirical analysis on which the Sentencing Commission relied to draft the initial Guideline did not warrant the additional enhancement for cases which did not involve production. In other words, this enhancement was not necessary to fulfill the purposes of sentencing in cases such as Mr. Matheron', which only involved possession. As long as the Sentencing Commission's empirically based conclusions controlled, the possession guideline remained unaltered in this respect. The Department of Justice, through its interference with the passage of the PROTECT Act, changed this Guideline.

Without consulting with the Sentencing Commission or conducting any research into its necessity, Congress directly amended this section of the Guideline. Inserted into § 2G2.4 was the new subsection (b)(4), which enhanced sentences for possession offenses if the images portrayed sadistic or masochistic conduct. The Sentencing Commission was left to explain only that "§ 401(i)(1)(B) of Public Law 108-21 directly amended subsection (b) to add subdivisions (4) and (5), effective April 30, 2003." § 2G2.2 (2003) ("background"). The Sentencing Commission did what it was told. See USSG Appendix C, Amendment 649.

Consequently, if Mr. Matheron had been sentenced under the Guideline's provision as proposed by the Sentencing Commission, he would have received a base offense level of 10 and a 2 point enhancement for material depicting a prepubescent minor for a total offense level of 12. Mr. Matheron would have received a 2 point reduction for acceptance of responsibility, leaving his offense level at 10. This would place Mr. Matheron in Zone B, facing a potential sentence of six to twelve months.[9]

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[9] Because Mr. Matheron's current offense levels are greater than 16, he is entitled to the extra 1 point reduction for acceptance of responsibility, as set forth in § 3E1.1(b).

Recently, in light of the Supreme Court's holdings in <u>Gall</u> and <u>Kimbrough</u>, several United States District Courts have sentenced possessors of child pornography to sentences significantly below the proposed Guideline range and, in some cases, to nonincarcerable terms. Likewise, several circuits have upheld such sentences. <u>See</u> <u>e.g.</u> <u>United States v. Rowan</u>, 530 F.3d 379 (5th Cir. June 4, 2008) (The Fifth Circuit affirmed defendant's probationary sentence even though the Guidelines provided a sentencing range of forty-six to fifty-seven months. The court concluded that the probation was appropriate because the defendant did not have a criminal history and also would benefit most from continuing his treatment with his psychologist); <u>see also</u> <u>United States v. Duhon</u>, ___ F.3d ____ 2008 WL 3843073 (5th Cir. Aug. 18, 2008) (Court affirmed defendant's probationary sentence where the defendant did not have any prior criminal record and the district court believed that the defendant would benefit most from continuing his medical and psychological treatment); <u>United States v. Smith</u>, 2008 WL 1816564 (4th Cir. Apr. 23, 2008) (Affirming downward variance to twenty-four months from a guideline range of seventy-eight to ninety-seven months); <u>United States v. Huckins</u>, 529 F.3d 1312 (10th Cir. 2008) (Affirming a downward variance to eighteen months from a guideline range of seventy-eight to ninety-seven months).

## V.  APPLICATION OF 18 U.S.C. § 3553(A) FACTORS.

Pursuant to 18 U.S.C. § 3553(a), "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

### A.  <u>The Nature and Circumstances of the Offense.</u>

Mr. Matheron used his computer to view a large amount of pornography. On occasion, this pornography was copied to a Yahoo photo account. Additionally, Mr. Matheron's viewing of pornography was not limited to adult pornography but also included viewing of child

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

pornography.   The particular facts to which Mr. Matheron plead guilty are set forth in the Statement of Offense ("Statement"), which he executed and which is on file with the Court.  Of note, there is nothing to suggest that Mr. Matheron's offense was particularly sophisticated.  Mr. Matheron did not employ any special software to enable a speedier download of images and there was no attempt to hide his IP address or in any way disguise what he was doing on his computers.

Moreover, when confronted by the Government on December 10, 2007, Mr. Matheron fully admitted to his conduct and provided a handwritten statement to Special Agent Donna Jackson.  Mr. Matheron Statement set forth both an account of what he had done, as well as a heartfelt statement of remorse to his family.  Mr.  Matheron recognizes that this offense is serious and has taken full responsibility for his actions.

B.  <u>History and Characteristics of Matheron</u>.

Mr. Matheron is a lifetime public servant, having spent the last twenty-four years working for the Library of Congress, in a job he describes with great enthusiasm and affection. Mr. Matheron stands before this Court as a man of 58 years, a father of a 24 year-old son and stepfather to his third wife's son and daughter.  By all accounts, Mr. Matheron has lived a productive and law-abiding life.  Mr. Matheron has had no criminal record nor any contact with the criminal justice system in the past, and has been a productive member of society his entire life.

1.  Background Information.

Mr. Matheron inarguably had a difficult childhood.  As is more fully set forth in the PSR, Mr. Matheron was adopted into a dysfunctional family, which often found Mr. Matheron in the middle of verbal arguments between his parents and left him isolated with an inability to turn to

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

either parent for his own problems.  Despite these problems, Matheron went on to attend several universities and earned a Legal Studies Certificate from Antioch College in 1980.  As mentioned above, Mr. Matheron was employed at the Library of Congress for twenty-four years and retired as a result of this case.

Mr. Matheron is currently married to Susan Meadows, and they reside with her 14 year-old son, Phillip Castagna, from her previous marriage.  In addition to Phillip, Susan has a 22 year-old daughter, Jennifer Castagna, who recently graduated from the University of Maryland.  Although the charge against Mr. Matheron was a shock and disappointment to Susan, she has maintained her support of Mr. Matheron throughout this ordeal.

Additionally, Mr. Matheron is well-regarded and respected in both his personal and professional life.  Attached to this Sentencing Memorandum as Attachments C - G  are numerous letters from various persons involved in Mr. Matheron's life, which all speak exceedingly well of him.  While they were all disappointed in Mr. Matheron's behavior in this case, the strength of Mr. Matheron's overall character has led them to continue their strong support of him, even in light of the events leading to this case.

2.    Psychological Counseling and Treatment.

Although Mr. Matheron did well to put his troubled childhood behind him, it was not without cost.  The emotional scars and problems of Mr. Matheron's past have followed him into his adult life and led him to seek psychological treatment.[10]  Mr. Matheron has a long history of mental health issues primarily focused on depression and obsessive-compulsive behavior.  During this time, the obsessive-compulsive behavior manifested itself, *inter alia*, in Mr. Matheron's use of online pornography.    During Mr. Matheron's previous psychological

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[10] A letter from Mr. Matheron's former therapist, Allan M. Leventhal, Ph.D. is contained in Attachment C-2.

treatment, he was opposed to taking any psychotropic medications which could help alleviate his severe anxiety, depression or obsessive-compulsive behavior.

Upon the execution of the search warrant at Mr. Matheron's home and his becoming aware of the likelihood of charges being placed against him, Mr. Matheron became severely depressed and was evaluated and treated by Dr. A. Carl Segal, a board-certified psychiatrist and neurologist.  A copy of Dr. Segal's initial report, updated report and resume are attached hereto as Attachment H.  Upon beginning treatment with Dr. Segal, Mr. Matheron began taking psychotropic medications for the first time.  In his updated report, Dr. Segal notes that Mr. Matheron is no longer severely depressed or anxious and that Mr. Matheron has been responding well to his medications, as well as psychotherapy sessions.  Mr. Matheron's wife has also been active in these sessions.  Dr. Segal diagnosed Mr. Matheron with adjustment disorder, depression and anxiety, dysthymic disorder, and obsessive-compulsive disorder manifested by a history of body-rocking behavior, and more recently a compulsive viewing of pornography.

Of particular note, Dr. Segal does not believe that Mr. Matheron meets the criteria for a diagnosis of pedophilia.  Despite his admitted viewing of pornographic images of children, Mr. Matheron's internet viewing "has not been accompanied by any behavioral activities, other than as part of a greater compulsion to view all pornography…"  Additionally, Dr. Segal opines that Mr. Matheron does not represent a danger to the community and is unlikely to reoffend.

3.   Medical Condition and Impairments.[11]

Mr. Matheron's physical condition can only be characterized as poor.  Mr. Matheron suffers from hypertension, diabetes, hyperlipidemia and most importantly, chronic renal failure. Since the initial medical report issued on March 25, 2008, Mr. Matheron's renal function has

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

---

[11] The medical reports of Brian L. Glenn, M.D., are attached hereto as Attachment I.

declined.  Although his compromised kidney function is not *yet* at a level that requires dialysis,

Mr. Matheron does require ongoing aggressive medical management and careful follow-up of

both his diabetes and his kidney failure.

The kidneys function to clean blood by removing excess fluid, minerals and waste.  <u>See</u>

Attachment J, *Treatment Methods for Kidney Failure: Hemodialysis,* National Institute of Health

(5th).  The kidneys also produce erythropoietin (EPO), a hormone necessary to stimulate bone

marrow in order to produce red blood cells.  Healthy kidneys are necessary to maintain the right

balance of fluid, hormones, proteins and minerals available to the rest of the body's organs.

Understandably, kidney failure creates a host of problems which can, singularly or combined

with other factors, lead to sudden death.

While the Bureau of Prisons has medical facilities, no one would argue that treatment in a

confined prison setting is ideal or even desirable.  If Mr. Matheron needs to undergo

hemodialysis, it is a not a substitute for functioning kidneys and is only an interim measure

before a needed kidney transplant could occur.  Likewise, Mr. Matheron's diabetes further

complicates his kidney failure and will continue to require significant monitoring and treatment

for the remainder of his life.

C.  <u>The Need for the Sentence Imposed</u>:

1.  To reflect the seriousness of offense, promote respect for the law and provide just
    punishment for adequate deterrence and to protect the public.

As more fully set forth above, if the Sentencing Commission's recommendations and the

Guidelines it had developed were applied in this case, Mr. Matheron's offense score would be a

10 with Criminal History Category I, placing him in Zone B with a proposed sentence of six to

twelve months.  Consequently, a probationary sentence with home detention would not minimize

the seriousness of the offense but rather would place it within the parameters originally set by the

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

Sentencing Commission.  As the court noted in <u>Gall</u>, "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  <u>United States v. Gall</u>, 128 S.Ct. at 595 (citing <u>United States v. Knight</u>, 534 U.S. 112, 119 (2001) (citations omitted)).  Probation has significant consequences:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases, receiving permission from their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any persons convicted of a felony and refrain from excessive drinking.  USSG § 5B1.3.  Most probationers are also subject to individual "special conditions" imposed by the court.  Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests and directed by his probation officer.

<u>United States v. Gall</u>, 128 S.Ct. at 595-96.  Currently, Mr. Matheron has been on pretrial release under some of these very same conditions, and has been fully compliant.  Thus, the seriousness of this offense, when viewed in the full context of the history of this offense and characteristics of Mr. Matheron, as well as the other information provided above, is sufficiently addressed with a sentence of probation and home detention.  Several courts have granted significantly below Guideline sentencing for possession of child pornography – which have been upheld on appeal.  <u>See</u> <u>United States v. Duhon</u>, _____ F.3d _____ 2008 WL 3843073 (5th Cir. August 18, 2008); <u>United States v. Rowan</u>, 530 F.3d 379 (5th Cir. 2008); <u>United States v. Smith</u>, 2008 WL1816564 (4th Cir. April 22, 2008); <u>United States v. Huckins</u>, 529 F.3d 1312 (10th Cir. 2008).

Futher, Mr. Matheron has already demonstrated his respect for the law.  Mr. Matheron was forthcoming about his conduct when interviewed by government agents, and he was appropriately remorseful.  Immediately thereafter, Mr. Matheron hired undersigned counsel to negotiate a plea with the Government so that he could accept responsibility in this case.

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

Additionally, there have been numerous collateral consequences to Mr. Matheron as a result of this case. First and foremost was the loss of Mr. Matheron's employment, which he held for the last twenty-four years at the Library of Congress. Mr. Matheron thoroughly enjoyed and excelled in this job. Moreover, this case has been publicized both in the newspapers and on Channel 4 News. In one instance, a Channel 4 reporter not only repeatedly came to Mr. Matheron's house but interviewed numerous neighbors, advising them of the charges filed against Mr. Matheron.

Lastly, Mr. Matheron is not a threat to the public. There is no indication that Mr. Matheron has ever harmed anyone nor likely to do so in the future. Given the circumstances presented in this case, a sentence of probation with home detention serves as sufficient punishment, deters this Defendant from reoffending, is equally sufficient to protect the public, and promotes respect for the law.

2. Need to avoid unwarranted sentence disparities.

There is no doubt that the Government will argue that a sentence of probation with home detention would be unlike other sentences for similar conduct. However, as set forth above, in United States v. Duhon, the United States Court of Appeals for the Fifth Circuit upheld a sentence of sixty months probation for a defendant who plead guilty to one count of possession of child pornography, just as Mr. Matheron has done in this case. See also United States v. Rowan, 530 F.3d 379 (5th Cir. 2008) (same).

Moreover, this Court is not prohibited from imposing a sentence which is different, rather, 18 U.S.C. § 3553 discourages a sentence which is "unwarranted" based on the factors set forth in the statute. What warrants a sentence of probation with home detention here are the many mitigating factors set forth herein. A sentence of probation is not unwarranted simply

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

because the Government disagrees with those factors.  Moreover, where this Court "correctly calculate[s] and review[s] the Guideline range," it "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities."  United States v. Gall, 128 S.Ct. at 586, 599.

       3.  The need for medical care.

As mentioned herein, a sentence of imprisonment imposes a real risk to Mr. Matheron's many needs for medical and psychological treatment.  Mr. Matheron is now 58 years-old and suffers from many physical ailments, including chronic renal failure.  More importantly, although Mr. Matheron is presently not in need of dialysis, further deterioration leading to the need for dialysis while incarcerated is possible.  Once this Court imposes a sentence of imprisonment, it loses jurisdiction over the fate of Mr. Matheron.  Mr. Matheron is then in the custody of the Bureau of Prisons, which is responsible for his treatment.  Matheron would not have any direct ability to seek recourse in the District Court since the Court would have no authority to interfere with the judgment of the Bureau of Prisons.  See Leja v. Sabol, Wardon, FMC Devens, 487 F.Supp.2d 1 (D.Mass 2007).

    D.  Mr. Matheron's age and lack of any prior criminal contacts whatsoever weigh against any propensity to commit future crimes.

Mr. Matheron is 58 years-old and is convicted of his first criminal offense.  Moreover, Mr. Matheron has never had a prior arrest.  These factors weigh strongly against the likelihood that he would reoffend.  See United States Sentencing Commission, *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 49, 76, 92, 103-6, 112, 131-34, 143-46 (2004).  In this report, the Sentencing Commission highlights the empirical data which shows that as one ages, the likelihood of recidivism declines.  In another report, the Sentencing Commission found very low

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

recidivism rates for people who would be considered true first offenders (those with no prior arrests):

> The analysis [of empirical data on reoffending] delineates recidivism risk for offenders with minimum prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal history points, offenders who have never been arrested, have the lowest recidivism risk of all.

See United States Sentencing Commission, *Recidivism and the "First Offender"* at 17 (2004). Consequently, the Sentencing Commission, again employing empirical data, comes to the conclusion that someone in Mr. Matheron's position, with zero criminal history points and having never been arrested in the past, is significantly less likely to reoffend than other offenders who have a Criminal History Category score of I. Thus, Mr. Matheron's Criminal History Category of I overstates the likelihood that he would ever reoffend.

As such, the Court is entitled to take this factor into account in determining a sentence which is sufficient but not greater than necessary to serve the purposes of sentencing. In United States v. Huckins, 529 F.3d 1312 (10th Cir. 2008), a defendant was convicted of possessing child pornography and the proposed guideline range was/ seventy-eight to ninety-seven months. The court's variance to an eighteen-month sentence was justified in part because this was the defendant's first conviction, thereby rejecting the Government's argument that the guidelines already considered this by placing the defendant in Criminal History Category I. In affirming the sentence the court held:

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

> The court's consideration of this factor [lack of any criminal record] was appropriate. Although the Guidelines discourage granting a downward departure based on criminal history when the defendant has been placed in a criminal history category of I… this

22

is not a departure case, it is a variance case... And after <u>Gall</u> and <u>Kimbrough</u>, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a)... Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into criminal history category of I, in its § 3553(a) analysis.

Thus, Mr. Matheron's age and lack of any prior contact with the criminal justice system strongly favor a probationary sentence with home detention.

## CONCLUSION

For the reasons set forth above, Michael J. Matheron respectfully requests that this Court enter a sentence of probation, subject to a term of home confinement, under such terms and conditions as the Court deems just and appropriate as a sentence which is sufficient but not greater than necessary to satisfy the purposes of sentencing.

Respectfully submitted,

SMITH, LEASE & GOLDSTEIN, LLC

By:     _____/s/_____
David W. Lease
11 North Washington Street
Suite 520
Rockville, Maryland  20850
Phone: (301) 838-8950
Fax:    (301) 838-0322

Attorneys for Defendant

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of August 2008, a copy of the foregoing 18 U.S.C. § 3553 Sentencing Memorandum was sent via the Court's Electronic Filing System to the following person(s):

Catherine Connelly
United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530


_____/s/_____

Z:\Matheron, Michael\Sentencing Memorandum.v3.doc

SMITH, LEASE &
GOLDSTEIN, LLC
ATTORNEYS AT LAW
11 NORTH WASHINGTON ST.
SUITE 520
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/838-8950

# INDEX OF ATTACHMENTS TO SENTENCING MEMORANDUM

**ATTACHMENT B:**    Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of Child Pornography Guidelines.*

**ATTACHMENT C:**    Reference Letters
  1. Reference Letter from Elizabeth A. Smith-Chavez
  2. Reference Letter from Allan M. Levanthal, Ph.D.
  3. Reference Letter from Carolyn Lernsky
  4. Reference Letter from Karen Kyle

**ATTACHMENT D:**    Reference Letters
  1. Reference Letter from Barron L. Weand
  2. Reference Letter from Kathleen Campbell
  3. Reference Letter from Morton Rosenberg
  4. Reference Letter from Anne Kirkman

**ATTACHMENT E:**  Reference Letters
  1. Reference Letter from Jennifer Castagna (Mr. Matheron's step-daughter)
  2. Reference Letter from Eric Campbell
  3. Reference Letter from Anne M. Christensen
  4. Reference Letter from Joyce Anita Thorpe

**ATTACHMENT F:**    Reference Letters
  1. Reference Letter from Jesse Blatt, Ph.D.
  2. Reference Letter from Henry Flood
  3. Reference Letter from Alfred S. Chavez, Jr.
  4. Reference Letter from Jill Y. Simpson

**ATTACHMENT G:**  Reference Letter from Sue Meadows (Mr. Matheron's wife)

**ATTACHMENT H:**    Psychological Reports from A. Carl Segal, M.D.
  1. Initial Report: April 14, 2008
  2. Supplemental Report: July 29, 2008

**ATTACHMENT I:**    Medical Reports from Brian L. Glenn, M.D.
  1. Initial Report: March 25, 2008
  2. Supplemental Report: July 31, 2008

**ATTACHMENT J:**    Article – *Treatment Methods for Kidney Failure: Hemodialysis*, National Institutes of Health.

**ATTACHMENT K:**    Letter from Michael Matheron

# Deconstructing the Myth of Careful Study:
# A Primer on the Flawed Progression of the Child Pornography Guidelines

Troy Stabenow[1]

July 3, 2008

## Table of Contents

I.      Introduction.................................................................................... 2

II.     The Commission in Charge......................................................... 3

    A.      1987 Guidelines................................................................. 3
    B.      1988 Amendment............................................................... 4

III.    The Seeds of Conflict.................................................................. 4

IV.     Congress Takes Charge............................................................... 6

    A.      1991 Amendment............................................................... 6
    B.      1996 Amendment............................................................... 9

V.      The 1996 Report to Congress.................................................... 12

    A.      Troubling Methodology................................................... 12
    B.      Use of a Computer Enhancement.................................. 14
    C.      Comments by the Commission....................................... 15

VI.     Congress Reacts to the Commission's Report  ...................... 16

    A.      2000 Amendment............................................................. 16
    B.      2001 Amendment............................................................. 17

VII .   Congress Yields Power to the Department of Justice............. 18

    A.      The Protect Act................................................................ 18
    B.      2003 Amendments........................................................... 20
    C.      2004 Amendment............................................................. 21

[1] Assistant Federal Public Defender, Western District of Missouri, Jefferson City Branch Office.  Copyright May 20, 2008.  All Rights Reserved.  This article will be updated from time to time, so all suggestions, comments, corrections, criticisms, and written opinions by courts accepting or rejecting the positions of this paper would be appreciated, and should be sent to troy_stabenow@fd.org.  Please do no request advice on a particular case unless there is an unusual issue or use of this paper.  Special thanks to Amy Baron-Evans for her contributions to Section IX, and for her editorial review throughout. Thanks also to David Johnson and Virginia Grady of the FPD Office in Colorado for their input, corrections, and advice.

**VIII.    The Typical Defendant**.................................................................. **23**

**IX**.       **The Implications of Gall and Kimbrough on
             Child Pornography Cases**.......................................................... **26**

**X.        Conclusion**.................................................................................... **31**

**Appendix A: Guideline Changes Charts: 1987 to Present**.................................. **33**

**Appendix B:  Letter from the Commission opposing increased penalties**.......... **35**

**Appendix C: Select Portion of Amendment 664**.................................................... **38**

-----

## I.  Introduction

From 1994 to 1995, child pornography offenders received a mean sentence of 36 months confinement.  *See* United States Sentencing Commission Report  to the Congress, "Sex Offenses Against Children," 1996, at Page 3, and Table 1.   The twenty-four defendants convicted of possessing illegal images received an average sentence of 15 months confinement.  *Id.*  The sixty-six defendants convicted of trafficking in child pornography received an average sentence of 29 months confinement*.  Id.*  The twenty-two defendants convicted of producing child pornography received an average sentence of 79 months.   *Id.*

Over the last six years, the mean imposed sentence on these offenders has increased an average of 11.9 months per calendar year.

| Fiscal Year | Mean Sentence in Months |
|---|---|
| 2007 | 109.6 |
| 2006 | 96.7 |
| 2005 | 75.0 |
| 2004 | 63.0 |
| 2003 | 63.5 |
| 2002 | 49.7 |

Taken from Sourcebook of Federal Sentencing Statistics at Tables 13, 17 for Pornography/Prostitution offenses involving §§ 2G1.1-2G3.2

In Fiscal Year 2007, the federal courts sentenced 1,256 defendants for child pornography offenses (1,084 defendants pursuant to Guideline § 2G2.2 and 172 pursuant to 2G2.1).  *See 2007 Sourcebook*, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.   While the mean sentence for all defendants convicted of a pornography/prostitution offense was 109.6 months, even first-time offenders received a mean sentence of 102.5 months.  *Id*. at Tables 13, 14.  This represents a

300+% increase in the typical *imposed* sentence since 1995.  Had not 394 defendants, or fully one-third of those sentenced in FY 2007, received sentences below their applicable guidelines, an even greater increase would have been realized.  *Id.* at Table 28.

The pertinent question to ask is what caused such an incredible increase.  Does the typical offender today require 73.6 months, or more than six full years, more confinement than the same offender a decade ago?  Is there a rational basis for an average annual increase of 11.9 months per imposed sentence?  Most importantly, are these changes grounded in "an empirical approach based on data about past practices, including 10,000 presentence investigation reports?" *Kimbrough v. United States*, 128 S. Ct. 558, 567 (2007).

The answer to these questions is a resounding "no."  As this article demonstrates, the changes to the child pornography guidelines are not the product of an empirically demonstrated need for consistently tougher sentencing.  Instead, these changes are largely the consequence of numerous morality earmarks, slipped into larger bills over the last fifteen years, often without notice, debate, or study of any kind.  Congressionally mandated changes were even enacted to prevent the Commission from implementing carefully considered modifications which would have *lowered* applicable offense levels.

Familiarity with the history of § 2G2.2 is therefore crucial to appropriate sentencing.  While judges "may not presume that the Guidelines range is reasonable," courts may nevertheless be forgiven for believing that pornography guidelines reflect the latest research and knowledge in the field.  *See Gall v. United States*, 128 S. Ct. 586 (2007) at 596-97; *see also Rita v. United States*, 127 S. Ct. 2456 (2007) at 2465.  It is incumbent upon the defense attorney to provide evidence to the contrary.  This paper provides the tools for a defense presentation to the court that the child pornography guidelines, as applied to a particular defendant, are not based on sound research and reflective experience, and therefore fail to produce an appropriate sentence.

Several sections in particular may provide useful material for educating the courts.  These sections, which could be excerpted to form the basis of a sentencing motion, include sections III, IV-A, IV-B, V, VII, VIII, IX, and Appendix A.

## II.  The Commission in Charge: April 13, 1987 to November 1, 1990

For the first three years of the Guidelines regime, the provisions of § 2G2.2 were the result of study at the Commission, without obvious outside interference.  These years are reviewed below, with changes indicated by bold, italicized type:

### A.  1987

On April 13, 1987, the Sentencing Commission submitted its initial § 2G2.2 offering. *See* U.S.S.G. § 1A1.1(n.1).  At the time, simple possession of child pornography was not a federal crime, so § 2G2.2 was limited to "transporting, receiving, or trafficking" offenses.

*§ 2G2.2*
*Base Offense Level:  13*
*Specific Characteristics:*
      *(b)(1) a minor under 12 years:*        *+2*
      *(b)(2) if distribution of < $100,000 in value*  *+5*
      *(b)(2) if > $100,000 in value, see 2F1.1*

## B. 1988

On June 15, 1998, the Sentencing Commission amended specific characteristic § 2G2.2(b)(1).  *See* Amendment 31, U.S.S.G. App. C.  Study indicated that "an alternative measure" was necessary "for determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown."  *Id.*  The phrase "or a prepubescent minor" was added to "a minor under the age of twelve years."  *Id.*

    § 2G2.2
    Base Offense Level:  13
    Specific Characteristics:
        (b)(1) *a prepubescent minor or* a minor under 12 years:   +2
        (b)(2) if distribution of < $100,000 in value       +5
        (b)(2) if > $100,000 in value, see 2F1.1

## II.  The Seeds of Conflict

On November 29, 1990, Congress criminalized the possession of child pornography.  *See* Pub.L. 101-647, Title III, § 323(a), (b), Nov. 29, 1990, 104 Stat. 4818, 4819.  Congress also raised maximum possible penalties, introduced a mandatory minimum for repeat offenders, and directed that "the United States Sentencing Commission shall amend existing guidelines for sentences involving sexual crimes against children, including offenses contained in chapter 109A of title 18, so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate."  *Id.*

The Commission had to immediately consider whether to treat possession of child pornography as equivalent to trafficking, or whether to create a separate Base Offense Level.  On January 17, 1991, the Sentencing Commission published its proposed solution.  *See* 56 FR 1846-01, 1991 WL 310646 (F.R.).  The solution consisted of three parts:

First, a new section, § 2G2.4, with a Base Offense Level of 10, would be created for the offense of possession of child pornography, and the analogous offenses of receiving and transporting child pornography.  *Id.*  In instances where the relevant conduct involved an association with trafficking, a cross reference to § 2G2.2 would apply.  *Id.*

Second, the Commission modified § 2G2.2 to apply only to cases involving "Selling or Possessing with Intent to Sell" child pornography. *Id.*  The proposal included a new,  four-level specific offense enhancement for "material that portrays sadistic or masochistic conduct or other

depictions of violence." *Id.*  This specific offense enhancement was neither recommended for, nor applied to the newly created § 2G2.4.

Third, the Commission inserted an application note to § 2G2.2 encouraging consideration of "an upward departure" where "the defendant sexually abused a minor at any time, whether or not such sexual abuse occurred during the course of the offense."  *Id.*

The Commission determined that current penalties were adequate and that it would be inadvisable to introduce more substantial penalties.  *Id.*

The Commission later explained the reasoning for these changes in a detailed letter to Congress.  *See* Appendix B; *see also* 137 Cong. Rec. H6736-02, 1991 WL 187764 (Cong.Rec.). In explaining the choice to create a new, lower base offense level for receipt, possession, and transportation, the Commission explained:

> It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy... The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact, a number of judges had written the Commission to express the view that the offense level for the least serious forms of conduct under § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under  § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed.  *Id.*

Ultimately, the first part of this plan (i.e new § 2G2.4) was implemented via Guideline Amendment 372, effective November 1, 1991.  The second and third parts of this solution (enhancements for sadistic material and a pattern of abuse) had already been implemented via Guideline Amendment 325, effective November 1, 1990.  *See* Amendments 372 and 325, U.S.S.G. App. C.

    § 2G2.2
Base Offense Level:  13
Specific Characteristics:
       (b)(1) prepubescent or a minor under 12 years:     +2
       (b)(2) if distribution of < $100,000 in value     +5
       (b)(2) if > $100,000 in value, see 2F1.1
      ***(b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4***

*Application Note 4: The Commission recommends consideration of an upward departure for actual sexual abuse of a child at any time in the defendant's past.*

§ 2G2.4
**Base Offense Level 10**
*Specific Characteristics:*
      *(b)(1) prepubescent or a minor under 12 years:*    *+2*

## III. Congress Takes Charge: Nov 27, 1991 - 2003

### A. 1991

In June, 1991, Senator Jesse Helms of North Carolina learned of the Commission's proposed approach to "smut peddlers and pedophiles." *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363). The carefully studied plan to refine § 2G2.2 and implement a new guideline for the lesser harms of possession, receipt, and transportation of child pornography, would be short-lived.

Shortly after the Commission published its 1991 modifications, Senator Helms received letters from two religious organizations opposed to the proposed Guideline modifications. *See* Exhibit 2, 137 Cong. Rec. S10322-04. The Religious Alliance Against Pornography, wrote, "We are profoundly disappointed to discover that the proposed guidelines recommended reduced sentencing levels for transporting, receiving, and possessing child pornography...We believe the pending Crime Bill offers an appropriate and opportune time to make vital adjustments consistent with the seriousness of the crime." *Id.* Morality in the Media echoed this opinion, requesting "if anything, the penalties should be made stricter, not weaker." *Id.*

Based upon these letters, Senator Helms introduced what can fairly be described as a morality earmark. On July 18, 1991, while most senators were in committee meetings, Senators Domenici and Helms briefly re-opened the pending debate on House Resolution 2622, the Treasury-Postal Service Appropriations Bill of 1991. *See* 137 Cong. Rec. S10322-04. Senator Domenici of New Mexico asked that the pending amendments be laid aside to allow Senator Helms to introduce an amendment regarding child pornography. *Id.* As there was no objection, Senator Helms took the floor and proposed "Amendment Number 780." *Id.* Amendment 780 would require the Commission to maintain receipt and transportation as § 2G2.2 offenses, and would direct expanded enhancements to both § 2G2.2 and § 2G2.4. *Id.* Since no other senators were present on the floor, the matter was "stacked" until the next roll call. *Id.* Ultimately, the amendment was included with several other amendments to the appropriations bill, and was approved by a vote of 99-0. *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363).

Because the issue was never debated in the Senate, Senator Helms' remarks are the only record of Senate intent. *Id.* As to Amendment 780, Senator Helms stated, incorrectly, "The

Sentencing Commission recently, for some unbeknown reason, decided to reduce the sentence for these smut peddlers so low that most of these convicted smut peddlers and pedophiles will receive, at most, probation...The amendment instructs the Sentencing Commission to increase the penalty for child porn offenses so that offenders will serve at least some time in jail." *Id.*

On September 21, 1991, the House of Representatives received and considered Amendment 780. *See* 137 Cong. Rec. H6736-02. Inserted into the record was a letter from the Chair of the Sentencing Commission in which the Chair politely, but strongly, objected to Amendment 780. *Id.*; *See also* Appendix B. The Chair wrote:

> Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography...

> ...In keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. **Senate Amendment No. 780, unfortunately, would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation**. [emphasis added].

> For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more severe penalties mandated by the Senate amendment by negotiating a plea to simple possession. **One primary reason Congress created the Sentencing Commission was to devise**

**guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.** [emphasis added] *Id.*

After a brief discussion by just three representatives, Amendment 780 was added to the House bill by a vote of 414-18. *See* 137 Cong. Rec. H6736-02; 1991 WL 187764 (Cong.Rec.). Amendment 780 would eventually become Section 632 of Public Law 102-141.

Although even the most zealous defense attorney would likely have agreed with Senator Helms that "smut peddlers and pedophiles" should serve "at least some time in jail," Amendment 780 had a vastly more expansive result. *See* Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992 at 137 Cong. Rec. S10356-01, S10363. Amendment 780 was nothing less than a rejection of the empirical, studied approach to child pornography sentencing. Henceforth, major changes would come from Congress, and would be dictated not by experience and study, but instead by a general moral sense that the penalties for "smut peddlers" should always, and regularly, be made stricter, not weaker.

On November 27, 1991, in accordance with the directive of Section 632 of Public Law 102-141, signed by the President October 28, 1991, the Sentencing Commission drastically altered the Guidelines. *See* Amendments 435 and 436, U.S.S.G. App. C. In keeping with the directives of Senator Helms, as expressed in Section 632 of Public Law 102-141, a person sentenced for simple possession on November 28, 1991 received the same Base Offense Level as a serious trafficker sentenced just one day earlier.

Guideline Amendment 435 modified § 2G2.2 in the following ways: First, offenses involving the receipt, transportation, or advertisement of child pornography were all returned to § 2G2.2. *Id.* The new § 2G2.2 therefore described "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic." *Id.* Second, the Base Offense Level was increased from 13 to 15. *Id.* Third, a new specific offense enhancement of a five level increase for a pattern of activity involving the sexual abuse or exploitation of a minor was inserted. *Id.*

> § 2G2.2
> **Base Offense Level:  15**
> Specific Characteristics:
> > (b)(1) prepubescent or a minor under 12 years:           +2
> > (b)(2) if distribution of < $100,000 in value           +5
> > (b)(2) if > $100,000 in value, see 2F1.1
> > (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
> > ***(b)(4) Pattern of Abuse +5***

Guideline Amendment 436 modified § 2G2.4 by redacting all offenses except simple

possession. *Id.* The Base Offense Level was raised from 10 to 13. *Id.* A specific two-level offense characteristic for possessing ten or more "books, magazines, periodicals, films, video tapes, or other items containing a visual depiction involving the sexual exploitation of a minor" was added. *Id.*

> § 2G2.4
> ***Base Offense Level: 13***
> Specific Characteristics:
> > (b)(1) prepubescent or a minor under 12 years:        +2
> > ***(b)(2) if 10 or more items: +2***

**B. 1996 Amendment.**

In March, 1995, as part of the Family Reinforcement Act, which was itself part of the "Contract with America," Representative William McCollum introduced House Resolution 1240, "An Act to Combat Crime by Enhancing the Penalties for Certain Sexual Crimes Against Children." *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759. House Resolution 1240 proposed to raise by at least two levels the Base Offense Level for the producers and distributors of child pornography, and to increase by at least two levels the Total Offense Level in cases of a violation of 18 U.S.C. 2251(c)(1)(A) or 2252 (a)(1)-(3), where a computer was used to "transmit the notice of," or "transport or ship" the visual depictions. *Id*; *See also* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.).

The Judiciary Committee promptly forwarded the measure to the main body of the House, noting, "the sexual crimes addressed by H.R. 1240 are usually prosecuted by state authorities rather than federal authorities. Assuming that this situation continues, the Congressional Budget Office estimates that the increased sentences under this bill would have no significant impact on the operating costs of federal prisons." *Id.* This statement was generally correct for the time, as demonstrated by the fact that in 1993, federal prosecutors accepted for prosecution only 25 of the 79 obscenity/pornography cases presented to them. *See* Compendium of Federal Justice Statistics, 1993 at Table 1.2; http://www.ojp.usdoj.gov/bjs/abstract/cfjs93.htm.

The measure arrived at the House on April 4, 1995. *See* 141 Cong. Rec. H4122-01, 1995 WL 143978 (Cong.Rec.). As described on the floor of the House, the bill "directs the Sentencing Commission, created by the Congress in 1984, to serve as an independent entity within the judicial branch, to increase the offense levels for certain crimes involving child obscenity;" to increase "by a minimum of 17 months incarceration the range of penalties that may be imposed for creating child pornography. It increases by a minimum of 6 months incarceration the penalties that may be imposed for trafficking child pornography. It increases by a minimum of 1 year incarceration the penalties that may be imposed for trafficking in child pornography if a computer was used in the transmission of the material or transmission of an advertisement for the material." *Id.*

Attachment B

The debate, such as it was, provides meaningful insight into the perceived intent of the bill.  After two members praised the bill, and one member praised a colleague for fair play, Representative Lofgren addressed the House.  *Id.*  Rep. Lofgren lamented the "wimpy" sentences for child pornographers, and advised, "We need to take a look at the underlying statute, not just advisory recommendations by the Sentencing Commission."  *Id.*  She then recommended that both parties should jointly work towards a punishment of mandatory life imprisonment for this:

> "lucrative business that rewards people who would abuse children, who would force them to do sexual acts on video, it is a lucrative business. If the abusers of children for money knew that they faced life imprisonment, I think it would have a salutary impact . . .We could have done something tough. But instead all we have got is a little hole punch, a little phrase, and it does not mean very much."  *Id.*

Rep. Lofgren was followed by Representative Conyers, who explained,

> "There were two ways that we could have moved in this area. One is to direct the U.S. Sentencing Commission to increase penalties for child obscenity violations. The other was to go into the underlying statute of some of these anti-pornography laws and attempt to increase the penalties there, but we might have gotten into a wide area that would infringe on civil liberties questions and other highly technical questions, and this bill would not have come up...This is one of the few bills during this first 100 days that, by moving with some dispatch, we have not offended any sensibilities."  *Id.*

From these discussions, it is clear that House Resolution 1240 was designed with two purposes in mind.  First, to avoid the need for debate, study, and considered review.  Second, to increase the punishment for those who produced and trafficked child pornography for profit.  As Senator Lofgren noted, it exactly achieved these goals, moving from introduction before the Judiciary Committee to unanimous passage by the House in just three short weeks.  *Id.*

The measure arrived at the Senate on April 6, 1995.  *See* 141 Cong. Rec. S5519-02, 1995 WL 169823 (Cong.Rec.)**.**  Upon arrival, Senators Grassley, Hatch, and Thurmond jointly proposed a seemingly minor amendment to the newly re-labeled Sex Crimes Against Children Prevention Act of 1995.  *Id.*  This "minor" amendment would extend the resolution to include all defendants convicted of child pornography offenses, not just the producers and traffickers of the material.  *See* 141 Cong. Rec. H14319-02.  As in the House however, discussion was limited to the target population of child pornography producers and mass distributors.  *Id.*  Senator Hatch enlisted the support of the Senate with the following impassioned speech:

> Obscenity is a plague upon the moral fabric of this great Nation. It poisons the minds and spirits of our youth and fuels the growth of organized crime. Child pornography, a particularly pernicious evil, is something that no civilized society can tolerate.

> To this end, I am introducing legislation to increase the penalties imposed under sections 2251 and 2252 of title 18 of the United States Code, upon those who exploit and degrade

the weakest and most helpless members of our society, our children. **Those persons who choose to engage in sexual exploitation of children, whether to satisfy prurient desire or to gain filthy lucre, must be made to feel the full weight of the law** and suffer a punishment commensurate with the seriousness of their offense. [emphasis added]

In addition to increasing the penalties for distributing child pornography or otherwise sexually exploiting children, I am pleased to note that **this legislation helps our law enforcement efforts in this area keep pace with changing technology by increasing the penalties for the use of computers in connection with the distribution of child pornography**. As an ever-increasing percentage of Americans, and especially our young people, enter the information superhighway, it is critical that we act to ensure that this highway is not littered with the debris of child pornography. [emphasis added]

The bill also directs the Sentencing Commission to assess the impact of these increased penalties and to report to Congress any necessary modifications in the law. The Sentencing Commission will also be required to survey the recidivism rates for those who commit sex crimes against children and analyze the effect of treatment for those offenders.

*See* 141 Cong. Rec. S5519-02.

The bill passed by unanimous consent. *See* 141 Cong. Rec. H14319-02. Public Law 104-71 was enacted December 23, 1995. On April 30, 1996, the Commission, as directed, published these Congressional changes. *See* 61 Fed. Reg. 20,306 (1996). As per Public Law 104-71 the Commission included provisions to raise the base offense levels in §§ 2G2.1, 2G2.2, and 2G2.4; and to provide a two-level enhancement under §2G2.2 "if a computer was used for the transmission of the material or a notice or advertisement" and § 2G2.4 for use of a computer "if the defendant's possession of the material resulted from the defendant's use of a computer." *Id.*

The Commission separately recommended to expand the definition of "pattern of activity involving sexual abuse" to reflect and respond to differing case opinions within the circuits about the applicability of the enhancement. *Id.* Amendment 537 took effect November 1, 1996. *See* Amendment 537, U.S.S.G. App. C.

§ 2G2.2
**Base Offense Level:  17**
Specific Characteristics:
        (b)(1) prepubescent or a minor under 12 years  +2
        (b)(2) if distribution of < $100,000 in value  +5
        (b)(2) if > $100,000 in value, see 2F1.1
        (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
        (b)(4) Pattern of Abuse +5
        **(b)(5) transmission of material or notice by computer +2**

§ 2G2.4
**Base Offense Level: 15**
Specific Characteristics:
      (b)(1) prepubescent or a minor under 12 years:     +2
      (b)(2) if 10 or more items: +2
      **(b)(3) Possession as a result of computer use +2**

## IV.  The 1996 Report to Congress

Section 6, Sex Crimes Against Children Prevention Act of 1995 (SCACPA), required the Sentencing Commission to "submit a report to Congress concerning offenses involving child pornography and other sex offenses against children" within 180 days. *See* Pub L. 104-71.  In June 1996, while Amendment 537 was still pending, the Sentencing Commission presented a detailed, forty-two page report to Congress. *See* Report to Congress, Sex Offenses Against Children, 1996; http://www.ussc.gov/r_congress/SCAC.HTM; *See also* Attachment A.

### A. Troubling Methodology:

The Commission opened the report by observing "Penalties for sex offenses against children have been increased several times in recent years and are quite severe. Nevertheless, the Commission's analysis indicates that some amendments may be appropriate to increase sentences for the most dangerous offenders, to ensure consistency in sentencing, and to clarify certain provisions that have been improperly interpreted and used." *Id.* at i.

The primary focus of the report were these "most dangerous offenders."  After a review of only 112 child pornography cases, the Commission concluded that "a significant portion of child pornography offenders have a criminal history that involves the sexual abuse or exploitation of children and that those with such histories are at a greater risk of recidivism." *Id*. at i, 3, 29.  It was with these particular offenders in mind, and to "ensure lengthy incarceration of the most dangerous offenders" that the Commission "significantly increased sentences for some child pornography offenses," "expanded the definition of a pattern of activity involving the sexual exploitation or abuse of a minor," and recommended that Congress should "increase the statutory maximum for production." *Id.* at i, ii.

These recommendations informed opinion within Congress, and became the basis for further Congressionally directed changes in 1998, 2000, and 2003.  It is worth asking, however, whether the data derived from such a small sample size in 1994 and 1995 should still be affecting policy in 2008.  Does the information still hold true today?  It does not.

We should understand that the 112 cases reviewed by the Commission represented only about one-third of child pornography cases presented for prosecution during that time frame. *See* Compendium of Federal Justice Statistics, 1993, at Table 1.2. In the early to mid 1990s, the United States rarely prosecuted child pornography offenses, selecting only the truly egregious offenders for federal prosecution. *See* H.R. REP. 104-90,1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg.Hist.) 759; *see also* Compendium of Federal Justice Statistics, 1993 at Table 1.2.  Generic offenders were prosecuted in state court. *Id.*

By 2006, when 1,275 defendants were federally prosecuted for child pornography offenses, generic offenders were routinely prosecuted by federal authorities.  *See* Bureau of Justice Statistics Bulletin: "Federal Prosecution of Child Sex Exploitation Offenses, 2006," at page 5; available at http://www.ojp.usdoj.gov/bjs/pub/pdf/fpcseo06.pdf.  This rise accompanied the formation of agencies such as the Innocent Images Project in 1995 (56 offices nationwide); the Internet Crimes Against Children Task Force (56 offices nationwide); the National Center for Missing and Exploited Children; and the introduction of local projects such as "Project Safe Childhood," and "Operation Predator."*Id.* at pages 1, 2, 3.  While total sex offense prosecutions rose from 431 in 1994 to 2,191 in 2006, an average of 15% growth per year for over a decade, child pornography cases accounted for 82% of the growth in case load.  *Id.* at page 1.



Next, the applicability of such a small pool of offenders in 1995 resulted in skewed data. The group studied by the Commission included "a significant portion of child pornography offenders [who] have a criminal history that involves the sexual abuse or exploitation of children."

That group bears little resemblance to the average offender of today.  In 2006, 79.9% of child pornography defendants had no prior felonies of any kind, let alone a criminal history of past "sexual abuse or exploitation."  *Id.*  at page 5.  In 2007, only 5% of child pornography defendants were involved in the production of child pornography.  *See* 2007 Sourcebook at Table 17.

The net result of these demographic changes is that the defendant towards whom the 1996 report was targeted, the "large-scale, commercial pornographers," and the "most dangerous repeat offenders" have been almost totally replaced.  *See* 1996 Report to Congress at pages ii, 28. The generic defendant of today is a first time offender who has never been involved with the production of child pornography.

In 1995, 1998, 2000, and 2003, Congress legislated changes that continue to affect all defendants today.  *See* Amendments 535, 575, 592, 649 and 661, U.S.S.G. App. C.  These changes modified the Guidelines in an effort aimed at combating the pernicious evil of repeat abusers, pornography producers, and mass distributors.  The methodology behind this tinkering, such as it was, can be demonstrated to apply to less than 5% of current defendants.  Shouldn't we question continued deference to the established guideline structure for the remaining 95%?  Given these facts, and the ability to exercise discretion, would a doctor prescribe medicine based on a decade old medical text, written by well meaning legislators, despite clear evidence that his patient did not suffer from the symptoms the text and medicine were designed to address?  For 95% of today's defendants, the applied Base Offense Level and specific offense enhancements are predicated upon a series of premises which do not exist.  The prosecution should have to establish the continued applicability of the assumptions underlying the Guidelines in each case.  Without a demonstration that the defendant was involved in the behavior targeted by Congress, the only remaining data is that which supported the Base Offense Levels of November 1, 1991.  In this environment, respect for the Guidelines should be withheld, and the Court should consider a variance.

### B.  Use of a Computer Enhancement

The 1996 Report to Congress critically reviewed the congressionally mandated two-level enhancement for use of a computer.  This two level enhancement, dictated in 1995 by the SCACPA (see Section II-B above) had yet to be enacted, but already the Commission could foresee problems.

First, the Commission wondered why the Senate amendment, which extended the scope of the act to include possession offenses, was made without any legislative history to explain the concerns motivating the change.  *Id.* at 30.  The initial offering in the House limited the change to instances of trafficking. The House made a clear record that the measure was designed to (1) fight the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, (2) combat the increased difficulty of investigation and prosecution by law enforcement officials, (3) minimize the increased likelihood that child pornography will be viewed by and harm children, and (4) limit the potential for pedophiles to lure children into sexual relations through the computer.  *Id.*, discussing the legislative history of the SCACPA found at H.R. Rep. No 90, 104th Congr., 1st Sess. 3-4 (1995) as reprinted in 1996 U.S.C.C.A.N. 759.

Although the Commission added the enhancement as directed in the final version of the SCACPA, it noted " Not all computer use is equal...sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's case." *Id.* at 29.  Without a rationale for applying the broadened enhancement, the Commission was left to observe:

"Online pornography comes from the same pool that can be found in specialty magazines or adult bookstores...thus, the differences between print and computerized porn is not in the content of the images, but in the means of distribution.  The seriousness of a crime involving computerized trafficking in child pornography depends in part on 1) the degree to which the computer use facilitates the widespread and instantaneous distribution of images, and 2) the degree to which it increases the likelihood that children will be exposed to the images.  Different types of computer use have different effects on these two harms.  "Downloading"

cyberporn is similar to receiving pornography through the mail...At the other end are large-scale, commercial pornographers. Creating and maintaining a B[ulletin] B[oard] S[ystem] or Website with pornography is similar to opening an adult bookstore...persons who upload, send, or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely disseminates or falls into the hands of children." *Id.* at 28.

"What seems apparent is that a person's culpability depends on *how* they use a computer..." *Id.* at 29.

"The adjustment does not distinguish between persons who email images to a single, voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers...the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes is widely accessible, such as posting it on a BBS or Website. However, a statutory amendment may be necessary to make these kinds of distinctions, because the current statutory directive is aimed broadly at all person who use a computer to transmit child porn, including receivers and possessors. " *Id.*

These concerns, expressed by the Commission in 1996 are even more true today. The Commission's fears were grounded in the fact that only 7 or 8 of the 112 cases they studied involved the use of a computer to establish a BBS, a website, or a similarly threatening means of spreading child pornography. *Id.* at 29. Study indicated that 23% of defendants in 1993, and 28% of defendants in 1995 used a computer. *Id.* at 30. Thus, many defendants to whom the enhancement was applied were not threatening the harm the enhancement was designed to address. *Id*. at 28-30.

How much more true is the over-inclusive effect of the enhancement today? In 1996, 97% of the 1,012 child pornography defendants had used a computer. *See* Bureau Bulletin at page 6. Today, forensic computer technology and monitoring facilitates, not thwarts, the investigation of child pornography offenses. So, if a client today used a computer, but did not widely disseminate the images, did not use them to entice or coerce a child, and did not show them to a child, then their conduct is completely outside the scope of why Congress required the enhancement, and a variance should be considered.

### C. Comments by the Commission

In reference to the implementation of the Prevention Act of 1995, the Commission noted: "As directed in the SCACPA, the Commission increased sentences for all pornography guidelines by approximately 25%...In addition, a further 25% was provided for the use of a computer in child pornography offenses." *Id.* at ii. "Based on the data described above, the Commission does not recommend an increase in the base offense level of more than two levels" [referring to the two level increase mandated for change on November 1, 1996] *Id.* at 9.

The Commission presented three amendments which were under consideration.

First, in an effort to target the most serious, repeat offenders, the Commission indicated it was considering adding the "pattern of activity" enhancement to § 2G2.4. *Id.* at 40.

Second, the Commission considered the need to modify the definition of "distribution." *Id.* The Commission noted that "many cases sentenced under this guideline involve trade clubs or other barter types of exchanges." *Id.* at 10. The Commission sought Congressional input into whether an amendment to include barter forms of distribution should be pursued. *Id.* at 40.

Third, returning to an issue from 1991, the Commission noted "there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases. Indeed, all material that is possessed must at some point have been received (unless it was produced, in which case the defendant would be sentenced under the more severe production guideline)." *Id.* at 11. "There is some indication that judges may be trying to avoid such a disparity" by sentencing receipt under the incorrect Guideline. *Id.* at 11, 41. Given this "unwarranted disparity," the underlying mission to reduce unwarranted disparities, and a Congressional prohibition from 1991 against reducing the offense level for receipt, the Commission indicated that it was being forced to consider consolidating possession into the higher § 2G2.2 Guideline. *Id.* at 11, 41. The Commission indicated consolidation would result in several specific offense characteristics from § 2G2.2 applying to cases of simple possession. *Id.* at 13. There is no mention in the report that the resulting higher sentences would be necessary or likely to affect deterrence, just punishment, or the need to protect society.

## V.    Congress Reacts to the Commission's Report

### A.  2000 Amendment

In 1998, Congress reacted to the 1996 Report to Congres by enacting the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314. Section 506 directed the Commission to "clarify that the term 'distribution of pornography' applies to the distribution of pornography--(A) for monetary remuneration; or (B) for a nonpecuniary interest." *Id.* Section 507 responded to the Commission's consideration of applying the pattern of abuse enhancement to § 2G2.4 by directing "with respect to any action relating to the Federal Sentencing Guidelines subject to this title, ensure reasonable consistency with other guidelines of the Federal Sentencing Guidelines." *Id.*

On November 1, 2000, these directives became effective via Amendment 592. *See* Amendment 592, U.S.S.G. App. C. The Commission explained its changes to § 2G2.2:

> The amendment addresses the directive in the Act [Protection of Children for Sexual Predators Act of 1998] to clarify that the term "distribution of pornography" applies to the distribution of pornography for both monetary remuneration and a non-pecuniary interest. In response to the directive, the amendment modifies the enhancement in § 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor), relating to the distribution of child pornographic material...the amendment (1) modifies the definition of "distribution" to mean any act, including production, transportation, and possession with intent to distribute, related to the transfer of the material, regardless of whether it was for pecuniary gain; and (2) provides for varying levels of enhancement depending upon the purpose and audience of the distribution. These varying levels are intended to respond to increased congressional concerns, as indicated in the legislative history of the Act, that pedophiles, including those

who use the Internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity.

The Commission explained its amendment to § 2G2.4 as follows:

The amendment clarifies the meaning of the term "item" in subsection (b)(2) of § 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). That subsection provides a two-level enhancement if the offense involved possession of ten or more items of child pornography. The amendment adopts the holding of all circuits that have addressed the matter that a computer file qualifies as an item for purposes of the enhancement. The amendment also provides for an invited upward departure if the offense involves a large number of visual depictions of child pornography, regardless of the number of "items" involved. This provision invites courts to depart upward in cases in which a particular item, such as a book or a computer file, contains an unusually large number of pornographic images involving children.

In the next amendment cycle, the Commission intends to continue consideration of the directive requiring that the Commission "provide for an appropriate enhancement in any case in which the defendant engaged in a pattern of activity of sexual abuse and exploitation of a minor." In addition, the Commission intends to consider further the general directive in the Act requiring the Commission to ensure "that the sentences, guidelines, and policy statements for offenders convicted of such offenses are appropriately severe and reasonably consistent with the other relevant directives and the relevant existing guidelines. *Id.*

§ 2G2.2
Base Offense Level: 17
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years  +2
    (b)(2) if distribution
        A) For pecuniary gain, see 2F1.1 but not less than +5
        **B) For value but not pecuniary gain +5**
        **C) To a minor +5**
        **D) To persuade a minor to engage in sexual conduct +7**
        **E) Other than for the reasons above +**2
    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    (b)(5) transmission of material or notice by computer +2

§ 2G2.4 (Unchanged)

**B. 2001 Amendment**

In 2001 the Commission made changes to § 2F1.1.  Accordingly, Section § 2G2.2(b)(2)(A) was amended by striking "§ 2F1.1 (Fraud and Deceit) and inserting "§ 2B1.1 (Theft, Property Destruction, and Fraud)"

§ 2G2.2
Base Offense Level:  17
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years  +2
    (b)(2) if distribution
        A) For pecuniary gain, see **2B1.1** but not less than +5
        B) For value but not pecuniary gain +5
        C) To a minor +5
        D) To persuade a minor to engage in sexual conduct +7
        E) Other than for the reasons above +2
    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    (b)(5) transmission of material or notice by computer +2

## VI.  Congress Yields Power to the Department of Justice

### A.  The Protect Act

In 2003, two attorneys at the Department of Justice convinced a novice Congressman to insert drastic changes to the child pornography Guidelines into an unrelated, popular bill, without notice to the Sentencing Commission.  *See* Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter Phillips) at 983 n. 185, 986.   This additional component of the Protect Act, Pub. L. No. 108-21 (2003), modified § 2G2.2 and § 2G2.4, nullified the ability of judges to consider many downward departures for child pornography defendants, and drastically changed the statutory penalties for child pornography offenses.  *See* Attachment B for a copy of relevant portions.

The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography. *Phillips* at 967-984.  As the legislation progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment to the bill that would directly amend various Guidelines.  *Id.; See also United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004).   Representative  Feeney later admitted he was just the "messenger" for two Justice Department officials who authored the provision and ***chose not to notify or consult the Sentencing Commission***.  *Phillips*, at 983 n. 185, 986; [emphasis added].

Debate on the amendment was limited to twenty minutes.  *Id*. at 983.  The House later passed the Child Abduction Prevention Act with the Feeney Amendment added.  *Id*. at 992-994. Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law April 30, 2003. *Id*. at 990-992, 991 n.219.

Numerous members of Congress objected to these changes, and the procedure by which they were introduced, including Senators Ted Kennedy and Patrick Leahy.  *Id* at n.215.  Senator Leahy explained, "The substance of the Hatch-Sensenbrenner amendment-whether in the form that was

voted on in conference, or in the form that was circulated after the conference adjourned-is just as outrageous as the way in which it was adopted. This amendment modifies in very limited ways the Feeney amendment, which was added to the bill on the House floor after only 20 minutes of debate. This far-reaching proposal will undermine the federal sentencing system and prevent judges from imposing just and responsible sentences." *Id.; See also* 149 Cong. Rec. S5137-01, 5145 (daily ed. Apr. 10, 2003) (statement by Sen. Leahy).

As was later noted by the Federal Public Defender for the Western District of Washington in a letter to Congress, "that the Feeney Amendment received virtually no attention or debate is inexplicable unless one assumes that it was produced at a time and in a way designed to escape detection and debate before its passage." *See* Materials From Interested Groups Opposing Original Feeney Amendment at 15 Fed.Sent.R. 346, 2003 WL 22208850 (Vera Inst.Just.)

Contained in both the original Feeney Amendment and the final version of the Protect Act, was a direct amendment to U.S.S.G. §§ 2G2.2 and 2G2.4, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, Pub.L. 108-21, § 401(i)(1)(B),(C). The Act also directly amended § 2G2.4 by adding an enhancement for "material that portrays sadistic or masochistic conduct." *Id*. Finally, the Protect Act also adjusted mandatory minimum sentences and statutory sentencing maximums for child pornography offenses. No research, study, body of experience, or rationale, was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement related to the number of images of child pornography. Nor was there any justification provided for § 2G2.4(b)(4)'s new 4-level enhancement.

When the Commission created § 2G2.4 in 1991 (due to Congress making it a federal offense to possess child pornography), it did not include a four-level enhancement for "material that portrays sadistic or masochistic conduct." The history of §§ 2G2.2 and 2G2.4 shows us that this was an intentional act. In 1990, the Commission added the sadistic conduct enhancement to § 2G2.2. *See* U.S.S.G. Appendix C, Amendment 325. However, in drafting and promulgating § 2G2.4, no such enhancement was included. *Compare* U.S.S.G. § 2G2.2 (1991) *with* U.S.S.G. § 2G2.4 (1991). This exclusion should be presumed to be intentional. *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) (if language is included in one section of a statute but excluded in another section of the same Act, it is presumed that the exclusion was done "intentionally and purposely").

The Sentencing Commission's expert analysis did not compel this enhancement in possession cases. In other words, this enhancement was not necessary to fulfill the purposes of sentencing in possession cases. And so long as the Commission's expert-based conclusions controlled, the possession Guideline remained unaltered in this respect. But this all changed with the passage of the PROTECT Act.

Without consulting the Commission or conducting any other research into the necessity of applying this enhancement to simple possession, Congress directly amended the possession of child pornography Guideline. Inserted into § 2G2.4 was the new subsection (b)(4). *See Pub. L. No.* 108-21, § 401. With this move – and without any explanation or justification – Congress began to sentence the mere possession of child pornography as akin to trafficking of child pornography. It

was Congressional actions like this that ultimately compelled the Sentencing Commission's reluctant consolidation of §§ 2G2.2 and 2G2.4.  *See* U.S.S.G. Appendix C, Amendment 664

As summarized by one commentator, with the passage of the PROTECT Act:

Congress directly amended [for the first time] the Federal Sentencing Guidelines by drafting Guideline text.  In the past, Congress often . . . issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text.  This time, Congress completely ignored the *expert* role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications.

Steven L. Chanenson, *Hoist With Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 & nn.54-57 (2004) (emphasis original); *see also Detwiler*, 338 F.Supp.2d at 1171.  Of even greater significance, Congress acted in this way without giving either the Judicial Conference or the Sentencing Commission "a fair opportunity to consider and comment" on the direct amendment. *See* Chanenson, 17 Fed. Sent'g Rep. at n.56 (*citing, e.g.* Letter from the Judicial Conference of the United States to Senator Orrin G. Hatch (April 3, 2003), *reprinted at* 15 Fed. Sent'g Rep. 343, 343 (2003)).

**B.  2003 Amendments**

The first changes to § 2G2.2 and § 2G2.4 took effect immediately upon the Act's signature into law.  *See* Pub. L. No. 108-21 (2003); *See also* Amendment 649, U.S.S.G. App. C.

§ 2G2.2
Base Offense Level:  17
Specific Characteristics:
    (b)(1) prepubescent or a minor under 12 years  +2
    (b)(2) if distribution
        A) For pecuniary gain, see 2B1.1**,** but not less than +5
        B) For value but not pecuniary gain +5
        C) To a minor +5
        D) To persuade a minor to engage in sexual conduct +7
        E) Other than for the reasons above +2

    (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
    (b)(4) Pattern of Abuse +5
    (b)(5) transmission of material or notice by computer +2
    **(b)(6) If**
        **A) 10-150 images        +2**
        **B) 150-300              +3**
        **C) 300-600              +4**
        **D) 600+                 +5**

§ 2G2.4
Base Offense Level: 15
Specific Characteristics:
      (b)(1) prepubescent or a minor under 12 years:    +2
      (b)(2) if 10 or more items: +2
      (b)(3) Possession as a result of computer use +2
      **(b)(4) if material portrays sadistic of masochistic conduct, or other violence +4**
      **(b)(5) If**
            **A) 10-150 images**    **+2**
            **B) 150-300**        **+3**
            **C) 300-600**        **+4**
            **D) 600+**          **+5**

On November 1, 2003, a technical change to § 2G2.2(b)(5) was made inserting ", receipt, or distribution" after "transmission." *See* Amendment 663, U.S.S.G. App. C.

Note: For the remainder of 2003, "double counting" was allowed under § 2G2.4 for possessing more than ten items, and for possessing more than ten images. It is difficult to understand why a defendant who possesses eleven printed pictures (eleven items containing one image each) should receive four levels of enhancement, while a defendant who possesses a single computer disk with 149 images (one item containing 149 images) should receive only a two level enhancement. This overlap, and the peculiar double-counting situation it created are indicative of the general lack of study, consideration, and review associated with the modifications of the Protect Act. The double-counting scenario was resolved on November 1, 2004 when Amendment 664 merged § 2G2.4 into § 2G2.2 and dropped the ten item specific offense enhancement. *See* Amendment 664, U.S.S.G. App. C.

**C. 2004 Amendment**

In November 2004, in an effort to reconcile the provisions of the Protect Act, the Sentencing Commission completely reworked §§ 2G2.2 and 2G2.4. *See* Amendment 664, USSG App. C; *See* also Appendix C. The Commission attempted to correct issues such as the double counting scenario described above. *Id.* The Commission also raised the Base Offense Level for trafficking, receipt, and distribution related offenses from 17 to 22. *Id.* Section 2G2.4 was merged into § 2G2.2, and the Base offense Level for possession increased from 15 to 18. *Id.* The Base Offense Level for simple receipt jumped from 17 to 22, with an allowance for a 2 level reduction under certain circumstances.[2] *Id.* The Commission observed, "The Protect Act established five year mandatory minimum terms . . . As a result of these new mandatory minimum penalties . . . the

---

[2] The provision allowing "passive" receivers and solicitors of child pornography to qualify for a lesser sentence appears to violate earlier congressional directives that "the Commission shall not promulgate any amendments that, with respect to such cases, would result in sentencing ranges that are lower than those that would have applied under such subsection." Pub. L. No. 108-21 (2003). However, by first raising the Base Offense Level by three levels for all non-possessory offenses, it became possible for the Commission to "give back" two levels to this select group of minor offenders without running afoul of congressional mandates.

Commission increased the base offense level for these offenses . . . The Commission determined that a base offense level of 22 is appropriate for trafficking because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached." *See* Amendment 664, USSG App. C.

The decision by the Commission to increase Base Offense Levels may have been politically expedient, but it was contrary to the Commission's established function.  Congress created the Sentencing Commission as an independent expert body and placed it in the Judicial Branch.  The Supreme Court upheld the promulgation of the Guidelines by the Commission against Separation of Powers challenge, "not without difficulty," based in part on a prediction that the Commission would not be enlisted in the work of the political branches, but instead would bring "judicial experience and expertise" to the "neutral endeavor" of sentencing, "the Judicial Branch's own business." *Mistretta v. United States*, 488 U.S. 361, 407-08 (1989).  Justice Scalia disagreed, stating that it was "not about commingling, but about the creation of a new Branch altogether, a sort of junior-varsity Congress."  *Id*. at 427 (Scalia, J., dissenting).

As the above explanation for Amendment 664 clearly indicates, the Sentencing Commission increased the Base Offense Levels and re-structured the specific offense characteristics of §2G2.2 with the singular goal of ensuring that the guidelines range matched or exceeded the newly increased mandatory minimums and rules put forth in the Protect Act, rather than with the goal of serving the statutory purposes of sentencing overall.  These actions undermine the Supreme Court's analysis in *Mistretta*: "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship.  That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta v. United States*, 488 U.S. 361, 407 (1989).

A useful analysis was provided by the Criminal Law Committee of the Judicial Conference in March 2007.  The Criminal Law Committee, which believes that the Commission, when deciding whether to amend the guidelines in response to a mandatory minimum, should make an assessment based on its own expert opinion, believes this opinion should be independent of any potentially applicable mandatory minimum.  *See* Comments of the Criminal Law Committee of the Judicial Conference (March 16, 2007), http://www.ussc.gov/hearings/03_20_07/walton-testimony.pdf. Afer all, if the resulting guideline, alone or in combination with specific offense characteristics, is lower than the mandatory minimum, § 5G1.1(b) will operate. The Commission could likewise consider in its independent evaluation any information in published reports or hearing records upon which Congress may have relied.  *Id*. What it should not do, is "launder" the actions of the political branches by signing the Commission's name to the work.

> §2G2.2
> **Base Offense Level:**
>> **(a)(1):  18 if a violation of 18 U.S.C. §1466A(b) or §2252(a)(4) or §2252A(a)(5)**
>> **(a)(2): 22 otherwise            BUT**
>> **If (a)(2), + conduct was limited to receipt or solicitation, + no intent to traffic or distribute, then -2**

Specific Characteristics:
> (b)(1) prepubescent or a minor under 12 years  +2
> (b)(2) if distribution
>> A) For pecuniary gain, see 2B1.1**,** but not less than +5
>> B) For value but not pecuniary gain +5
>> C) To a minor +5
>> **D) To a minor to persuade the minor to engage in illegal activity other than E) +6**
>> **E**) To persuade a minor to engage in sexual conduct +7
>> F) Other than for the reasons above +2
> (b)(3) if material portrays sadistic or masochistic conduct, or other violence, +4
> (b)(4) Pattern of Abuse +5
> (b)(5) transmission of material or notice by computer +2
> **(b)(6) If**
>> **A) 10-150 images        +2**
>> **B) 150-300               +3**
>> **C) 300-600               +4**
>> **D) 600+                    +5**

Redacted/Not Merged with 2G2.2: the enhancement for possessing greater than ten items containing visual depictions of the sexual exploitation of a minor.  *See* Amendment 664, U.S.S.G. App. C.


## VII.  The Typical Defendant

The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History.  As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images)."  *See* Amendment 664, U.S.S.G. App. C "Reason for Amendment", (November 1, 2004).  The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement.  *See* U.S.S.G. § 2G2.2(b)(6).  Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase.  *See* U.S.S.G. § 2G2.2(b)(7)(D). The 2004 Guidelines created an Application Note defining any video-clip as creating 75 images.  *See* U.S.S.G. § 2G2.2, App. Note 4(ii).  Thus one email containing eight, three-second video clips would also trigger a five-level increase.  Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase.  *See* U.S.S.G. § 2G2.2(b)(2),(4).  Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value.  *See* U.S.S.G. § 2G2.2(b)(3)(B).  Thus, an individual who swapped a single picture, and who was only engaged in

viewing and receiving child pornography for a few hours, can quickly obtain an offense level of 40. Even after Acceptance of Responsibility, an individual with no prior criminal history can quickly reach a Guideline Range of 210-262 months, where the statutory maximum caps the sentence at 240 months.  *See* U.S.S.G. § 5G1.1(a).

The results are illogical; Congress set the statutory range for first time distributors as five to twenty years.  Congress could not have intended for the average first time offender with no prior criminal history to receive a sentence of 210 to 240 months.  An individual with a Criminal History Category of II faces a Guideline range of 235 to 240 months, and any higher Criminal History score mandates the statutory maximum.  These result runs contrary not only to Congressional will, but also to a principal Guideline policy - providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.

Let us examine the results of these Congressionally directed and influenced changes as they apply to two hypothetical, but statistically typical defendants. Quoted statistics are derived from United States Sentencing Commission's "Use of Guidelines and Specific Offense Characteristics: FY 2006" report found at http://www.ussc.gov/gl_freq/06_glinexgline.pdf  and *the 2007 Sourcebook*,  http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.

**Defendant #1.**
Convicted of distributing child pornography.  Sentenced pursuant § 2G2.2.
Specific Offense Characteristics:
- Possessed a picture depicting a child under the age of 12 (96.2%)
- Used a computer (96.8 % of defendants)
- Possessed one picture involving bondage (63.2%)
- Emailed 5 pictures to another person in expectation of getting 5 pictures back (49.4% of defendants receive some type of distribution enhancement)
- Possessed four short movie clips and ten pictures resulting in a calculated 310 pictures (53.6 % had greater than 300, 85.5% had greater than 10)

Defendant #1 has no criminal history and has never abused or exploited a child. He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, we can easily calculate his Guideline Range:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | 108-135 months |
| November 1, 2004: | 188-235 months |

Percentage increase in the low end of the Guideline Range after Acceptance since 1987: 1,567%.
Actual increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines:  167 months.

If we simply add the extra 10 second movie clips to this collection, defendant #1 charts as follows:

| | |
|---|---|
| April 30, 1987: | 12-18 months |
| November 1, 1991: | 21-27 months |
| November 27, 1991: | 27-33 months |
| November 1, 1996: | 41-51 months |
| November 1, 2000: | 70-87 months |
| April 30, 2003: | **121-151 months** |
| November 1, 2004: | **210-262 months** |

This would result in a 1750% increase, or a 198 month increase over a defendant sentenced for the same conduct on October 30, 1991.

**Defendant #2**
Convicted of possessing child pornography.  Sentenced pursuant to § 2G2.2.
Specific Offense Characteristics:
- Possessed a picture depicting a child under the age of 12 (93.5%)
- Used a computer to obtain the image (93.1%)
- Had one disk containing two movie files and 10 pictures, equating to 160 pictures (38% had at least 150 pictures, 63.1% had greater than 10 images)
Defendant #2 has no criminal history and has never abused or exploited a child.
He pleads guilty in a timely fashion and receives the maximum standard reduction for acceptance of responsibility.

Using the chart provided at Appendix A, Defendant #2 receives this Guideline Range:

| | |
|---|---|
| April 30, 1987: | No punishment - not illegal |
| November 1, 1991: | 6-12  months |
| November 27, 1991: | 12-18  months |
| November 1, 1996: | 21-27 months |
| April 30, 2003: | 30-37 months |
| November 1, 2004: | 41-51 months |

Percentage increase in the Total Offense Level after Acceptance since 1991: 683%
Increase in the low end of the applicable Guideline Range since Congress directly, and repeatedly, began increasing the Guidelines: 41  months.

A comparison of defendant #1's case to the Guidelines for two similar offenses demonstrates the absurdity of this result.

First consider the hypothetical of a man who, in 2006, contacted a twelve year-old girl over the internet. Using his age and experience, he convinced her to meet, and the two then engaged in repeated sex.  U.S.S.G. § 2G1.3(a) (since amended to be made consistent with congressionally initiated changes of the Adam Walsh Act) established a base offense level of 24 for the offense. After a two-level enhancement for unduly influencing the child under U.S.S.G. §2G1.3(b)(2), a two-level enhancement for use of the computer (b)(3), and a two-level enhancement for commission of a sex act (b)(4), the final offense level would be 30. After Acceptance, the Guideline range for this Category I offender would be 70-87 months.  Today, after Congressionally mandated changes, the Guideline range would be only 108-135 months.

Consider next the aggravated case of Joe Champion, as discussed at *United States  v. Kane*, 470 F.3d 1277 (8th Cir. 2006).  Mr. Champion paid to have a mother hold down her nine year-old child while Mr. Champion raped the young girl twice a week for two years.  During these rapes, the child experienced such trauma she passed out.  The damage to the child physically and emotionally is unimaginable.  Using the (then existing) Guidelines, applying all enhancements, and granting only Acceptance of Responsibility, the court determined the Guideline range was 151-188 months. *Id*. at 1282.

That the Guidelines would mete out the most severe punishment for the least egregious of these three offenses requires some correction.  Defendant #1's Guideline range is 450% higher for trading pornography than for the man who actually coerces a young child into sex.  Defendant #1 faces a Guideline range 140% higher than the man who paid to rape a prepubescent child over 200 times.  *Id*. at 1279.   Such a result either means that the entire Guideline system is bunk, or it is an indication that the stacked enhancements resulting from the Protect Act result in sentences that are greater than necessary to satisfy sentencing purposes.

Courts of appeals may accord a presumption of reasonableness to a within guideline sentence based on the general assumption that the guidelines are the product of careful study based on extensive empirical evidence, *Rita*, 127 S. Ct. at 2464, but "not all of the Guidelines are tied to this empirical evidence." *Gall*, 1287 S. Ct. at 594 n.2.  Where, as here, we can demonstrate that the Guidelines were dramatically skewed upwards by the efforts of two DOJ attorneys, who used a novice Congressman to backdoor changes into a major bill, over the objection of the Sentencing Commission, which specifically stated that no careful study or review had been allowed, then the assumption of careful study becomes unfounded, and the resulting Guideline is worthy of little respect.

## VIII. The implications of Gall and Kimbrough for Child Pornography Cases[3]

Thankfully, recent changes in the law allow us to argue this position to the courts.

---

[3] Large passages in this section are excerpted, with permission of the author, directly from Amy Baron-Evans, *"Rita, Gall and Kimbrough:A Chance for Real Sentencing Improvements."*;

The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564; *see also Gall*, 128 S. Ct. at 602 (same). "The statute, as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough*, 128 S. Ct. at 570.

Because the "Guidelines are not the only consideration," the judge, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. The judge must independently evaluate the appropriate sentence in light of the Section 3553(a) purposes and factors, and must consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures), or "regardless." *Rita*, 127 S. Ct. at 2463, 2465, 2467-68. In doing so, the judge "may not presume that the Guidelines range is reasonable." *Gall*, 128 S. Ct. at 596-97; *see also Rita*, 127 S. Ct. at 2465 (same).

Of great importance is the fact that district court judges must now consider and respond to nonfrivolous arguments that the guideline sentence itself reflects an unsound judgment because it fails properly to reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way, or a different sentence is appropriate regardless. *Rita*, 127 S. Ct. at 2465, 2468. District courts are no longer required, or permitted, to simply defer to Commission policies. *Id*. Courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Id*. at 2463. Even the government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'"[4] *Kimbrough*, 128 S. Ct. at 570.

Thus, judges may vary from the child pornography guidelines because of the individual circumstances of the case, *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007), and/or because the Guidelines are not the product of empirical data, national experience, or independent expertise and thus do not satisfy § 3553(a)'s objectives, or both. *See United States v. Baird*, slip op., 2008 WL 151258 (D. Neb. Jan. 11, 2008). As the Fourth Circuit observed while upholding an individual circumstances variance from 78-97 months down to 24 months:

> "In the wake of *Gall*, the Government's principal argument is that the district court failed to take into account the seriousness with which Congress views sexual crimes involving children. The district court's statement of reasons, however, expressly acknowledged the seriousness of the offense charged in computing the sentence. See J.A. at 96 (explaining that Congress considered Smith's crime 'a very serious offense' and that the district court 'was treating it as such'). In addition, the district court noted during the sentencing hearing that 'Congress has indicated its abhorrence of the offense or offenses relating to child pornography.' (J.A. at 92)." *United States v. Smith*, slip op., 2008 WL 1816564 (4th Cir. Apr. 23, 2008).

---

[4] *See also* Tr. of Oral Argument at 50, *Rita v. United States* (U.S. argued Feb. 20, 2007); Tr. of Oral Argument at 32-33, *Claiborne v. United States* (U.S. argued Feb. 20, 2007).

Helpful language may also be found from recent case law dealing with the seemingly settled issue of variances based on fast-track disparities.  The First Circuit recently abrogated a ban on the consideration of fast-track disparities in sentencing, noting:

"While the *Kimbrough* Court acknowledged that a sentencing court can be constrained by express congressional directives, such as statutory mandatory maximum and minimum prison terms, 128 S. Ct. at 571-72, the PROTECT Act — as the Fifth Circuit would have to concede — contains no such express imperative. The Act, by its terms, neither forbids nor discourages the use of a particular sentencing rationale, and it says nothing about a district court's discretion to deviate from the guidelines." *U.S. v. Rodriguez*, __F.3d __, 2008 WL 2265898 (1st Cir. June 4, 2008)

As district court judges become comfortable in the knowledge that the appellate courts will respect their reasoned discretion, these opportunities for effective advocacy will grow.  Indeed, in the right circumstances, a detailed record may encourage, and support, exceptional downward variances.  *See United States v. Rowan II*, slip op., 2008 WL 2332527 (C.A.5 June 9, 2008)(abrogating prior circuit precedent to affirm a variance from 47-56 months downwards to supervised release for possession of child pornography).

This article has demonstrated a number of policy problems with the child pornography guidelines that can be easily put into the record.  First, the guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary.  Second, repeated Congressional directives were targeted to deter mass producers, repeat abusers, and mass distributors, but this group makes up less than 5% of the defendants effected by the changes.  Third, the two point enhancement for use of a computer is applied to nearly every defendant, but the rationale for creating and continuing the enhancement is rarely present.  Fourth, the latest, and most dramatic changes to the Guidelines result not from study by the Commission, nor debate in Congress, but instead by the actions of two unknown authors within the Department of Justice.

In a decisive rejection of mindless uniformity, the Court has recognized that unwarranted uniformity is every bit as objectionable as unwarranted disparity:  "[I]t is perfectly clear that the District Judge . . . also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." *Id.* at 600 (emphasis in original).  Thus, the judge "must make an individualized assessment based on the facts presented," and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 128 S. Ct. at 597.  *Kimbrough*, for example, was an "unremarkable" "mine-run" case in which the guideline itself reflects unsound judgment in that it fails properly to reflect § 3553(a) considerations.  128 S. Ct. at 575.  There, the Court upheld a below-guideline sentence in an ordinary crack trafficking case because the crack guidelines (like all of the drug guidelines) were not based on past practice at their inception, and reflect unsound judgment in light of the purposes of sentencing and the need to avoid unwarranted disparities.  The Court said:  "In the main," the Commission used an "empirical approach based on data about past practices, including 10,000 presentence investigation reports," but it "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Id.* at 567.  When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to

conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *Id.* at 575.

In *Kimbrough*, "the District Court properly homed in on the particular circumstances of Kimbrough's case and accorded weight to the Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)." 128 S. Ct. at 576. The Court did not mean that the district court properly relied on something "unique" about Mr. Kimbrough or his offense because it made quite clear that this was an "unremarkable" "mine-run" case. What it meant was that the facts of the case fit what is wrong with the crack cocaine guidelines. Thus, a defense attorney who argues for a below-guideline sentence is not seeking a "categorical" rejection of a guideline in all possible cases, but a rejection of the guideline in the particular case because the facts fit the policy problems of the guideline.

Although some guidelines may be entitled to respect, this does not pertain to guidelines, like the child pornography guidelines, that "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 128 S. Ct. at 575. Where, as here, the Commission is merely parroting the directives of Congress, which in turn admits that it was merely enacting an undebated item written by federal prosecutors, then little respect is due.

In *Rita*, the basis for the non-binding- with-no-independent-legal-effect presumption was that it was "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve 3553(a) objectives" because the original Commission (instead of basing the Guidelines on the purposes of sentencing as Congress directed, *see* 28 U.S.C. § 991(b)(1)(A)) used an "empirical approach" based on "past practice," and the Guidelines "*can*" evolve in response to non-guideline sentencing decisions and consultation with the criminal justice community. *Rita*, 127 S. Ct. at 2464-65 (emphasis supplied). But this is simply untrue when the Commission has not exercised its capacity to develop guidelines based on empirical data, national experience, and independent expertise. *Kimbrough*, 128 S. Ct. at 575.

After *Gall* and *Kimbrough*, the fact that a guideline (or amendment to a guideline) was spawned by congressional action is a red flag for lack of empirical basis, raising the question whether the guideline reflects unsound judgment. *See Gall*, 128 S. Ct. at 594 n.2 ("For example, the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes."); *Kimbrough*, 128 S. Ct. at 575 ("The crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'"); *id*. at 569 n.10 ("The amended Guidelines still produce sentencing ranges keyed to the mandatory minimums in the 1986 Act.").

The Court affirmatively recognizes that Congress makes mistakes, and that when the Commission blindly follows or exacerbates a congressional mistake with guidelines that are not based on empirical evidence or experience, and that are contrary to sentencing purposes and/or create unwarranted disparities or unwarranted similarities, the courts are free to reject such

guidelines.  *Kimbrough*, 128 S. Ct. at 567-68, 569 n.2, 571-72, 574-75; *Gall*, 128 S. Ct. at 594 & n.2.

The Commission has acknowledged that the goals of sentencing reform have not been fully achieved because, "[i]n some cases, the results of research and collaboration have been overridden or ignored . . . through enactment of mandatory minimums or specific directives to the Commission."  *See* U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at vii (2004).  Indeed, "frequent mandatory minimum legislation and specific directives to the Commission to amend the [sex offense] guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."  *Id*. at 73.  The term "directives" may convey the impression of express instructions to amend the guidelines in particular ways, but many of the guidelines were created or amended as a reflexive response to a new or increased mandatory minimum, an increased statutory maximum, an instruction to study some aspect of sentencing or to change penalties if appropriate, or behind-the-scenes discussions not in the public record at all.  In some instances, the Commission exceeded an express congressional directive, or took other action that appears to contravene congressional intent.

It is important to recognize that a Guideline which follows to the letter a congressional directive stated in "express terms" is not immune from scrutiny by the sentencing judge as a potentially unsound judgment.  Even the government acknowledges as much.  *See* Brief of the United States at 29, *Kimbrough v. United States* ("As long as Congress expresses its will wholly through the Guidelines system, the policies in the Guidelines will best be understood as advisory under *Booker* and subject to the general principles of sentencing in section 3553(a)."); Letter stating the government's position on the career offender guideline, docketed March 17, 2008 in *United States v. Funk*, No. 05-3708, 3709 (6th Cir.) ("position of the United States" is that "*Kimbrough*'s reference to [§ 994(h)] reflected the conclusion that Congress intended the Guidelines to reflect the policy stated in Section 994(h), not that the guideline implementing that policy binds federal courts.") (emphasis in original), available on the Sentencing Resource Page of www.fd.org.

Congress has the exclusive right and responsibility to legislate statutory minimums and maximums,[5] and those outer limits trump any inconsistent guideline range, as is obvious, and as USSG § 5G1.1 says.  But when Congress uses the Commission as a conduit for a specific sentence or sentencing increase, the resulting guideline is but one factor to be considered under § 3553(a), and is subject to the same critical analysis as other guidelines, as the courts have found in both career offender and child pornography cases.  *See United States v. Martin*, 520 F.3d 87, 88-96 (1st Cir. 2008) (courts have broad discretion to sentence below career offender guideline under *Gall* and *Kimbrough*); *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008) (Section 994(h) is a

---

[5] See *United States* v. *Evans*, 333 U.S. 483, 486 (1948) (observing that "as concerns the federal powers, defining crimes and fixing penalties are legislative, not judicial, functions"); *Ex parte United States*, 242 U.S. 27, 41-42 (1916) (stating that "the authority to define and fix the punishment for crime is legislative," while the "right . . . to impose the punishment provided by law, is judicial"); *United States* v. *Wiltberger*, 18 U.S. (1 Wheat) 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *United States* v. *Hudson*, 11 U.S. (1 Cranch) 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.").

directive to the Commission, not the courts); *United States v. Marshall*, slip op., 2008 WL 55989 **7-8 (7th Cir. Jan. 4, 2008) ("We must reexamine our case law" holding "that courts are not authorized to find that the guidelines themselves, or the statutes upon which they are based, are unreasonable . . . in light of the Supreme Court's recent decision in *Kimbrough*."); *United States v. Malone*, 2008 U.S. Dist. LEXIS 13648 (E.D. Mich. Feb. 22, 2008) (imposing below guideline sentence based on Commission's reports finding career offender guideline unsound); *United States v. Baird*, slip op., 2008 WL 151258 *7 (D. Neb. 2008) ("Because . . . the Guidelines for child [pornography] offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but . . . in response to statutory directives. . . . the court affords them less deference than it would to empirically-grounded guidelines."). If it were otherwise, the Separation of Powers problem that most troubled the Court in *Mistretta* would arise. *See Mistretta*, 488 U.S. at 407.

The fact that 33% of FY 2007 child pornography defendants were sentenced below the Guidelines is encouraging. *See 2007 Sourcebook*; http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm at Table 28. It is also indicative of the fact that the courts recognize the flawed character of the child pornography sentencing scheme. This flaw exists, and severely impacts our clients, regardless of whether our clients were special or "extraordinary." Following *Rita*, *Gall*, and *Kimbrough*, the Courts are now in an even better position to ameliorate this problem.

As one district court judge recently observed:

[F]or policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as . . . child crimes and sexual offenses. Consequently, the Guideline ranges of imprisonment for those crimes are a *less reliable appraisal of a fair sentence*. In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role — basing its determinations on "'empirical data and national experience, guided by a professional staff with appropriate expertise'", — it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in § 3553(a).

*United States v. Bennett*, 8:07CR235 (D. Neb. May 30, 2008) (Sentencing Memorandum)available at http://sentencing.typepad.com/sentencing_law_and_policy/files/bennett_sentencing_opinion.pdf

## IX. Conclusion

Child pornography is a pernicious evil. However, the hysteria associated with public events such as the Dateline "To Catch a Predator" series is not a sound basis for sentencing. Since 1991, the punishment for these offenses has been dramatically and irrationally increased, to the point where today rapists, murderers, and molesters receive lesser sentences than would a man who swaps a few, thirty-year old, pictures of child pornography that were produced before the defendant was even born. Recent changes to the sentencing system, and an increased familiarity with the

Attachment B

underlying presumptions of § 2G2.2 should persuade and embolden the courts to conclude that unless a defendant was a repeat offender, or a mass distributor, the Guidelines yield a sentence 'greater than necessary' to achieve §3553(a)'s purposes.

Attachment B

# Appendix A
## Guideline Changes Chart 1987 to Present

| Date | 13-Apr-87 | 1-Nov-91 | 27-Nov-91 | 1-Nov-96 | 1-Nov-00 | 1-Nov-01 | 30-Jan-03 | 30-Apr-03 | 1-Nov-04 |
|---|---|---|---|---|---|---|---|---|---|
| **Simple Possession (Base Offense Level)** | | 10 | 13 | 15 | 15 | 15 | 15 | 15 | 18 |
| <12 years or prepubescent | | +2 | +2 | +2 | +2 | +2 | +2 | +2 | |
| >10 items containing images | | | +2 | +2 | +2 | +2 | +2 | (see below) | (see below) |
| # of images | | | | | | | | +2 to 5 | +2 to +5 |
| use of a computer | | | | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | | | | | | | +4 | +4 |
| Max | | 12 | 17 | 21 | 21 | 21 | 21 | 28 | 31 |
| Max Guideline Range w/o Acceptance, CH I | | 10-16 months | 24-30 months | 37-46 mnths | 37-46 months | 37-46 months | 37-46 months | 78-97 months | 108-135 months* |
| Max Guideline Range w/ Acceptance, CH I | | 6-12 months | 15-21 months | 27-33 mnths | 27-33 months | 27-33 months | 27-33 months | 51-63 months | 78-97 months |
| Statutory Range | | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 5 yrs | NMT 10 yrs | NMT 10 |
| | | | | | | | | | |
| | | | | | | | | | |
| **Distribution (Base Offense Level)** | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 22 |
| Receipt w/ intent to traffick/distro (Base) | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 22 |
| Receipt w/o intent to traffick/distro (Base) | 13 | 10 | 15 | 17 | 17 | 17 | 17 | 17 | 20 |
| Possession w/ intent to traffick/distro (Base) | 13 | 13 | 15 | 17 | 17 | 17 | 17 | 17 | 18 |
| Distribution for SS | +5 to +11 (2F1.1) | +5 to +x | +5 to +x | +5 to + 18 | +5 to + 18 (2F1.1) | +5 to +26 (2B1.1) | +5 to +30 | +5 to +30 | +5 to +30 |
| Disribution for other reason than SS | | | | | +2 to +7 | +2 to +7 | +2 to +7 | +2 to +7 | +2 to +7 |
| <12 years | +2 | +2 | | | | | | | |
| <12 years or prepubescent | | | +2 | +2 | +2 | +2 | +2 | +2 | +2 |
| sadistic or masochistic | | +4 | +4 | +4 | +4 | +4 | +4 | +4 | +4 |
| pattern of abuse or exploitation | | | +5 | +5 | +5 | +5 | +5 | +5 | +5 |
| use of a computer | | | | +2 | +2 | +2 | +2 | +2 | +2 |
| # of images | | | | | | | | +2 to +5 | +2 to +5 |
| Max | 20+ | 24+ | 31+ | 35+ | 35+ | 37+ | 37+ | 42+ | 47+ |
| Max Guideline Range w/o Acceptance, CH I | 33-41 | 51-63 | 108-135 | 168-210** | 168-210** | 210-262** | 210-262** | 360-Life*** | Life*** |
| Max Guideline Range w/ Acceptance, CH I | 24-30 | 37-46 | 78-97 | 121-151 | 121-151 | 151-188** | 151-188** | 262-327*** | Life*** |
| Statutory Range | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NMT 15 | NLT 5, NMT 20 | NLT 5, NMT 20 |

\* Exceeds statutory max of 120 months for 1st time offender
\** Exceeds statutory max of 180 months for 1st time offender
\*** Exceeds statutory max of 240 months for 1st time offender

Bold, Red type indicates a change from the previous year.

Attachment B

# Guideline Changes Chart 1987 to Present
(Page 2)

Distribution Offenses:
　　　Base Offense Level:　13 (Committee)
　　　　　　　　　　　　　15 (by law in 1991)
　　　　　　　　　　　　　17 (by law in 1996)
　　　　　　　　　　　　　22 (to comport with new mandatory minimum in 2003)

Receipt Offenses:
　　　Base Offense Level:　10 (Committee)
　　　　　　　　　　　　　13 (by law in 1991)
　　　　　　　　　　　　　15 (by law in 1991)
　　　　　　　　　　　　　20/22 (to comport with new mandatory minimums in 2003)

Simple Possession:
　　　Base Offense Level　10 (Committee)
　　　　　　　　　　　　　13 (by law in 1991)
　　　　　　　　　　　　　18 (to comport with new mandatory minimums in 2003)

+2 for a victim <12　　　　Committee
sadistic/masochistic　　　 Committee
Pattern of Abuse　　　　　 Committee
Distribution　　　　　　　 Committee

+2 computer　　　　　　　 by law / Congress
# of pictures　　　　　　　 by law / written by the DOJ

## Appendix B:
## Letter from the Commission opposing increased penalties

U.S. SENTENCING COMMISSION
Washington, DC, August 7, 1991.
Hon. EDWARD R. ROYBAL,
Chairman, Subcommittee on Treasury, Postal Service, and General Government,
Capitol, Washington, DC.

DEAR CONGRESSMAN ROYBAL: I am writing in reference to Senate Amendment No. 780 to the FY 1992 Treasury, Postal Service Appropriations Bill that directs the United States Sentencing Commission to amend the sentencing guidelines pertaining to child pornography offenses.

Regrettably, the debate in the Senate mischaracterized the Commission's recent actions as having reduced the guideline penalties for trafficking in child pornography. This is not correct. In point of fact, the Commission amendments assure that defendants who peddle child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography. The Commission has always regarded child pornography offenses as serious, as indicated by the fact that the guidelines do not permit straight probation for the least serious forms of this conduct and require a substantial term of imprisonment for the more serious forms.

The Commission's 1991 amendments to the child pornography guideline were principally motivate by the creation of a new offense in the 1990 crime bill (codified at 18 U.S.C. s 2252(a)(4)) that punishes by imprisonment up to five years the knowing possession of three or more items of child pornography. Prior to the 1990 crime bill, 18 U.S.C. s 2252 provided up to ten years imprisonment upon a first offense conviction for a wide range of conduct varying in seriousness from the simple receipt through the mail of one item of child pornography to for-profit trafficking in large volumes of such material. Convictions for such conduct were sentenced under guideline § 2G2.2, which provided a base offense level of 13, increased by 2 levels (about 25 percent) if the material involved a prepubescent minor or minor under age 12, and further increased by at least 5 levels if the offense involved for-profit distribution.

In response to the 1990 crime bill amendment, the Commission created a new guideline, § 2G2.4, and assigned to it a base offense level of 10, increased to 12 if the pornographic material involved a prepubescent minor or minor under age 12. The base offense level of 10 was the highest of the alternatives proposed for public comment 1 and is roughly 50 percent greater than the base offense level for simple receipt or possession (in federal jurisdiction) of one item of adult obscene matter. The sentencing significance of this is that a first offender who violates 18 U.S.C. s 2252(a)(4) by possessing three items depicting a prepubescent child and who manifests remorse will be subject to a guideline range of 6–12 months imprisonment. A sentence of probation is only permitted in such circumstances if the defendant, as a condition of probation, loses his liberty for at least six months in jail, community confinement, or home detention.

In constructing the new guideline, the Commission made several other significant decision. First, the Commission provided that if the actual offense conduct involves trafficking in child pornography, the trafficking guideline, with its more severe penalties, will apply, although the defendant may only be convicted of simple child pornography possession. Similarly, if the actual offense conduct involves production of child pornography, the still more severe penalties of guideline 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material . . .) will apply. The purpose of these "cross references" is to ensure that defendants will be punished commensurate with

the seriousness of their real offense conduct, even if a plea bargain allows a plea to a possession charge. Furthermore, for those cases in which the defendant possesses a large quantity of prohibited material, but the government is unable to prove trafficking (in order to trigger the cross reference to the trafficking guideline), commentary to the new guideline recommends an above-guideline sentence.

Secondly, in keeping with the overarching congressional mandate to ensure that defendants who commit similar offense conduct are treated similarly under the guidelines, the Commission determined that the new guideline should encompass other conduct of comparable seriousness to the new statutorily-created offense (simple possession of child pornography) that was formerly sentenced under § 2G2.2, including simple receipt. Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct. In this regard, the Commission's rationalization of the offense conduct according to its severity parallels the manner in which illegal drug (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely. Senate Amendment No. 780, unfortunately, would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation.

For example, the Senate Amendment mandates the same base penalty for a defendant who, in response to a postal sting solicitation, orders one prohibited magazine as it does for an active "smut peddler." At the same time, the amendment would require the Commission to provide sentences that are 25 percent more severe if the defendant transports one prohibited magazine across state lines than if he is apprehended with nine child pornography movies in his home. Furthermore, through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more sever penalties mandated by the Senate amendment by negotiating a plea to simple possession. One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.

The Commission fully concurs in the need to provide appropriately sever penalties for these offenses that involve the sexual exploitation of young victims. The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice. In fact a number of judges had written the Commission to express the view that the offense level for the lest serious forms of conduct under s § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence. Empirical data on non-distribution cases sentenced under s § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. By ordering the Commission to raise penalties even higher for the least serious cases (i.e., simple possession and receipt), Senate Amendment No. 780 may aggravate this below-guideline sentencing rate and heighten sentencing disparity.

As I stated in recent testimony submitted to the Senate Judiciary Committee in connection with the 1991 crime bill, the Commission welcomes the opportunity to work with Congress to ensure that the guidelines are achieving the objectives Congress sees fit to establish, and we will implement any new congressional directives as promptly as the law permits. At the same time, we believe it is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on

Attachment B

actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy.


If the conferees determine that a directive to the Commission is needed in this area, I recommend consideration of the attached substitute provision. This directive, with its more flexible language, is patterned after similar directives in the Commission's original statute and several subsequent crime bills. It expresses the clear Congressional will that the Commission provide appropriately severe penalties in this area without hamstringing the ability of the Commission to take into account variations in the actual offense conduct and significant offender characteristics. Given reasonable flexibility, I am confident the Commission can accomplish the desired aim without creating anomalous results or compromising the core principles of the Sentencing Reform Act.


Thank you for your consideration in this matter.


With highest regards and best wishes, I am,


Sincerely,


WILLIAM W. WILKINS, JR.,
Chairman.

**Appendix C:**
**Select Portions of Amendment 664**

"Background: Section 401(i)(1)(C) of Public Law 108-21 directly amended subsection (b) to add subdivision (7), effective April 30, 2003.".

Reason for Amendment: This amendment implements the directives to the Commission regarding child pornography and sexual abuse offenses in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, (the "PROTECT Act"), Pub. L. 108-21. This amendment makes changes to Chapter Two, Part A (Criminal Sexual Abuse), Chapter Two, Part G (Offenses Involving Commercial Sex Acts, Sexual Exploitation of Minors, and Obscenity), §§ 3D1.2 (Groups of Closely Related Counts), 5B1.3 (Conditions of Probation), 5D1.2 (Term of Supervised Release), and 5D1.3 (Conditions of Supervised Release), and Appendix A (Statutory Index).

First, the amendment consolidates §§ 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic), and 2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct), into one guideline, § 2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct). Consolidation addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys regarding difficulties in determining the appropriate guideline (§ 2G2.2 or § 2G2.4) for cases involving convictions of 18 U.S.C. § 2252 or § 2252A. Furthermore, as a result of amendments directed by the PROTECT Act, these guidelines have a number of similar specific offense characteristics.

Section 103 of the PROTECT Act established five-year mandatory minimum terms of imprisonment for offenses related to trafficking and receipt of child pornography under 18 U.S.C. §§ 2252(a)(1)-(3) and 2252A(a)(1), (2), (3), (4) and (6). This section also increased the statutory maximum terms of imprisonment for these offenses from 15 years to 20 years. Furthermore, the PROTECT Act increased the statutory maximum penalty for possession offenses from five to ten years. As a result of these new mandatory minimum penalties and the increases in the statutory maxima for these offenses, the Commission increased the base offense level for these offenses.

The amendment provides two alternative base offense levels depending upon the statute of conviction. The base offense level is set at level 18 for a defendant convicted of the possession of child pornography under 18 U.S.C. § 2252(a)(4), 18 U.S.C. § 2252A(a)(5), or 18 U.S.C. § 1466A(b), and at level 22 for a defendant convicted of any other offense referenced to this guideline, primarily trafficking and receipt of child pornography. The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations. The Commission increased the base offense level for possession offenses from level 15 to level 18 because of the increase in the statutory maximum term of imprisonment from 5 to 10 years, and to maintain proportionality with receipt and trafficking offenses. The amendment also provides a two-level decrease at § 2G2.2(b)(1) for a

defendant whose base offense level is level 22, whose conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor, and whose conduct did not involve an intent to traffic in or distribute the material. Thus, individuals convicted of receipt of child pornography with no intent to traffic or distribute the material essentially will have an adjusted offense level of level 20, as opposed to an offense level of level 22, for receipt with intent to traffic, prior to application of any other specific offense characteristics. The Commission's review of these cases indicated the conduct involved in such "simple receipt" cases in most instances was indistinguishable from "simple possession" cases. The statutory penalties for "simple receipt" cases, however, are the same as the statutory penalties for trafficking cases. Reconciling these competing concerns, the Commission determined that a two-level reduction from the base offense level of level 22 is warranted, if the defendant establishes that there was no intent to distribute the material.

The amendment also provides a new, six-level enhancement at § 2G2.2(b)(3)(D) for offenses that involve distribution to a minor with intent to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than sexual activity.

The amendment also makes a number of changes to the commentary at § 2G2.2, as follows. The amendment adds several definitions, including definitions of "computer," "image," and "interactive computer service," to provide greater guidance for these terms and uniformity in application of the guideline. The amendment also broadens the "use of a computer" enhancement at § 2G2.2(b)(5) in two ways. First, the amendment expands the enhancement to include an "interactive computer service" (e.g., Internet access devices), as defined in 47 U.S.C. § 230(f)(2). The Commission concluded that the term "computer" did not capture all types of Internet devices. Thus, the amendment expands the definition of "computer" to include other devices that involve interactive computer services (e.g., Web-Tv). In addition, the amendment broadens the enhancement by explicitly providing that the enhancement applies to offenses in which the computer or interactive computer service was used to obtain possession of child pornographic material. Prior to this amendment, the enhancement only applied if the computer was used for the transmission, receipt or distribution of the material.

The PROTECT Act directly amended §§ 2G2.2 and 2G2.4 to create a specific offense characteristic related to the number of child pornography images. That specific offense characteristic provides a graduated enhancement of two to five levels, depending on the number of images. However, the congressional amendment did not provide a definition of "image," which raised questions regarding how to apply the specific offense characteristic. This amendment defines the term "image" and provides an instruction regarding how to apply the specific offense characteristic to videotapes. Application Note 4 states that an "image" means any visual depiction described in 18 U.S.C. § 2256(5) and (8) and instructs that each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered one image. Furthermore, the application note provides that each video, video-clip, movie, or similar recording shall be considered to have 75 images for purposes of the specific offense characteristic. Application Note 4 also provides two possible grounds for an upward departure (if the number of images substantially under-represents the number of minors or if the length of the videotape or recording is substantially more than five minutes). Because the image specific offense characteristic created directly by Congress in the PROTECT Act essentially supercedes an earlier directive regarding a specific offense characteristic relating to the number of items (see Pub. L. 102-141 and Amendment 436), the Commission deleted the specific offense characteristic for possessing ten or more child pornographic items (formerly § 2G2.4(b)(3)). This deletion avoids potential litigation regarding issues of "double counting" if both specific offense characteristics were retained in the guideline.

In response to the increase in the use of undercover officers in child pornography investigations, the amendment expands the definition of "minor." "Minor" is defined as (1) an individual who had not attained the age of 18 years; (2) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (A) had not attained the age of 18 years, and (B) could be provided to a participant for the purposes of engaging in sexually explicit conduct; or (3) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

The amendment also makes clear that distribution includes advertising and posting material involving the sexual exploitation of a minor on a website for public viewing but does not include soliciting such material. In response to a circuit conflict, the amendment adds an application note to make clear that the specific offense characteristic for material portraying sadistic or masochistic conduct applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material. The circuit courts have disagreed regarding whether a defendant must have specifically intended to receive the sadistic or masochistic images. Some circuit courts have required that the defendant must have intended to receive these images. See United States v. Kimbrough, 69 F.3d 723 (5th Cir. 1995); United States v. Tucker, 136 F.3d 763 (11th Cir. 1998). The Seventh Circuit has held that this specific offense characteristic is applied based on a strict liability standard, and that no proof of intent is necessary. See United States v. Richardson, 238 F.3d 837 (7th Cir. 2001). The Commission followed the Seventh Circuit's holding that the enhancement applies regardless of whether the defendant specifically intended to possess, receive, or distribute such material.

Second, section 103 of the PROTECT Act increased the mandatory minimum term of imprisonment from 10 to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251. In response, the amendment increases the base offense level at § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production) from level 27 to level 32. A base offense level of level 32 is appropriate for production offenses because, combined with the application of several specific offense characteristics that are expected to apply in almost all production cases (e.g., age of the victim), this base offense level will ensure that the 15 year mandatory minimum (180 months) will be met in by the Chapter Two calculations almost every case.

The amendment adds three new specific offense characteristics that are associated with the production of child pornography. The amendment provides, at § 2G2.1(b)(2), a two-level increase if the offense involved the commission of a sex act or sexual contact, or a four-level increase if the offense involved a sex act and conduct described in 18 U.S.C. § 2241(a) or (b) (i.e., the use of force was involved). The Commission concluded that this type of conduct is more serious than the production of a picture without a sex act or the use of force, and therefore, a two-or four-level increase is appropriate. The amendment also adds a two-level increase if the production offense also involved distribution. The Commission concluded that because traffickers sentenced at § 2G2.2 receive an increase for distributing images of child pornography, an individual who produces and distributes the image(s) also should be punished for distributing the item. Lastly, the amendment adds a new, four-level increase if the offense involved material portraying sadistic or masochistic conduct. Similar to the distribution specific offense characteristic, the Commission concluded that, because § 2G2.2 contains a four-level increase for possessing, receiving or trafficking these images, the producers of such images also should receive comparable additional punishment.

NORMAN T. SELTZER
ROBERT CAPLAN
GERALD L. McMAHON
REGINALD A. VITEK
DAVID J. NOONAN
BRIAN T. SELTZER
ELIZABETH A. SMITH-CHAVEZ
JOYCE C. McCOY
DENNIS J. WICKHAM
JOHN H. ALDERMAN
JAMES F. DELPHEY
ELINOR T. MERIDETH
MICHAEL G. GARDI
THOMAS F. STEINKE
NEAL P. PANISH
SEAN T. HARGADEN
DAVID J. EVEROFF
CHARLES L. GOLDBERG
PATRICK Q. NAU
MICHAEL A. LEONE
DANIEL A. AMBROSE
L. SCOTT SCHEPER
LEE F. HERMANDORFER
DANIEL E. EATON
RUSTY A. NUNNLEY
GREGORY A. VEGA
HOWARD J. GARBHORST II
PAUL N. DAINOW
JACK B. LEER
AMANDA L. HARRIS
MESHEE SMITH GREEN
DAVID H. GREELEY
CHARLES S. WETHAM
SHONDE K. CRANDALL
SCOTT A. MEYER
ROBERT TRENTIN H. FRANCOA
LINDA RAPPT de LEON
JOSEPH J. KARTINOS
RICHARD A. CLERIC
G. SCOTT WILLIAMS
JEFFREY E. HARRIS
MATTHEW M. MAHONEY
ERIK L. SCHRANER
CHRISTOPHER J. LUCKNER
CYNTHIA MORGAN
ANDREW D. BROOKS
CHRISTINE H. LA PONTA
DANIEL W. ABBOTT
ANGELA A. WOODLAND
ALLISON C. SHARMAN
JASON P. SWEENEY
JASON M. SANTANA
NICHOLAS S. BARRY-PAST
CHAS M. HARRIS
MICHAEL G. LEES
JUSTINE N. PHILLIPS
HOPE N. CHAU
J. KEVIN RENN
TRACY A. HANSEN
WES C. HENRICKSEN
KEVIN C. ROGER
KIRSTEN V. ZITTLAU
RACHEL M. SCATTIZZI
TODD R. WYATT
MATTHEW D. SELTZER
EDWARD J. O'CONNOR
JESSICA A. JOHNSON
KATHRYN Q. QUALLES

OF COUNSEL
K. CHRISTINE TERRISON

www.scmv.com    2100 SYMPHONY TOWERS
619.685.3003    750 B STREET
619.685 3100 FAX    SAN   DIEGO,   CALIFORNIA
92101

S E L Z E R | C A P L A N | McMAHON | V i T E K

A LAW CORPORATION

ELIZABETH A. SMITH-CHAVEZ,
ESQ.

esmith@scmv.com
619 685.3199
619 702.6609 FAX

August 11, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 2001

Re:  Defendant Michael Matheron, Criminal Case No. 08-66

Dear Judge Roberts,

I am writing this letter with regard to Michael Matheron. I have known Mike for over eight years. I have always found him to be a kind and honorable man, with good intentions and intense loyalty to his friends. I have seen his kindness in dealing with mutual friends who were undergoing emotional problems, such as divorce. I attended his wedding, and saw his deep love and respect for his wife Sue and for her family. He and his wife came to California for my wedding.

I understand that Mike pled guilty to one count of possession of child pornography. I know that this is a serious charge; indeed, as the mother of two daughters, I would always take such a charge seriously. Nevertheless, I do not believe that Mike is, or could be, a continuing threat to anyone, including especially children.

I am an attorney who has practiced law for thirty years. I specialize in business and real property law, and am an author of West's California Real Estate Litigation. I am also a Master in the American Inns of Court, and was for a time the chief lawyer representative to the Ninth Circuit Judicial Conference. Although I do not practice criminal law, my firm of over seventy attorneys does have a criminal law department. Over the years, I have dealt with a number of clients and other persons who have been charged with crimes. I can honestly say that Mike's level of remorse is the highest I have seen. He has not attempted to pretend he is not guilty of the charge to which he pled guilty, or that this is somehow "unfair." This is

SELTZER | CAPLAN | McMAHON | VITEK
Hon. Richard W. Roberts
August 11, 2008
Page 3

consistent with the Mike that I have known for years — he has a strong underlying core of integrity.

I urge you to be lenient with Mike. He has a strong support system and is not a threat to society. I have known his wife, Sue, from before they were married. He is being honest with her regarding all of his actions; her guidance will be a strong support for him. Sending Mike to jail would be a tremendous hardship for her, as well as devastating for Mike. I know that he is taking this seriously, and believe that the losses he has already suffered (to his job, his reputation, his ability to earn a living, his emotional well-being, even his physical health) have been extensive punishment. He has expressed that he recognizes how wrong his actions were; I believe him when he says he has "learned his lesson."

Thank you for your consideration. If there is any other information which I can provide, I would be pleased to do so.

Yours truly,

Elizabeth Smith-Chavez
Seltzer Caplan McMahon Vitek
A Law Corporation
EAS-C:ls

ALLAN M. LEVENTHAL, PH.D.
9219 MANCHESTER ROAD
SILVER SPRING, MD 20901

(301) 586-9383

August 17, 2008
The Honorable Richard W. Roberts
Associate Justice
U. S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

In regards to defendant Michael Matheron, Crim. Case # 08-66

Dear Judge Roberts,

In June of 2003 I retired after a career of 45 years as a Clinical Psychologist. I am a
Professor Emeritus of Psychology at American University, a former chairman of the
Maryland State Board of Examiners of Psychologists, a former President of the Maryland
Psychological Association, a Diplomate in Clinical Psychology and a Fellow of the
American Psychological Association, with more than 40 years of clinical practice.

Mike Matheron was a therapy patient of mine for many years, on and off. His early life
was one of considerable emotional trauma and psychological deprivation. Abandoned by
his mother, with no knowledge of his father, he was adopted by a childless, dysfunctional
couple and came to the conclusion he was fundamentally defective and unlovable. He
grew up with little sense of self worth, filled with anxiety, guilt, and shame and routinely
responded to life with passivity and avoidance. In therapy, he worked hard to address a
host of self-defeating behaviors, making great gains in overcoming his profound feelings
of worthlessness and vulnerability. He learned how to relate more successfully to others,
how to make better use of his considerable intelligence, to trust himself, and to succeed
vocationally. These gains did not come easily –for a person with such self-doubts they
entailed experiencing high anxiety in making changes that took courage and hard work to
accomplish. In the process, I came to know and respect him as a very decent, moral
person who cared deeply about doing what was right in life for himself and others.

While the behaviors that led to his indictment were not an issue when he was in therapy
with me I believe I understand how they may have occurred. Vulnerabilities of the depth
Mike has struggled with all his life do not entirely disappear no matter how much has
been overcome. All of us err and people with Mike's emotional baggage can err more
dangerously. Resorting to the solitary self-stimulation provided by pornography can
become a means of placating one's demons, an easy (albeit ill-considered) way of
ameliorating the torments of anxiety and self-doubt, and readily generating satisfaction.
It is behavior that can quickly come to feed on itself. I know of no history of Mike
engaging in deviant sexual behavior. His actions were likely a recurrence of the self-
defeating behaviors that he largely overcame, but for which he needs additional help.
What I am certain of is that Mike's behavior in no way represented a threat to others,

most certainly not to children, with whom he would identify because of their vulnerability.

After years of knowing Mike very well, I regard him as someone of good character, who in fact has gone through life exercising increasing levels of responsibility – despite the actions that have brought him to this court -- and for whom doing harm to others would be anathema. I know that he has pled to one count of child pornography. Clearly his actions call for him to continue to get psychological help. It is my understanding that he is getting the assistance he needs. Knowing him and respecting him as I do, I hope his continuing to seek help in coming to terms with his problems will be regarded as what is required – not punishment, but therapy for someone who has a record of having benefited significantly when help was obtained.

Yours truly,

Allan M. Leventhal, PhD

42 Silver Aspen Drive
Thornhill, Ontario
Canada L3T 3T2

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

      RE: Michael Matheron, Crim. Case # 08-66

To the Honorable Judge Richard W. Roberts:

I am pleased to be able to write this letter on behalf of my friend Mr. Michael Matheron. I am a Licensed Clinical Neuropsychologist by trade, employed as the clinical director of Community Head Injury Resource Services of Toronto. I first met Mike through my husband, Eric Campbell, who has also provided a letter of reference for your review. As Eric notes, he and Mike met through an internet site, *Divorce On-Line*. My relationship with Mike began when I reluctantly attended a Toronto gathering of members of Divorce on-line group some 10 years ago. Eric asked me to go with him to meet, in person, some of the people with whom he had developed a connection on line—top of that list was Mike. Eric showed me some of Mike's posts which were, to my relief, not bitter or angry, but humorous, gentle and supportive.

At our first lunch together, which included about 15 members of the online group, a number of stories were exchanged about how Mike's posts had diffused anger and sadness with his humor. Mike himself talked about his love of hockey, Moose and the universe of information available at the Library of Congress. My impression during the Toronto gathering was Mike was a very well-known and popular member of the group because of his thoughtful and kind nature. I personally enjoyed his intelligence and his warmth. Over the years since that first meeting, my initial impression has proved to be very accurate. My visits with Mike and his wife Sue were always enjoyable. Among other things, we talked about relationships, divorce, and step-parenting.

I was very saddened to learn that Mike had been charged with possession of child pornography and has pled to one count of possession of child pornography. When I read Mike's e-mail explaining his situation, his psychological state, the treatment he has undergone and the circumstances under which he acquired the images, I was impressed with his candor and sincerity. There was nothing that I read in that e-mail which in anyway contradicts my understanding of Mike as the sensitive and caring human being that I have come to know these past 10 years. I would not expect an outward expression of anxiety or aggression from Mike. It makes sense to me that he would choose a release that he thought he would be able to keep private and would not harm others. Based upon this writing I believe that he experiences great remorse for any negative impact his behavior might have had.

I have personally struggled with being a step-parent. It always helps to know others who are working through similar life issues. Knowing Mike and Sue has helped me to bring into perspective some of the issues that I had with being a step-parent. Even knowing the circumstances of his arrest and his use of pornography, I still consider him to be a good influence in my life. Without reservation, I continue to hope that he will be a part of my life for years to come.

Thank you for your time and careful consideration,

Carolyn Lefnsky

Karen Kyle
1312 Turkey Court
P.O. Box 94
Pocono Lake, Pennsylvania 18347

August 5, 2008

Reference: Michael Matheron, Criminal Case #08-06

The Honorable Richard W. Roberts, Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Roberts,

My name is Karen Kyle. I am a retired paraeducator having worked with special-needs children for many years.

I became acquainted with Mr. Matheron in mid 2000. Our meeting occurred via a support group consisting of people dealing with distressing events in their lives. In June 1999 I found myself widowed after a thirty-year marriage and eventually chose to seek support. A smaller group of us came to know each other, in depth, based on our geographic proximity. There were often heartfelt discussions within the group as we were all dealing with difficult times in our lives.

Mr. Matheron always exhibited sincere concern, friendship, compassion, and wisdom. His character was never in question. I never witnessed any behavior which would explain his current situation. I consider myself hyper vigilant in sensing such issues based on my work with abused children.

I accept that Mr. Matheron has pled guilty to one count of child pornography. Knowing him as I do, I wish to express the excruciating pain this situation has cost him personally as well as the devastating impact this has had on his family and those who love him.

Mr. Matheron's remorse and shame has impacted his quality of his life to its maximum limits. His emotions have taken him to the depth of despair, but his remarkable intelligence has lead him on a road of introspection and healing. He is currently making great strides with counseling and insight into what may have driven this behavior in order to never allow it to happen again.

Mr. Matheron has no criminal history. He has been a model citizen in society and a very special friend to those who know him personally. It is my fervent hope that these facts will be taken into consideration during his sentencing.

Sincerely,

*Karen Kyle*

Karen Kyle

3206 Cambridge Court
Fairfax, VA 22030
August 6, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue
Washington, D.C.

Re: Defendant Michael Matheron, Criminal Case # 08-66

Dear Judge Roberts:

I am writing as a friend of Michael Matheron to present information that I hope will help mitigate his sentence in the above referenced case. My understanding is that Michael has pleaded guilty to one count of possession of child pornography. Although I have no knowledge of the legal issues in this case, I do know Michael well enough to speak of his character and decency.

I have known Michael for approximately 9 years. During that time I have been with him on many social occasions, witnessed his compassion and helpfulness with other individuals, shared his pain as a divorcing father, and came to appreciate his fundamental humanity and decency.

I originally met Michael through a divorce support group. We were both going through the emotional turmoil of divorce and we both had sons who were affected by our problems. Michael was universally respected within the group for his honesty and advice. On several occasions he committed his time and labor to help members of the group to move, to settle legal and financial matters, and to simply supply emotional support during trying times.

I have witnessed Michael's extreme remorse over the events that led to him to your courtroom. The psychological effects were profound, and caused him to withdraw from social contact for over 6 months. Although somewhat improved in spirit at this date, I still find him self-flagellant, anxiety ridden, and very hard on himself for his past actions.

I think it might be a common assumption in a charge of this nature that Michael might be a child predator. Nothing could be farther from the truth. I have seen Michael interact with many children, from youngsters of 4-5 years old to teenagers. My own son (now 16) was one of these. I have never seen nor been told of any inappropriate behavior from Michael in connection with children. I feel strongly that Michael does not present any danger in this regard to either children or the community at large. In fact, I do not see that Michael's incarceration would provide any benefit to society.

1

I think you can tell from my comments that I regard Michael Matheron as an admirable individual, whom I respect greatly and am proud to have as a friend. I understand that he has admitted to breaking the law, but I hope his overwhelming good qualities will be adequately considered when his punishment is meted out.

Sincerely,

Barron L. Weand

Barron L. Weand

*Kathleen Campbell*
*3030 Ali Court*
*Huntingtown, MD 20639*

August 4, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.

Dear Judge Roberts,

My name is Kathleen Campbell. I am a friend of Michael J. Matheron. In fact, I can honestly say that Michael is my best friend. I have known him for about 10 years. In that time, he has become an integral part of my family.

Michael is always there for us -- offering assistance (he helped us move two houses); just for fun (taking the boys to the scary movies or 'male bonding' movies I didn't want to see, while his wife and I watched the chick flicks); and more.

My sons think of him as Uncle Mike because he has been, and remains, a positive male influence in their lives. He has been a sounding board for me, a reliable source of information and compassion as I struggle to raise my sons following the death of my husband 9 years ago. My older son suffered with depression and addiction and other issues which were compounded by the death of his father. Michael was a font of information and common sense for me and a soothing, calming influence on my son.

I know he has pled guilty to one count of possession of child pornography. I also know that his remorse is palpable. He has offered his apologies to me, thinking more of the pain this may bring his family and friends than himself. I have never seen such abject sorrow, from him or any man.

As you consider your decision on a sentence for Michael, I hope you will take into consideration the positive contributions he has made in my life and the lives of my family.

Sincerely,

*Kathleen Campbell*

Kathleen Campbell

33 Eton Overlook
Rockville, Maryland, 20850
August 1, 2008

The Honorable Richard W. Roberts

Associate Justice

U.S. District Court for the District of Columbia

333 Constitution Avenue, N.W.

Washington, D.C.

R: Defendant Michael Matheron, Criminal Case #08-66

Dear Judge Roberts,

I am writing with regard to your imminent sentencing of Michael Matheron. I have known Mike since about 1980. At that time he was a student in several courses I taught in a Masters of Legal Studies program at Antioch Law School as well an employee in the administration of the program. I was impressed at time at his conscientiousness and proficiency in his studies and his diligence and competence in the performance his job with program. I also found him congenial as a person. These traits so impressed me that when an opening for a paralegal position at my place of employment, the American Law Division of the Congressional Research Service in the Library of Congress, I encouraged him to apply and successfully supported his application.

Over the years, Mike proved his worth and validated my judgment. He was a more than competent paralegal and found a niche in several areas of the law in support of Division lawyers. But his most valuable contribution to the Division and to Congress was in developing, administering and expanding our continuing legal education program for Members of Congress and their staffers. From modest beginnings Mike made it possible for lawyer Members and staffers to obtain the necessary continuing education credits for almost every state in the union. Throughout his years of employment his reputation was that of a congenial, competent and reliable co-worker. In the few conversations over the years that dealt with his personal life, he showed great love, compassion and concern with respect to his son.

I am aware that Mike has pled guilty to one count of possession of child pornography. In my communications with him since he entered his plea he has exhibited to me a sincere sense of remorse for the humiliation he has brought on wife and son and the

breach of trust and faith with those of who were his colleagues and friends. I hope you take this into consideration in deciding his punishment.

I have been a Specialist in American Public Law with the American Law Division for 35 years and am a member of the New York bar.

Very truly yours,

**Morton Rosenberg**

Anne Kirkman
128 East Street
Foxboro, MA  02035

August 4, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.

Dear Judge Roberts,

I am writing this letter in behalf of Michael Matheron and his family.  My name is Anne
Kirkman and Mike is my brother-in-law.  My perspective is with respect to the family.

Mike has been my brother-in-law for three years, but I have known him for six years.  He has
been the primary source of leadership for his family since I have known him.  He has really
stepped up to the plate financially, emotionally, intellectually and as a wonderful teacher.  He
thought long and hard before he took on a second family in his fifties.  I'm not sure if he realized
it, but he had assumed the role of male in the family long before.

The first time I met Mike was at an Easter holiday at my sister's home.  Mike had come very
graciously bringing food and presents.  It must have been overwhelming for him to meet the
family due to our large size.  Shortly after, Sue developed an extremely severe case of strep and
had to be hospitalized immediately.  Mike arranged with the neighbors to watch over Susan's
children when he was not able to.  He stayed with Susan for seven hours in the emergency room
and then daily at the hospital.  He made certain the kids went to school in the morning, and he
brought them in to visit.  This was just months after meeting Susan.  This is typical of Mike.

He has been there for this family in every conceivable way.  He has caught errant frogs that
escaped from Jennifer's aquarium.  He has provided a strong and much needed father figure for
his own son, Brian, and for Susan's two children, Jennifer and Phillip.  He has provided security,
friendship, and love for the children and Susan.  I am fully aware of the charges brought against
him; but, I know very well how necessary it is to his family that he be with them physically.
There are so many actions he has shown his love for them, it would be difficult to enumerate
them – everything from sharing his love of golf with Phil, to sending birthday cards to Jennifer
from each of the family pets individually, and from himself.  His humor is a wonderful gift.

The family life has been devastated since the pornography charges were brought.  Mike has been
so embarrassed by this situation that he hated to go out during the day.  He chose early
retirement from his job because of the enormous stress.  Their house was egged.  Phillip was
interviewed by a reporter sniffing for details.  It was a huge struggle for Sue to get Mike to walk
down to the neighborhood Starbucks to get a cup of coffee and just get out of the house.  They
have only recently begun to welcome friends into their home.  It has been a trying ordeal for the
entire family.  Mike is horrified by this.

Mike and Sue have created together a peaceful, nurturing home environment for their family. This is the biggest possible gift that Mike has given. It's also the most fragile. It is inconceivable to me that Mike is a predator. The past several months have been a horror show. Mike has been in a daze. Susan, Jennifer and Phil keep going on, but it is a struggle. I hope that you can get a feel for the tremendous reliance this family places on Mike, and that he has lovingly honored. He has shown remorse for his actions and he has suffered and continues to suffer. His family carries that burden too.

Sincerely,

Anne M. Kirkman

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

In regards to defendant Michael Matheron, Crim. Case # 08-66

Dear Judge Roberts,

I am Michael Matheron's stepdaughter. I am now 22 years old, and have known him for seven years, before and after his marriage to my mother. Throughout this time he has demonstrated himself to be a kind, compassionate, and forgiving man.

I am aware that he has pled guilty to one count possession of child pornography. I can say that he has demonstrated great remorse in the time since charges have been levied. I have never known him to act in an inappropriate manner toward a child, and he has been racked with guilt for some time.

Michael Matheron is an example to the community of character, kindness and service. He dedicated many hours volunteering at the Montgomery County Crisis Hotline. He cosigned my first lease for me, so that I could live on my own. He has helped support me for years. When my car broke down on the side of the road, he came to wait for the tow truck with me. When I got in a car accident in the fall, he came to the scene and helped me to the paramedics. When we had our first Christmas together, before he married my mother, he still brought presents for both my brother and I. I ask that you evaluate his case in the context of his entire character, as well as his offense.

Sincerely,

Jennifer Castagna

42 Silver Aspen Dr.,

Thornhill, ON

Canada L3T 3T2

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

In regards to defendant Michael Matheron, Crim. Case # 08-66

Dear Judge Roberts,

I am an I.T. professional, so it is not surprising that I first met Mike Matheron via the Internet on an online divorce support group. If his lawyer could enlist even a small percentage of those group members whom were helped by Mike, testimony would abound to his empathetic sensibilities and gentle good humour. He was, in my opinion, the most respected and popular member of that group, and deservedly so.

Since those days, a little over ten years ago, Mike has been our guest in Toronto and we have visited Mike and his wife, Sue, in D.C. When we meet, we do the unremarkable kinds of things that unremarkable middle-aged middle-class couples tend to do. Nonetheless, I cannot imagine a nicer or more hospitable couple to share those times with.

I therefore reacted with some shock when Mike told me he had pled guilty to a count of possession of child pornography. From his emails, I am aware of the guilt and humiliation that he's experienced - not only since his arrest, but for many years before that. It's surely been difficult for Mike to write of those deeply-personal issues and it speaks to how earnestly that he is making amends.

I'm sure this is hardly your first case of a quintessential good guy who did a bad thing. And I sincerely wish I knew how to underscore the "good guy" bits that would count most in Mike's favor. All I can do is relate to you what I know of Mike and hope that this letter might play a small role in helping you to construct an honest and critical assessment of the man. Such an assessment of Mike is, I believe, his best hope for your leniency.

Thank you for your consideration.

Sincerely,

*Eric Campbell*

Eric Campbell

August 6, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

In regards to defendant Michael Matheron, Crim. Case # 08-66

Dear Judge Roberts,

I have worked as a public librarian with the Phoenix Public Library, Phoenix, AZ for over 20 years. I am writing in regard to Michael Matheron's guilty plea to one count of possession of child pornography. I want to encourage you to show leniency in sentencing.

I have known Michael Matheron for 12 years. We met in an online support group for those going through divorce. During those years, Mike's rare combination of wit, intellect, and insight have helped support and comfort me through difficult times.

Mike is the victim of multiple treatable psychiatric disorders, including Generalized Anxiety Disorder, Dysthymia, and Obsessive Compulsive disorder. If he had not recently told me about these illnesses I never would have known from his behavior.

As a person with Bipolar Disorder, Dysthymia, and Anxiety myself, I know how difficult it can be to control one's actions when psychiatric illness rages out of control. I have been blessed to find appropriate treatment. Now that Mike has also found the blessing of appropriate treatment he is able to cope with his illnesses in a manner more congruent with his true character.

Based on my own experience with mental illness, I know that continuity in treatment is a strong factor in successful disease management. From my own experience, I feel that disrupting Mike's treatment plan by removing him from his current environment would decrease his chances for rehabilitation and survival.

Mike has repeatedly expressed deep remorse over his actions. He refuses to place blame for his actions on his illness symptoms. He has chosen, instead, to take complete blame for his behavior.

Mike has expressed a desire to dedicate his life to healing the problems his behavior has caused. He is also firmly committed to treating and controlling his illness. I believe his goals are achievable if he stays in his current environment. I encourage you again to show leniency in sentencing.

Thank you for your consideration.

Sincerely,

Anne M. Christensen

Anne M. Christensen

Joyce Anita Thorpe, Esq.
419 Rosier Road
Fort Washington, Maryland 20744
202.707.9081

July 21, 2008

The Honorable Richard. W. Roberts
United States District Court for the District of Columbia
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Roberts,

I, Joyce Thorpe, am writing this letter on behalf of my friend and colleague Michael Matheron. I understand that Michael has pled guilty to one count of possessing child pornography.

Michael and I have been friends and colleagues for over 27 years. We have worked together as paralegals, Information Research Specialist, etc. Michael has always been a brilliant, caring, hard-working human being. For the past five or more years for at least six weeks of every year I worked closely with Michael on the Federal Law Update (FLU) program that he administered for the American Law Division of the Library of Congress. This program offers free courses to members of the United States Congress and their staff allowing them to meet their continuing education requirements. Michael nor I have doors covering the opening to our offices. Therefore, I was surprised at the charges as I walk in to Michael's office as many as ten times and hour when we are working on the FLU. Michael is the Director of the program, I assist him. Michael is always working on the program when I enter his office unannounced and uninvited. He has never been viewing any materials other than those that are related to the FLU when I enter his office. Many members of Congress and high level staff members attend the FLU. They have nothing but praise for Michael. He singlehandedly took the program from the stone age with low attendance to the 21st Century with a level of attendance that has exceeded the capacity of the very large venue.

Because I am one of the seven plaintiffs of the *Cook* class action, I am reviled by the management of the Library of Congress, specifically the management of the Congressional Research Service. We won a monetary and non-monetary settlement that was the largest settlement of its kind in 1996. There has been a concerted effort to fire me from the Library of Congress for the thirty-one years that I have been employed here. If it was not for Michael's open door policy, and his constant encouragement, I would not still be employed at the Library. Several times Michael has literally placed his job on the line to defend me when I was unfairly accused of not meeting a clients needs or when I was attacked by a supervisor. As an example of Michael's selfless attitude, when our section was reorganized in February of 2005, a temporary supervisor was assigned to our section. She assigned me an impossible workload and would literally stand over me at the end of the day yelling at me to show her how I had completed my task. I took no breaks, no lunch and worked late every day. I frequently went to Michael's office to let off steam. He never denied me access and always took the time to listen to me. Michael, another coworker and I presented evidence of this mistreatment to the newly appointed director of our newly created Knowledge Services Division. Michael's presentation on my behalf was so compelling, that the supervisor was immediately

removed from our section. Michael did not have to go with me and the other staff member. The supervisor was not mistreating Michael nor the other staff member.

Another example of Michael's caring for me and others involves events similar to those that I related above. In an attempt to fire me, an attorney who had an axe to grind with me because she was personally named in the *Cook* case told my supervisor a few weeks before she retired, that I did not meet the needs of a client. The attorney was not involved in the transaction with the client. I was unaware of the problem. I was passing Mike's office and saw him working on the same request that I had finished earlier in the day. Michael called the client to see if she had complained about my work or if there was a problem with my work. After he ascertained that there was no problem with my work and that the client had not complained about my work, we went to the temporary supervisor who replaced the supervisor from the incident that I related above. The supervisor was quivering with rage and ordered Michael to leave his office, he said that he wanted to speak to me alone. Michael and I invoked my *Weingarten* privileges. The supervisor said that he did not care if Michael was my union steward, he wanted to talk to me alone. Michael left the office and closed the door as he was ordered. Michael went back to his office and waited for me. Although it was past the time that Michael should have left the office at the end of his hours of duty, when I emerged from the "meeting," Michael was still there. He accompanied me to the union office and advised the union president of the situation. Michael did not leave the union office until he was assured that I was alright. When questioned about the incident by the head of the office of workplace violence, Michael, once again, placed his job on the line and told the truth. This is especially dangerous in an institution that has a long history of reprisals against employees who are in effect whistle blowers. When no one else volunteered for the thankless task of being a union steward for the American Law division, Michael volunteered and worked extremely well in that capacity.

The issue of space allocation is always contentious in any work environment. Michael volunteered to work as a representative of non-management employees on a committee with management officials from the American Law division. During non-duty hours Michael worked on a configuration for office space that would be fair and equitable. He attended many meetings where management officials vehemently disagreed with a fair allocation of space. Michael reported to the various factions in the division on the content of each meeting. He never got upset or acted in a non-professional manner. Even when an attorney cursed at the other representatives on the committee, (Michael included) Michael did not respond in kind. After several months of such meetings, Michael presented a plan that he had prepared without any input from others to the acting assistant division chief, and let her take the credit for his plan in an effort to end a stalemate. Michael is very modest and has let high ranking management officials take the credit for his work and ideas on numerous occasions. In fact, we often laugh when we read that these same officials have been promoted higher in the ranks of senior levels and their promotion was based in part on Michael's work.

I could relate numerous other examples of Michael's kindness, generosity of spirit and of his caring for me and others. I know Michael well as we are forced to spend hours together working alone on the Federal Law Update. We literally spend hours talking to one another when we are collating materials. Michael has always been a gentleman. He will lend a hand to any task including moving furniture in his suit to make sure that the program is glitch free. Individuals from the Programs Office, the Technical Office, the Print Shop and all of the other offices that are involved in reporting to Michael as coordinator of one of the most important functions of the Congressional Research Service all love and respect Michael; and, they have told me on numerous occasions that he is the best program coordinator that they have ever worked for.

*Joyce Sharpe, Esq. - 7/21/2008*

**Jesse Blatt, Ph.D.**
**10815 Lorain Avenue**
**Silver Spring, Maryland 20901**
**301-593-9520**

August 25, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

In regards to defendant Michael Matheron, Crim Case # 08-66

Dear Judge Roberts:

I am a licensed psychologist (Colorado) and recently retired as a research psychologist from the National Highway Traffic Safety Administration after 20 years of Federal service. I have known Mike Matheron for upwards of 18 years, since his son, Brian, and my son, Danny, became best friends in elementary school.

As fathers of active and growing boys we frequently found ourselves side by side at soccer games and band concerts. Brian and Danny remained close through high school, and often had overnights together at our respective houses. Brian accompanied us on a family vacation and Danny spent several weekends with Brian and Mike. Mike has always been a thoughtful and loving father and a worthy role model for our son. My wife and I have the highest regard for his compassion and intelligence. Mike Matheron is one of the nicest men we have ever known.

We were greatly surprised to learn of Mike's arrest and subsequent plea of guilty to the charge of possession of child pornography. Nothing in our experience has ever suggested any impropriety in his language or behavior. We have heard his account of his involvement in this activity and we believe that he is, indeed, sincere in his remorse for his actions. I understand how his depressive state could lead to the events that precipitated legal action. I respect and applaud his efforts to change and understand that he has sought long-term professional help to deal with his problems.

It is my sincerest hope that you will show the utmost compassion in determining a disposition for Mike's offense. Without presuming on your authority, I doubt that incarceration would add to the lessons that he has already learned, and would deprive our society of valuable services that he could provide as an alternative.

Sincerely,

Jesse Blatt, Ph.D.

Henry Flood
20335 West Country Club Drive #1009
Aventura, FL 33180
305-332-4051 (Direct Dial)
786-472-7200 (Fax Reception)
HFlood49@bellsouth.lnet (Email)

August 1, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue3, N.W.
Washington, D.C. 20001

Dear Judge Roberts:

RE:     Michael John Matheron
Crim. Case #08-66

I have known and been a faithful friend of Mike Matheron for 28 years. We met in 1980 and
both attended graduate school together at Antioch School of Law (now DC School of Law).
During our time there I earned a Masters Degree in Legal Studies, and he earned, with highest
distinction, a Certificate in Legal Studies which was available for those students who had not yet
completed their undergraduate degrees. After graduation, we both worked at the Center for
Legal Studies, the management group for the Antioch Legal Studies program, where Mike was a
program designer and administrator, and where I often taught Administrative Law and the law
of Federal grants to students who would later end up working in law-related occupations,
primarily in Federal agencies.

We were and remain personal and intellectual friends over the 28 years. I write to you on his
behalf in the foreknowledge that Mike has pled guilty to a single count of possessing child
pornography. Neither Mike nor I seek to excuse the fact of his guilty plea after advice from
counsel and a thorough review of all of the facts and circumstances which have been shared
with me recently. It is a serious and troubling charge that my beloved Mike is pleading to.

Yet, the person who will stand before you on September 3, 2008 is very far from being a
monster. Regardless of the sentence that evolves from your hand, Mike is a person deserving of
a generous measure of compassion and especially psychological and spiritual assistance to
recover from his compulsive addiction to pornography.

1

It is my sincere hope that you'll consider what I say on his behalf in the light of the foregoing paragraphs—especially paragraphs two and three immediately above.

For as long as I have known Mike, he has been a kind, generous and decent person. Shortly after my arrival in Washington, DC in 1980, I experienced a severe personal crisis and Mike, a person I had known for only four weeks helped me financially and personally. His assistance saved my graduate education and my mental health after living 6 years with a mentally ill woman. He helped me survive during the 1981 Reagan era recession until things got better.

There were many other instances when Mike reached out to help others who needed temporary financial or other assistance during my time in Washington, DC. What I have enjoyed most about Mike is his brilliant intellect, lively discussions and our joint love of writing and oral discussion. I followed him from a distance as he served in the Library of Congress as a Senior Paralegal in the American Law Division where he performed with obvious distinction.

How then might one explain his slide into pornography and the situation he now finds himself? As one who has known Mike a long time and lived and worked with him for five of my 14 years in Washington, DC, I can offer some insights. Mike has a lengthy history with depression, anxiety and personal self-esteem. He has received counseling off and on over the years. He grew up as an adopted son of a Stepfather who could be quite harsh at times and I believe that this has played a major role in his many battles with psychological and self-esteem issues. Having been abused myself, I can understand how hard it is to fight against depression or other psychological issues that can turn your life in dangerous directions.

Anxiety and self-esteem issues can lead to complicated identity problems with women and things sexual. This could very well explain Mike's gradual slide into pornography and ultimately his coming to possess child pornography. This is important because in all of my associations with Mike, I am not aware of any proclivity to any fascination with child pornography or desire to have sex with children. Any discussions we have ever had about women were always in the context of an adult situation and adult relationships. I have no reason whatever to believe that Mike is a pedophile or holds such rabid desires.

When I last saw Mike in person in the summer of 2006, I did not see him as being all that well. His health was not as robust. We spoke of his new wife to be—a good thing but I could sense that he was battling those old demons of anxiety and self-esteem. I wanted to attend his wedding as he had been my best man when I re-married in 1990, but my wife was too ill for me to attend as she has a serious seizure disorder and was in the latter stages of recovery from paralyzing spine cancer.

I trust that these disclosures—painful as they are—will convince you that my treasured friend is not an evil monster but a person needing significant psychological and medical assistance to recover fully and become truly himself again. This is made evident to me as his lovely wife Sue related to me. She wrote me recently hoping I would speak to and not reject Mike because of

2

the situation he is in. I know he feels a genuine and deep personal shame over what he has done and what has happened.

I choose to stand with and for Mike even as he accepts full responsibility for the plea he has entered. If deemed necessary and my own health permits, I will come personally to stand with him.

What I urge for Mike is probation and a carefully structured system of treatment and supervised support to ensure that he avoids the dangers of pornography and the risks it poses to himself, his new wife and his friends. He is a brilliant writer and speaker. Perhaps some community service should be part of his sentence.

I thank you for your attention to this letter and I desire to know what else I can do to help Mike. I want you to call me and let me know if there is anything you think I might do.

Cordially,

Henry Flood

3

August 9, 2008


The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

In regards to defendant Michael Matheron, Crim. Case # 09-66

Dear Judge Roberts:

I am a CPA with an active license in New Mexico and have been an internal
auditor in higher education since 1973. I was president of the Association of
College and University Auditors in 1992. I am currently employed by the
University of San Diego and was previously Director of Internal Audit for the
University System of Maryland for 22 years.

I have known Michael Matheron for 11 years.

I am aware that my friend Michael has pled guilty to one count of possession of
child pornography.

Knowing Mike as I do, my first reaction was that he would be overwhelmed with
remorse for the misjudgments that lead to his predicament, and indeed, having
been in touch with him, I know that to be the case.

Mike is a man who has brought great joy into the lives of his friends and
acquaintances. His wit and unrelenting sense of humor have brought smiles to
the faces of all the people he knows, many of whom he met on an internet
discussion group dedicated to discussing the problems of divorce. Mike freely
discussed issues that arose during his divorce in the mid-90s and he used his
experiences to help others understand the problems he faced. That he could
always see the good in others and lighten any conversation with his trademark
humor made him a very popular contributor to the group.

1

Mike and I went to hockey games, Oriole baseball games, and concerts together
and spent hours talking sports. We talked about everything under the sun—
politics and religion were not taboo. We also went to a church group's meetings
for separated and divorced people. He was always willing to lend a helping hand,
such as the time a mutual friend whose husband had committed suicide needed
help moving out of her old house to temporary storage and then later into a new
house in Southern Maryland. He was and is a "stand-up guy."

Judge, please consider the whole man who will stand before you for sentencing.
He has already paid for his indiscretions with the loss of his career and will have a
difficult time finding employment in the future. Many like me will continue to be
his friend, knowing that Mike is a good man at heart and will prove to be a good
citizen in the future.

Sincerely,


Alfred S. Chavez Jr.
9812 Lyncarol Dr.
La Mesa, CA 91941

Home: (619) 741-1872
Work: (619) 260-2789

2

August 19, 2008

Mrs. Jill Y. Simpson
321 SE 45th Ave.
Portland, OR 97215
(503) 232-2080

The Honorable Richard W. Roberts
Associate Justice U.S. District Court for the District of Columbia
333 Constitution Avenue
N.W. Washington, D.C. 20001

Dear Judge Roberts,

I am writing on behalf of Michael Matheron. I have known Mike for nearly 10 years. We have spent many hours on the telephone discussing everything from personal problems and world events, to our own philosophy of religion and spirituality. I have treasured our friendship.

I am 60 years old and am now caring for my 85 year old blind mother who has Alzheimer's and other serious medical problems. Mike has been a terrific support through the years it took me to get my mother away from my younger brother who was abusing her. He helped me to figure out what laws I could use to get custody of her. He has always been kind and made me laugh when things were too frustrating for me. He has shown his friendship and caring when I had medical problems of my own. He always managed to make me laugh at myself when I got too serious about things that were not in my control. I can honestly say that I think Mike is one of the kindest people I have ever known.

I do not work outside the home. I was in real estate for 14 years, and have always done volunteer work and been involved in civic affairs. I find I have little time to do much outside the home now that I am caring for my mother.

I am aware Mike has plead guilty to one count of possession of child pornography. I have seen Mike around children, and his behavior has always been appropriate. If anything, I would say that Mike has always been a person who would go to any lengths to protect a child. Would I trust Mike to be around my grandchildren? Absolutely. I know that Mike is so ashamed and that it took a great deal of courage for him to tell me about all this. He has expressed to me how sorry he is and I told him that I know he had no evil intent. I also told him how naive he is when it comes to opening email on the computer. All of us have received porn emails, unsolicited, and in my early computer-naive days, I actually opened a few.

I would like to conclude by saying that this is such a complicated world we live in, there is too much coming at us all the time. We are human, and therefore, designed to make mistakes. I know that Mike has learned from this mistake and he will not repeat it. He is not a danger to society at large and children in particular, in my opinion.

Sincerely,

Jill Y. Simpson

August 25, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

Dear Judge Roberts,

I am Michael Matheron's wife, and I am writing to ask that you consider the importance
of him to our family and his presence in our home as you decide on a sentence for him.

This is difficult to write, as I am afraid of misstating or not including something that will
be critical to your decision-making. I'm sure you receive many letters like this one. I'm
also sure that very few are as strongly felt by the writer as this.

I need Michael. I don't need him to be perfect. I understand he pled guilty to possessing
child pornography. Although I'm fully aware of the seriousness of viewing child
pornography, I cannot in any way reconcile this with the man I know, as it is alien to his
integrity, character and morals. I fully believe it to be a consequence of a recurrence of a
severe psychological compulsion, a function of his life-long struggle with severe anxiety
and depression.

He has been and is now a compassionate caring partner to me as a person, a woman, and
a mother in raising my children. He brings joy and love to us. My son has benefited
hugely from Michael's steady loving presence and understanding of him. My daughter
has also benefited, both directly from his empathetic support of her and indirectly as he
has supported me in being a good mother when that has been painfully challenging.

That is who Michael is, and how important he is to me. I need him.

We have a strong, vital marital relationship that is the footing of our family. From the
first when my children met him, they each have shown trust and pleasure in his company.
When my son, at age 9, realized Michael would be living with us, he exulted, "I knew it!"
and danced around.

Now fourteen, my son has benefited hugely from living with Michael. The consistent support and sharing of his life has given Phillip a vital sense of security and love that he has not received from his biological father. He knows he can count on Michael and he relies on him for understanding, companionship and care. Michael provides Phillip daily security and affection, as he knows he can rely on his stepfather to champion him.

My son has seen turbulent times with his biological father, and suffers from anxiety as a result. For example, several years ago Phillip suffered from his father's refusal to see him for two years rather than pick him up at the court-designated location. Before and since that time he has dealt with his erratic rage and controlling nature. Michael has given Phillip steady support while never attempting to overtly usurp the role of father.

There are many other examples of the importance of Michael's presence to Phillip. Michael has helped Phillip reorganize his room so that he now finds it a peaceful retreat. He taught him to shoot pool, understand various sports, and finds books they both read, enjoy, and talk about. He encourages Phillip's interests and skills in technology and art, and Michael is always available to listen while Phillip describes the projects he is engaged in. Phillip happily uses him as a sounding board for new ideas and inventions. He clearly relishes doing things with Michael, from movies to trips to Chipotle restaurants, and travel to Williamsburg, Maine, Canada, Finland and Massachusetts. Having Michael in our family has been and is a source of strength for Phillip, even more so as he is now becoming a young man in need of Michael's further support as he enters high school years. He often can't wait to tell him about some event or idea. Michael's attentive presence and caring have helped shore up an unstable world for Phillip in a thousand ways that I could not do on my own.

When Michael and I first began dating seven years ago my daughter Jennifer, now 22, was emotionally fragile and unstable, suffering from post-traumatic stress disorder as a result of verbal, emotional, and sexual abuse by her biological father, as well as bipolar affective disorder. As a result, she had made two very serious suicide attempts, at ages 13 and 14. She was prone to acting out. Michael provided kind, patient attention to her, finding activities we all could attend and also helped me to understand when she could manage on her own. He admired her intellectual and artistic strengths and encouraged them. He also helped me recognize legitimate needed boundaries for her behavior, allowing us to continue living as a family. Michael's patient steadiness when Jennifer was most out of control has meant I could offer the support and mothering she really needed. Now at the age of 22, she has earned her B.A. from the University of Maryland despite six hospitalizations and years of instability. Michael helped me during all of that time to remind myself of her extraordinary abilities and gifts, while providing the care she needed to grow.

When we met, for years Michael also worked as a volunteer on a midnight to four a.m. shift twice weekly at the Montgomery County Crisis Hotline, listening and helping troubled people who called. His extraordinary empathy at times made that work draining on him emotionally, yet he felt the callers were in greater need than he, and continued.

Michael took great pride in being able to contribute to the value offered by the Library of Congress, Congressional Research Service. Over the years he many times began his days as early as 6:00 a.m. to prepare properly to manage the Federal Law Update seminars, ensuring that congressional staff and members were well served. He was diligent in his research and writing work there. He received more than twenty recognition and monetary awards for his service there. Many past and current Library staff have expressed concern and support for Michael in the past months, and miss him at work. Michael is very remorseful at the abrupt end to his career there and his ability to continue to contribute to Congress through his research and analysis in areas like disability law, health law, and civil rights issues.

In our family, in our community, and in his service at work Michael has given of himself. He has fought hard against his own issues and problems, even reporting for the military draft, expecting to be sent to boot camp despite having club feet that required six major corrective surgeries when he was a child just to enable him to walk. He struggled against anxiety and self-loathing for over thirty years before finally being able to complete his bachelor's degree. The pain, psychological and physical, he has experienced from birth are a burden he has surmounted and turned to do good for many others.

I trust Michael completely. I know he could not harm another person, certainly not a child. He is anguished at the pain he has brought to us. He was so remorseful that he could not imagine living through this, knowing how it might hurt us. For six months he could not bear to face even our closest friends. With intensive expert psychiatric help he is finding a way to keep moving forward, addressing the deep anxiety and self-hate he has harbored. Even so, our friends and neighbors have offered strong support to him and to us, a testament to Michael's real character. Please let us all continue this path and allow Michael to be home, where we need him.

I am in awe of the bravery Michael demonstrates in giving of himself as he does. I would suffer if he were not with us. I have fought recurring major depression most of my adult life, and he gives me an emotional scaffolding. Our marriage and home life is central to my happiness and ability to be the best person I can.

Two and a half years ago Michael was hospitalized for more than a week due to complications from diabetes. His physical health has required extensive treatment with a team of physicians. His health issues and our having found each other and married later in life with full knowledge of what a bad marriage can cost, have made evident to me both how important he is in my life and that any time we do have together is already limited, no matter how long that may be. Every day is precious.

The search and removal of computers and other items from our home resulted in more than six months' disruption in my ability to earn income, as my work requires the equipment that was taken. An information statement that was to have been sealed at the Department of Justice nonetheless was made public through a news station, exposing my fourteen year old son to the fear of public vigilantism and fear that a man he loves and depends on would be removed.

Our family has suffered collateral damage and it has reawakened traumatic feelings from the very difficult times I and my children have experienced in the past. Michael has been and continues to work very hard to get himself and us through this, and we all need him with us to continue to move ahead.

Sincerely,

Sue Meadows

FAX

To:  David Lease, Esq.

RE: Michael Matheron

Attachment J



Treatment Methods for Kidney Failure
# HEMODIALYSIS









U.S. Department
of Health and
Human Services

## NIDDK

NATIONAL INSTITUTES OF HEALTH
National Kidney and Urologic Diseases
Information Clearinghouse

# Treatment Methods for Kidney Failure
# HEMODIALYSIS



NATIONAL INSTITUTES OF HEALTH
National Institute of Diabetes and Digestive and Kidney Diseases



# Contents

When Your Kidneys Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

How Hemodialysis Works . . . . . . . . . . . . . . . . . . . . . . . . . 1

Adjusting to Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Getting Your Vascular Access Ready . . . . . . . . . . . . . . . . . . 4

Equipment and Procedures . . . . . . . . . . . . . . . . . . . . . . . . 4

Tests to See How Well Your Dialysis Is Working . . . . . . . . . 7

Conditions Related to Kidney Failure and
Their Treatments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

How Diet Can Help . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Financial Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hope Through Research . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Hemodialysis is the most common method used to treat advanced and permanent kidney failure. Since the 1960s, when hemodialysis first became a practical treatment for kidney failure, we've learned much about how to make hemodialysis treatments more effective and minimize side effects. In recent years, more compact and simpler dialysis machines have made home dialysis increasingly attractive. But even with better procedures and equipment, hemodialysis is still a complicated and inconvenient therapy that requires a coordinated effort from your whole health care team, including your nephrologist, dialysis nurse, dialysis technician, dietitian, and social worker. The most important members of your health care team are you and your family. By learning about your treatment, you can work with your health care team to give yourself the best possible results, and you can lead a full, active life.

## When Your Kidneys Fail

Healthy kidneys clean your blood by removing excess fluid, minerals, and wastes. They also make hormones that keep your bones strong and your blood healthy. When your kidneys fail, harmful wastes build up in your body, your blood pressure may rise, and your body may retain excess fluid and not make enough red blood cells. When this happens, you need treatment to replace the work of your failed kidneys.

## How Hemodialysis Works

In hemodialysis, your blood is allowed to flow, a few ounces at a time, through a special filter that removes wastes and extra fluids. The clean blood is then returned to your body.

1

Removing the harmful wastes and extra salt and fluids helps control your blood pressure and keep the proper balance of chemicals like potassium and sodium in your body.

One of the biggest adjustments you must make when you start hemodialysis treatments is following a strict schedule. Most patients go to a clinic—a dialysis center—three times a week for 3 to 5 or more hours each visit. For example, you may be on a Monday-Wednesday-Friday schedule or a Tuesday-Thursday-Saturday schedule. You may be asked to choose a morning, afternoon, or evening shift, depending on availability and capacity at the dialysis unit. Your dialysis center will explain your options for scheduling regular treatments.

Researchers are exploring whether shorter daily sessions, or longer sessions performed overnight while the patient sleeps, are more effective in removing wastes. Newer dialysis machines



Hemodialysis.

make these alternatives more practical with home dialysis. But the Federal Government has not yet established a policy to pay for more than three hemodialysis sessions a week.

Several centers around the country teach people how to perform their own hemodialysis treatments at home. A family member or friend who will be your helper must also take the training, which usually takes at least 4 to 6 weeks. Home dialysis gives you more flexibility in your dialysis schedule. With home hemodialysis, the time for each session and the number of sessions per week may vary, but you must maintain a regular schedule by giving yourself dialysis treatments as often as you would receive them in a dialysis unit.

## Adjusting to Changes

Even in the best situations, adjusting to the effects of kidney failure and the time you spend on dialysis can be difficult. Aside from the "lost time," you may have less energy. You may need to make changes in your work or home life, giving up some activities and responsibilities. Keeping the same schedule you kept when your kidneys were working can be very difficult now that your kidneys have failed. Accepting this new reality can be very hard on you and your family. A counselor or social worker can answer your questions and help you cope.

Many patients feel depressed when starting dialysis, or after several months of treatment. If you feel depressed, you should talk with your social worker, nurse, or doctor because this is a common problem that can often be treated effectively.



## Getting Your Vascular Access Ready

One important step before starting hemodialysis is preparing a vascular access, a site on your body from which your blood is removed and returned. A vascular access should be prepared weeks or months before you start dialysis. It will allow easier and more efficient removal and replacement of your blood with fewer complications. For more information about the different kinds of vascular accesses and how to care for them, see the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) fact sheet *Vascular Access for Hemodialysis.*



Arteriovenous fistula.

## Equipment and Procedures

When you first visit a hemodialysis center, the mix of machines and people may seem complicated. But once you learn how the dialysis procedure works and you become familiar with the equipment, you'll be more comfortable.



Graft.

4

## Dialysis Machine

The dialysis machine is about the size of a dishwasher.  This machine has three main jobs:

- pump blood and watch flow for safety
- clean wastes from blood
- watch your blood pressure and the rate of fluid removal from your body

## Dialyzer

The dialyzer is a large canister containing thousands of small fibers through which your blood is passed.  Dialysis solution, the cleansing fluid, is pumped around these fibers.  The fibers allow wastes and extra fluids to pass from your blood into the solution, which carries them away.  The dialyzer is sometimes called an artificial kidney.



Structure of a typical hollow fiber dialyzer.

- **Reuse.** Your dialysis center may use the same dialyzer more than once for your treatments.  Reuse is considered safe as long as the dialyzer is cleaned before each use.  The dialyzer is tested each time to make sure it's still working, and it should never be used for anyone but you.  Before each session, you should be sure that the dialyzer is labeled with your name and check to see that it has been cleaned, disinfected, and tested.

5

## Dialysis Solution

Dialysis solution, also known as dialysate, is the fluid in the dialyzer that helps remove wastes and extra fluid from your blood. It contains chemicals that make it act like a sponge. Your doctor will give you a specific dialysis solution for your treatments. This formula can be adjusted based on how well you handle the treatments and on your blood tests.

## Needles

Many people find the needle sticks to be one of the hardest parts of hemodialysis treatments. Most people, however, report getting used to them after a few sessions. If you find the needle insertion painful, an anesthetic cream or spray can be applied to the skin. The cream or spray will numb your skin briefly so you won't feel the needle.

Most dialysis centers use two needles—one to carry blood to the dialyzer and one to return the cleaned blood to your body. Some specialized needles are designed with two openings for two-way flow of blood, but these needles are less efficient and require longer sessions. Needles for high-flux or high-efficiency dialysis need to be a little larger than those used with regular dialyzers.



Arterial and venous needles.

Some people prefer to insert their own needles. You'll need training on inserting needles properly to prevent infection and protect your vascular access. You may also learn a "ladder" strategy for needle placement in which you "climb" up the entire length of the access session by session so that you don't weaken an area with a grouping of needle sticks. A different approach is the "buttonhole" strategy in which you use a limited number of sites but insert the needle back into the same hole made by the previous needle stick. Whether you insert your own needles or not, you should know these techniques to better care for your access.

## Tests to See How Well Your Dialysis Is Working

About once a month, your dialysis care team will test your blood by using one of two formulas—URR or Kt/V—to see whether your treatments are removing enough wastes. Both tests look at one specific waste product, called blood urea nitrogen (BUN), as an indicator for the overall level of waste products in your system. For more information about these measurements, see the NIDDK fact sheet *Hemodialysis Dose and Adequacy.*



# Conditions Related to Kidney Failure and Their Treatments

Your kidneys do much more than remove wastes and extra fluid. They also make hormones and balance chemicals in your system. When your kidneys stop working, you may have problems with anemia and conditions that affect your bones, nerves, and skin. Some of the more common conditions caused by kidney failure are extreme tiredness, bone problems, joint problems, itching, and "restless legs." Restless legs will keep you awake as you feel them twitching and jumping.

## Anemia and Erythropoietin (EPO)

Anemia is a condition in which the volume of red blood cells is low. Red blood cells carry oxygen to cells throughout the body. Without oxygen, cells can't use the energy from food, so someone with anemia may tire easily and look pale. Anemia can also contribute to heart problems.

Anemia is common in people with kidney disease because the kidneys produce the hormone erythropoietin, or EPO, which stimulates the bone marrow to produce red blood cells. Diseased kidneys often don't make enough EPO, and so the bone marrow makes fewer red blood cells. EPO is available commercially and is commonly given to patients on dialysis.

For more information about the causes of and treatments for anemia in kidney failure, see the NIDDK fact sheet *Anemia in Kidney Disease and Dialysis.*

## Renal Osteodystrophy

The term "renal" describes things related to the kidneys. Renal osteodystrophy, or bone disease of kidney failure, affects 90 percent of dialysis patients. It causes bones to become thin and weak or formed incorrectly and affects both children and

adults.  Symptoms can be seen in growing children with
kidney disease even before they start dialysis.  Older patients
and women who have gone through menopause are at greater
risk for this disease.

For more information about the causes of this bone disease
and its treatment in dialysis patients, see the NIDDK fact
sheet *Renal Osteodystrophy.*

### Itching (Pruritus)

Many people treated with hemodialysis complain of itchy
skin, which is often worse during or just after treatment.
Itching is common even in people who don't have kidney
disease; in kidney failure, however, itching can be made worse
by wastes in the bloodstream that current dialyzer membranes
can't remove from the blood.

The problem can also be related to high levels of parathyroid
hormone (PTH).  Some people have found dramatic relief
after having their parathyroid glands removed.  The four
parathyroid glands sit on the outer surface of the thyroid
gland, which is located on the windpipe in the base of your
neck, just above the collarbone.  The parathyroid glands help
control the levels of calcium and phosphorus in the blood.

But a cure for itching that works for everyone has not been
found.  Phosphate binders seem to help some people; these
medications act like sponges to soak up, or bind, phosphorus
while it is in the stomach.  Others find relief after exposure to
ultraviolet light.  Still others improve with EPO shots.  A few
antihistamines (Benadryl, Atarax, Vistaril) have been found to
help; also, capsaicin cream applied to the skin may relieve
itching by deadening nerve impulses.  In any case, taking care
of dry skin is important.  Applying creams with lanolin or
camphor may help.

9

## Sleep Disorders

Patients on dialysis often have insomnia, and some people have a specific problem called the sleep apnea syndrome, which is often signaled by snoring and breaks in snoring. Episodes of apnea are actually breaks in breathing during sleep. Over time, these sleep disturbances can lead to "day-night reversal" (insomnia at night, sleepiness during the day), headache, depression, and decreased alertness. The apnea may be related to the effects of advanced kidney failure on the control of breathing. Treatments that work with people who have sleep apnea, whether they have kidney failure or not, include losing weight, changing sleeping position, and wearing a mask that gently pumps air continuously into the nose (nasal continuous positive airway pressure, or CPAP).

Many people on dialysis have trouble sleeping at night because of aching, uncomfortable, jittery, or "restless" legs. You may feel a strong impulse to kick or thrash your legs. Kicking may occur during sleep and disturb a bed partner throughout the night. The causes of restless legs may include nerve damage or chemical imbalances.

Moderate exercise during the day may help, but exercising a few hours before bedtime can make it worse. People with restless leg syndrome should reduce or avoid caffeine, alcohol, and tobacco; some people also find relief with massages or warm baths. A class of drugs called benzodiazepines, often used to treat insomnia or anxiety, may help as well. These prescription drugs include Klonopin, Librium, Valium, and Halcion. A newer and sometimes more effective therapy is levodopa (Sinemet), a drug used to treat Parkinson's disease.

Sleep disorders may seem unimportant, but they can impair your quality of life. Don't hesitate to raise these problems with your nurse, doctor, or social worker.

### Amyloidosis

Dialysis-related amyloidosis (DRA) is common in people who have been on dialysis for more than 5 years. DRA develops when proteins in the blood deposit on joints and tendons, causing pain, stiffness, and fluid in the joints, as is the case with arthritis. Working kidneys filter out these proteins, but dialysis filters are not as effective. For more information, see the NIDDK fact sheet *Amyloidosis and Kidney Disease.*

## How Diet Can Help

Eating the right foods can help improve your dialysis and your health. Your clinic has a dietitian to help you plan meals. Follow the dietitian's advice closely to get the most from your hemodialysis treatments. Here are a few general guidelines.

- **Fluids.** Your dietitian will help you determine how much fluid to drink each day. Extra fluid can raise your blood pressure, make your heart work harder, and increase the stress of dialysis treatments. Remember that many foods—such as soup, ice cream, and fruits—contain plenty of water. Ask your dietitian for tips on controlling your thirst.

- **Potassium.** The mineral potassium is found in many foods, especially fruits and vegetables. Potassium affects how steadily your heart beats, so eating foods with too much of it can be very dangerous to your heart. To control potassium levels in your blood, avoid foods like oranges, bananas, tomatoes, potatoes, and dried fruits. You can remove some of the potassium from potatoes and other vegetables by peeling and soaking them in a large container of water for several hours, then cooking them in fresh water.

11



You can remove some potassium from potatoes by soaking them in water.

- **Phosphorus.**  The mineral phosphorus can weaken your bones and make your skin itch if you consume too much.  Control of phosphorus may be even more important than calcium itself in preventing bone disease and related complications.  Foods like milk and cheese, dried beans, peas, colas, nuts, and peanut butter are high in phosphorus and should be avoided.  You'll probably need to take a phosphate binder with your food to control the phosphorus in your blood between dialysis sessions.

- **Salt (sodium chloride).**  Most canned foods and frozen dinners contain high amounts of sodium.  Too much of it makes you thirsty, and when you drink more fluid, your heart has to work harder to pump the fluid through your body.  Over time, this can cause high blood pressure and congestive heart failure.  Try to eat fresh foods that are naturally low in sodium, and look for products labeled "low sodium."

- **Protein.**  Before you were on dialysis, your doctor may have told you to follow a low-protein diet to preserve kidney function.  But now you have different nutritional priorities.  Most people on dialysis are encouraged to eat as much high-quality protein as they can.  Protein helps you keep muscle and repair tissue, but protein breaks

down into urea (blood urea nitrogen, or BUN) in your body. Some sources of protein, called high-quality proteins, produce less waste than others. High-quality proteins come from meat, fish, poultry, and eggs. Getting most of your protein from these sources can reduce the amount of urea in your blood.

- **Calories.** Calories provide your body with energy. Some people on dialysis need to gain weight. You may need to find ways to add calories to your diet. Vegetable oils—like olive, canola, and safflower oils— are good sources of calories and do not contribute to problems controlling your cholesterol. Hard candy, sugar, honey, jam, and jelly also provide calories and energy. If you have diabetes, however, be very careful about eating sweets. A dietitian's guidance is especially important for people with diabetes.

- **Supplements.** Vitamins and minerals may be missing from your diet because you have to avoid so many foods. Dialysis also removes some vitamins from your body. Your doctor may prescribe a vitamin and mineral supplement designed specifically for people with kidney failure. Take your prescribed supplement after treatment on the days you have hemodialysis. **Never take vitamins that you can buy off the store shelf, since they may contain vitamins or minerals that are harmful to you.**

You can also ask your dietitian for recipes and titles of cookbooks for patients with kidney disease. Following the restrictions of a diet for kidney disease might be hard at first, but with a little creativity, you can make tasty and satisfying meals. For more information, see the NIDDK booklet *Eat Right to Feel Right on Hemodialysis.*



## Financial Issues

Treatment for kidney failure is expensive, but Federal health insurance plans pay much of the cost, usually up to 80 percent. Often, private insurance or State programs pay the rest. Your social worker can help you locate resources for financial assistance. For more information, see the NIDDK fact sheet *Financial Help for Treatment of Kidney Failure.*



## Hope Through Research

The NIDDK, through its Division of Kidney, Urologic, and Hematologic Diseases, supports several programs and studies devoted to improving treatment for patients with progressive kidney disease and permanent kidney failure, including patients on hemodialysis.

- **The End-Stage Renal Disease Program** promotes research to reduce medical problems from bone, blood, nervous system, metabolic, gastrointestinal, cardiovascular, and endocrine abnormalities in kidney failure and to improve the effectiveness of dialysis and transplantation. The research focuses on evaluating different hemodialysis schedules and on finding the most useful information for measuring dialysis adequacy. The program also seeks to increase kidney graft and patient survival and to maximize quality of life.

- **The HEMO Study,** completed in 2002, tested the theory that a higher dialysis dose and/or high-flux membranes would reduce patient mortality (death) and morbidity (medical problems). Doctors at 15 medical centers recruited more than 1,800 hemodialysis patients and randomly assigned them to high or standard dialysis

doses and high- or low-flux filters. The study found no increase in the health or survival of patients who had a higher dialysis dose, who dialyzed with high-flux filters, or who did both.

- **The U.S. Renal Data System (USRDS)** collects, analyzes, and distributes information about the use of dialysis and transplantation to treat kidney failure in the United States. The USRDS is funded directly by the NIDDK in conjunction with the Centers for Medicare & Medicaid Services. The USRDS publishes an *Annual Data Report,* which identifies the total population of people being treated for kidney failure; reports on incidence, prevalence, death rates, and trends over time; and develops data on the effects of various treatment approaches. The report also helps identify problems and opportunities for more focused special studies of renal research issues.

- **The Hemodialysis Vascular Access Clinical Trials Consortium** is conducting a series of multicenter, clinical trials of drug therapies to reduce the failure and complication rate of arteriovenous (AV) grafts and fistulas in hemodialysis. These studies are randomized and placebo controlled, which means the studies meet the highest standard for scientific accuracy. AV grafts and fistulas prepare the arteries and veins for regular dialysis. See the NIDDK fact sheet *Vascular Access for Hemodialysis* for more information. Recently developed drugs to prevent blood clots may be evaluated in these large clinical trials.



## Resources

### Organizations That Can Help

**American Association of Kidney Patients**
3505 East Frontage Road
Suite 315
Tampa, FL  33607
Phone:  1–800–749–2257
Email:  info@aakp.org
Internet:  www.aakp.org

**American Kidney Fund**
6110 Executive Boulevard
Suite 1010
Rockville, MD  20852
Phone:  1–800–638–8299 or 301–881–3052
Email:  helpline@kidneyfund.org
Internet:  www.kidneyfund.org

**Life Options Rehabilitation Program**
c/o Medical Education Institute, Inc.
414 D'Onofrio Drive
Suite 200
Madison, WI  53719
Phone:  1–800–468–7777 or 608–232–2333
Email:  lifeoptions@MEIresearch.org
Internet:  www.lifeoptions.org
            www.kidneyschool.org

**National Kidney Foundation, Inc.**
30 East 33rd Street
New York, NY  10016
Phone:  1–800–622–9010 or 212–889–2210
Internet:  www.kidney.org

## Additional Reading

If you would like to learn more about kidney failure and its treatment, you may be interested in reading

### *AAKP Patient Plan*

A series of booklets and newsletters that cover the different phases of learning about kidney failure, choosing a treatment, and adjusting to changes.
American Association of Kidney Patients
3505 East Frontage Road
Suite 315
Tampa, FL  33607
Phone:  1–800–749–2257
Email:  info@aakp.org
Internet:  www.aakp.org

### *Getting the Most From Your Treatment* **series**

A series of brochures based on the National Kidney Foundation's Dialysis Outcomes Quality Initiative (NKF–DOQI).  Titles include *What You Need to Know About Peritoneal Dialysis, What You Need to Know Before Starting Dialysis,* and *What You Need to Know About Anemia.*
Additional patient education brochures include information on diet, work, and exercise.
National Kidney Foundation, Inc.
30 East 33rd Street
New York, NY  10016
Phone:  1–800–622–9010 or 212–889–2210
Internet:  www.kidney.org

*Medicare Coverage of Kidney Dialysis and Kidney
Transplant Services*
Publication Number CMS–10128
U.S. Department of Health and Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD  21244–1850
Phone:  1–800–MEDICARE (1–800–633–4227)
TDD:  1–877–486–2048
Internet:  www.medicare.gov/publications/pubs/pdf/10128.pdf

*You Can Live:  Your Guide for Living with Kidney Failure*
Publication Number CMS–02119
U.S. Department of Health and Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD  21244–1850
Phone:  1–800–MEDICARE (633–4227)
TDD:  1–877–486–2048
Internet:  www.medicare.gov/publications/pubs/pdf/02119.pdf

Newsletters and Magazines

*Family Focus Newsletter* (published quarterly)
National Kidney Foundation, Inc.
30 East 33rd Street
New York, NY  10016
Phone:  1–800–622–9010 or 212–889–2210
Internet:  www.kidney.org

*For Patients Only* (published six times a year)
ATTN:  Subscription Department
18 East 41st Street
20th Floor
New York, NY  10017–6222

*Renalife* (published quarterly)
American Association of Kidney Patients
3505 East Frontage Road
Suite 315
Tampa, FL  33607
Phone:  1–800–749–2257
Email:  info@aakp.org
Internet:  www.aakp.org

The U.S. Government does not endorse or favor any
specific commercial product or company.  Trade,
proprietary, or company names appearing in this
document are used only because they are considered
necessary in the context of the information provided.
If a product is not mentioned, the omission does not
mean or imply that the product is unsatisfactory.


## Acknowledgments

The NIDDK thanks these dedicated health professionals for
their careful review of the original version of this publication.

Richard A. Sherman, M.D.
Robert Wood Johnson Medical School

Richard D. Swartz, M.D.
University of Michigan Health System

Charlie Thomas, A.C.S.W., C.I.S.W.
Samaritan Transplant Services, Phoenix, AZ

The individuals listed here facilitated field testing for this
publication. The NIDDK thanks them for their contribution.

Kim Bayer, M.A., R.D., L.D.
BMA Dialysis
Bethesda, MD

Cora Benedicto, R.N.
Clinic Director
Gambro Health Care
N Street Clinic
Washington, DC

## About the Kidney Failure Series

You and your doctor will work together to choose a treatment that's best for you. The booklets and fact sheets of the NIDDK Kidney Failure Series can help you learn about the specific issues you will face.

Booklets

- *Eat Right to Feel Right on Hemodialysis*
- *Kidney Failure: Choosing a Treatment That's Right for You*
- *Kidney Failure Glossary*
- *Treatment Methods for Kidney Failure: Hemodialysis*
- *Treatment Methods for Kidney Failure: Peritoneal Dialysis*
- *Treatment Methods for Kidney Failure: Transplantation*

Fact Sheets

- *Amyloidosis and Kidney Disease*
- *Anemia in Kidney Disease and Dialysis*
- *Financial Help for Treatment of Kidney Failure*
- *Hemodialysis Dose and Adequacy*
- *Kidney Failure: What to Expect*
- *Peritoneal Dialysis Dose and Adequacy*
- *Renal Osteodystrophy*
- *Vascular Access for Hemodialysis*

Learning as much as you can about your treatment will help make you an important member of your health care team.

The NIDDK will develop additional materials for this series as needed. Please address any comments about this series and requests for copies to the National Kidney and Urologic Diseases Information Clearinghouse. Descriptions of the publications in this series are available on the Internet at *www.kidney.niddk.nih.gov/kudiseases/pubs/kidneyfailure/index.htm.*

## National Kidney and Urologic Diseases Information Clearinghouse

3 Information Way
Bethesda, MD 20892–3580
Phone: 1–800–891–5390
Fax: 703–738–4929
Email: nkudic@info.niddk.nih.gov
Internet: www.kidney.niddk.nih.gov

The National Kidney and Urologic Diseases Information Clearinghouse (NKUDIC) is a service of the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK). The NIDDK is part of the National Institutes of Health of the U.S. Department of Health and Human Services. Established in 1987, the Clearinghouse provides information about diseases of the kidneys and urologic system to people with kidney and urologic disorders and to their families, health care professionals, and the public. The NKUDIC answers inquiries, develops and distributes publications, and works closely with professional and patient organizations and Government agencies to coordinate resources about kidney and urologic diseases.

Publications produced by the Clearinghouse are carefully reviewed by both NIDDK scientists and outside experts.

This publication is not copyrighted. The Clearinghouse encourages users of this booklet to duplicate and distribute as many copies as desired.

This booklet is also available at *www.kidney.niddk.nih.gov.*







U.S. Department of Health and Human Services
National Institutes of Health



National Institute of Diabetes and Digestive and Kidney Diseases
NIH Publication No. 07–4666
December 2006

**Michael John Matheron**
**300 Saint Lawrence Drive**
**Silver Spring, Maryland 20901**

August 22, 2008

The Honorable Richard W. Roberts
Associate Justice
U.S. District Court for the District of Columbia
333 Constitution Avenue
N.W. Washington, D.C. 20001

RE: *U.S. v. Matheron* Crim. Case #08-66

Dear Judge Roberts,

This letter is intended to provide you with a testament as to how my behavior has adversely affected many people. Although I will on occasion refer to mitigating circumstances, I, of course, leave it to my counsel, David Lease, to do so formally. This letter is not the vehicle for that. Here I hope to provide you a very personal view of how devastating have been the results of my bad behavior.

Your honor, I have, particularly in the last decade, regularly heard defendants and others state that their behavior was the result of a "mistake." Until my recent failings, I didn't give that commonplace idea too much thought. Now, however, I have done so, rather deeply, and I cannot accept the concept entirely. A "mistake" is believing that the capitol city of Maryland is Oklahoma City. Surely, though, honest "mistake" does mitigate certain behavior, but I now believe not so much as is commonly asserted.

My behavior, however, I believe to be a combination of psychological compulsion and failed moral, spiritual, and, ultimately, legal responsibility. Despite a history of psychological difficulties, there were times when I was aware of my growing reckless behavior that more and more moved towards utterly unacceptable carelessness in my Internet usage. I failed in my responsibility to alert others who would

1

have helped me address and recover from my compulsion to view pornography, in general, and, in particular, its careless escalation into allowing my "filters" to collapse and my viewing to cascade into the virtually uncontrolled and unscreened. The result of this is simply that my remorse is miles wide and miles deep, as it has taught me that my behavior has many utterly innocent victims.

Firstly injured are the direct victims of child pornography, the children who were victimized by those who produced and distributed their images. And one who views those pictures re-victimizes them, whether the children are conscious of it or not, and whether those viewing their images are driven by purposeful behavior or behavior incidental to a psychological illness. My behavior did re-victimize children who had been truly and significantly harmed, and I will make amends in practical ways in the future whenever I can.

Secondly, my behavior harmed my family, my wife, Susan, my stepchildren, Phillip (14) and Jennifer (22), and my biological son, Brian (24). Due to my shame, and my consequent failure to seek spiritual and psychological help for my Internet pornography compulsion, devastating consequences have been visited upon those I love the most. The impact of a spouse, father, or stepfather being investigated and submitting a guilty plea to a charge as publicly onerous as possession of child pornography caused the entire family mental agony, embarrassment and shame.

The consequent need for my unscheduled early retirement from the Library of Congress due to my behavior has destabilized my family's future plans through the loss of significant income. I had hoped to work another six or seven years, and thus my early retirement - "retirement" in name only - incurs both immediate and long-term financial problems. This is yet another way I have hurt Sue and my family by having to forgo the accumulation of significantly more in annuity and other benefits for their comfort and care, and in making it likely impossible for me to find comparable work in the future.

My wife Susan has been dealt an emotional blow that has caused great damage and anxiety. Although she has never once

2

wavered in her love, support, and understanding, my behavior has
precipitated an emotional roller coaster of unknown duration and
destination that has exacerbated her chronic depression, and, I believe,
may have impacted her physical health. In addition, among the seized
items was her work computer that contained many important
documents and databases, including a book she was writing. Although
the Department of Justice did early on return to her certain files of
importance, most of her work-related files were kept from December
2007 until June 2008.

During the search of the family home in December of 2007,
my then 13 year old stepson, Phillip, and stepdaughter Jennifer, then
21, were present. While Phillip and Jennifer have been my staunch
supporters, it is quite obvious that they should not have had to suffer
such an event at any age, but particularly as young as they were. As a
result of the search and seizure which I necessitated Phillip was, for
five months, without his computer, his beloved iPod, and other items
dear to a 13 year old. My 23 year old son, Brian, unfortunately learned
of the charges against me second-hand as a result of an unauthorized
release of sealed information, and this has caused a rift between us that
is as yet unrepaired. He has needed psychological counseling because
of my behavior, and this is a young man who had just begun to find his
way in life with the joyful challenges of his first full time job of
consequence. Other, extended family members have also been
affected, and although they have rallied to assist me, they have been
emotionally distraught.

Thirdly, I have tarnished the reputation of the Library of
Congress where I spent 24 years doing very meaningful legislative
research in the Congressional Research Service. I had the great
privilege of working for this storied institution, and had earned much
respect and many awards for my efforts primarily in disability law and
policy, but also in many other areas. My inability to control my
compulsive behavior at times at the workplace has disrupted the
continuation of my service and that is among my strongest regrets. As
mentioned above, I had hoped to retire in six or seven more years, with
honor, from a world renown public service library, and instead, my
actions caused me to lose almost all contact with career-long

3

colleagues, and caused them understandable consternation - at best –
and distraction from their meaningful work for Congress. The Library
deserved far better from me, had always supported me, and -
admirably, remarkably - in the end, was kind enough to permit me to
retire without undue disgrace.

I have also harmed my country. I have caused the
Department of Justice, and other support agencies, to spend valuable
time, money, and effort investigating and prosecuting my actions. As is
true of most citizens in a free society, even when sometimes
disagreeing with the laws of my county, state, and country, I have
respected and tried to abide by those laws. I taught my children respect
for law, and the principles embedded in all lawful and just systems of
governance. I followed carefully, and taught, the necessary principle of
personal responsibility. My recent behavior involved mental illnesses,
yet, as I've written above, there were times when I was aware that I
needed help, that my viewing of pornography, begun somewhat
"innocently" - if not morally or spiritually so - was becoming reckless
and more and more beyond my control;  careful screening of Internet
content had yielded to opening the floodgates to almost quite literally
everything pornographic. Yet, and this is what I most regret, and where
I believe my true fault lies, at the times I might have stopped myself
through confession to my wife and subsequent discussion with a
spiritual and psychological counselor, I did not assert my usual strong
sense of responsibility due, primarily, to shame;  and ironically, shame
led me to where I am today, utterly buried under a mountain of the
very shame I sought to avoid. That, for the remainder of my life, is a
lesson in irony I will teach to all who will listen.

Also among the victims of my behavior are friends and
neighbors who, at best, I've stunned with my behavior, and, as a result,
have imposed upon their lives something uninvited that taxes their
minds and hearts at times when they too have personal and family
challenges. That they have come to my support, and submitted letters
on my behalf to you, is a testament to their characters and their
capacity for forgiveness and understanding.

4

Early on - and I'm not seeking unearned sympathy here - I fought with the urge to "exit the stage," in disgrace, as a kind of atonement for the pain I caused all the victims of my actions, but my wife Sue and my psychiatrist Dr. Segal pulled me back from the precipice. I know now that my punishment must be endured, and my ultimately hoped for absolution must be earned, in *this* life; I cannot hide, through death, by seeking absolution in the next life. I must face those I've hurt by my reckless conduct, particularly those times when failed personal responsibility went beyond any valid excuse resulting from underlying psychological conditions.

Despite this recent failure, I have always tried and most often succeeded in living a moral life. In this particular area of failure, however, my feelings regarding hardcore pornography, in general, were from the outset negative and were utterly negative about child pornography and, given my difficult upbringing, child mistreatment of any kind whatever. All my "better angels" stood between me and what my compulsions and personal failures caused; as I wrote, I ignored caution flags at times when my sense of responsibility was intact and cogent. This failing is the essence of immoral behavior, and, as it sometimes caused me to carelessly access child pornography, illegal behavior.

One cannot put too fine a point on it: I hope someday to regain my reputation and trustworthiness through redemptive actions, and continued psychiatric and spiritual counseling combined with the already exceptionally noticeable ameliorative effect of anti-anxiety and anti-depression medications that I once fought against but now fully understand are vital to my recovery. I do not expect anyone's forgiveness merely through my verbal or written act of confession. I was raised with a strong sense of religious obligation that one is required to act upon one's failings in ways that directly and positively affect those whom one has injured. For example, I have already spoken candidly to others, and will continue to do so, about my difficulties in order to warn them of the consequences to self and others when one does not seek help for dangerous compulsions. In addition, I will be a meaningful and direct contributor in any way I am permitted to organizations that champion issues of child protection, such as the

5

Children's Defense Fund, and organizations dedicated to helping victims of child pornography or abuse of any kind. In short, I will do whatever I can to make my spoken confession a group of true and realistic acts of contrition.

In closing, I want to give thanks. To my wife Susan, who as Auden wrote in a different context,

> "is my North, my South, me East, and West;
> my working week, my evening's rest;
> my noon, my midnight, my talk, my song . . ."

To my children and family for their loving support – they were literally my safety net. To my attorney, David Lease, who guided me expertly and sensitively through these troubled waters. To my psychiatrist, Dr. Segal, for his wise and sound treatment and encouragement. To my friends who have come to my support with understanding, letters of support, and regular contact. To the Library of Congress for permitting me an exit that did not add to my shame. And finally, to those men and women in the Department of Pretrial Services and the Parole Office who unfailingly treated me with respect and kindness, particularly Officer George Monk and Mr. Michael Penders.

Thank you, your honor, for reading my letter.

Sincerely,

Michael John Matheron